UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

NEAL R. VERFUERTH
5042 Pierce Drive
Manitowoc, Wisconsin 54220

        Plaintiff,

    vs.                              Case No: 14-CV-352

ORION ENERGY SYSTEMS, INC.        **JURY TRIAL DEMANDED**
2210 Woodland Drive
Manitowoc, Wisconsin 54220

        Defendant.

---

## COMPLAINT

---

    COMES NOW the Plaintiff, NEAL R. VERFUERTH, by his counsel, Walcheske & Luzi, LLC, and Nelson, Connell, Conrad, Tallmadge & Slein, S.C., and as and for his claims against the Defendant, alleges and shows to the Court as follows:

### JURISDICTION

    1.    Plaintiff brings this action under the Sarbanes-Oxley Act of 2002, as amended, 18 U.S.C. §1514 *et seq.*, and the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §78 u-6. This Court has jurisdiction pursuant to the following statutes:

    a.    28 U.S.C. §1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, laws or treaties of the United States;

    b.    28 U.S.C. §1367, which gives the district courts supplemental jurisdiction over state law claims that are so related to claims in the action within the court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2.     The unlawful employment practices of which Plaintiff complains occurred in Manitowoc County within the Eastern District of Wisconsin, Green Bay Division, and therefore venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

## PARTIES

3.     Plaintiff, Neal R. Verfuerth, is an adult, male resident of the State of Wisconsin residing in Manitowoc County with a post office address of 5042 Pierce Drive, Manitowoc, Wisconsin 54220.

4.     Defendant, Orion Energy Systems, Inc., is a Wisconsin corporation with a principal office located at 2210 Woodland Drive, Manitowoc, Wisconsin 54220. Defendant's registered agent is National Registered Agents Inc., 901 South Whitney Way, Madison, Wisconsin 53711.

5.     Defendant has been a publicly-traded company since December 17, 2007.

6.     At all times subsequent to becoming a publicly-traded company on December 17, 2007, Defendant has been subject to the Sarbanes-Oxley Act of 2002, as amended, 18 U.S.C. § 1514 *et seq.*

7.     At all times subsequent to becoming a publicly-traded company on December 17, 2007, Defendant has been subject to the Securities Exchange Act of 1934, as amended (the "Exchange Act").

8.     At all times subsequent to becoming a publicly-traded company on December 17, 2007, Defendant has been subject to the rules and regulations of the Securities and Exchange Commission ("SEC").

9.     As a publicly-traded company, Defendant became subject to the Dodd-Frank Wall

Street Reform and Consumer Protection Act, upon that Act's passage in July 2010.

10. At all times subsequent to becoming a publicly-traded company on December 17, 2007, Defendant has been subject to operation, control, and direction by a Board of Directors (hereinafter "the Board" or "Defendant's Board").

11. Each of Defendant's Board members and senior management officers has a fiduciary duty to Defendant and its shareholders. Further, they have a duty to promote integrity, internal controls, effective governance and ethical leadership within the Defendant. These general principles are part of the "Tone at the Top," which was the subject of training and instruction at Defendant.

12. By virtue of their fiduciary and other obligations to Defendant and its shareholders, each of Defendant's Board members is subject to and required to act in accordance with the Exchange Act and SEC rules and regulations.

13. From the date Defendant became a publicly-traded company on December 17, 2007 until his termination from the position on September 27, 2012, Mr. Verfuerth was Chief Executive Officer ("CEO") of Defendant.

14. Pursuant to the Exchange Act, the CEO and Chief Financial Officer ("CFO") of a public corporation, like Defendant, have certain duties and obligations to ensure the corporation's financial reports and disclosures are accurate. Such officers must be assured that receipts and expenditures of the company are being made in accordance with the authorization of management and the directors of the company. Such officers must also provide reasonable assurance that unauthorized acquisition, use or disposition of corporate assets is prevented. The CEO and CFO are also responsible for making sure that all financial reporting of the company is

3

performed in accordance with the Exchange Act, including reasonably detailing and fairly reflecting transactions and dispositions of the assets of the company.

15.     By virtue of their fiduciary and other obligations to Defendant, as Board Members, Defendant's Directors were also subject to and required to act in accordance with the duties and obligations set forth in the Exchange Act.

16.     As CEO of Defendant, and per the Exchange Act, SEC rules and regulations, and Sections 404 and 906 of the Sarbanes-Oxley Act of 2002, as amended, Mr. Verfuerth was held to a high standard as related to, among other things, financial disclosure rules, enforcement of Defendant's Code of Conduct, and taking appropriate action resulting from the reporting up from corporate counsel.

## PERSONS REFERRED TO IN THE COMPLAINT

17.     The following persons are referred to in the Complaint and are identified herein, as follows:

> A.     James Kackley. Kackley is the Chairman of Defendant's Board. He became the Chairman of the Board on August 25, 2010.
>
> B.     Mark Williamson.  Williamson is a member of Defendant's Board.
>
> C.     Michael Potts. Potts is the President of Defendant and a member of Defendant's Board.
>
> D.     John Scribante. Scribante is Defendant's CEO and a member of Defendant's Board.
>
> E.     Scott Jensen.  Jensen is the CFO of Defendant.
>
> F.     Steven Barth.  Barth is a Partner at the law firm of Foley & Lardner LLP ("Foley & Lardner").
>
> G.     Michael Altschaefl.  Altschaefl is a member of Defendant's Board.

4

H.     Paul Kardish.  Defendant hired Kardish on October 25, 2011, as its Vice President – General Counsel and Corporate Secretary.  Kardish is no longer employed at Defendant.

I.      James Prange.  Prange is a former Vice President of Defendant.  Defendant terminated his employment in March 2007.

## THE COMPOSITION OF DEFENDANT'S BOARDS OF DIRECTORS FROM JANUARY 1, 2008 TO SEPTEMBER 1, 2012

18.     Defendant's Board was established in 1996.

19.     Defendant compensates each independent, outside Board member with an annual salary of at least $100,000 per year.

20.     As of January 1, 2008, Defendant's Board consisted of the following individuals: Mr. Verfuerth, Kackley, Potts, Eckhart Grohman, Patrick Trotter, Russell Flaum, Diana Propper, and Thomas Quadracci.  Quadracci served as Chairman of the Board.

21.     As of January 1, 2009, Defendant's Board consisted of: Mr. Verfuerth, Kackley, Potts, Flaum, Quadracci, and Rollie Stephenson.  Quadracci remained Chairman of the Board until October 2009, at which point Mr. Verfuerth became Interim Chairman of the Board.

22.     In or about October 2009, Defendant appointed Barth to the position of Board Secretary.

23.     As of January 1, 2010, Defendant's Board consisted of: Mr. Verfuerth, Kackley, Potts, Quadracci, Stephenson, Altschaefl, and Williamson as Lead Director of the Board.

24.     On or about August 25, 2010, Mr. Verfuerth resigned as Chairman of the Board and Kackley assumed this position.

25.     As of January 1, 2011, Defendant's Board consisted of: Mr. Verfuerth, Kackley as Chairman of the Board, Potts, Quadracci, Williamson, Altschaefl, Elizabeth Rich, and Thomas

5

Schueller.

26.     As of January 1, 2012, Defendant's Board consisted of: Mr. Verfuerth, Kackley as Chairman of the Board, Potts, Williamson, Altschaefl, Rich, Schueller, and Tryg Jacobson.

27.     The composition of Defendant's Board did not change between January 1, 2012 and September 1, 2012.

## DEFENDANT'S POLICIES AND GUIDELINES

28.     Defendant adopted "Corporate Governance Guidelines" on August 29, 2007.

29.     According to Defendant's Corporate Governance Guidelines, the responsibilities of Defendant's Board include, but are not limited to, "[s]electing, evaluating and compensating" Defendant's Chief Executive Officer ("CEO") and senior management, "overseeing CEO succession planning," and "[a]ssessing…risks facing the Company and reviewing options for their mitigation."

30.     Defendant's Corporate Governance Guidelines state in part:

> Anyone who has a concern about the Company's conduct…may communicate that concern directly to the Audit and Finance Committee…The Company's Code of Conduct…prohibits any director, officer or employee from taking retribution against any director, officer or employee who provides information or assists in an investigation concerning an event that person reasonably believed constituted a violation of the Code of Conduct.

31.     Defendant's Corporate Governance Guidelines state in part:

> The Compensation Committee is responsible for evaluating the CEO's performance on an annual basis, reviewing its actions with the Board, and making recommendations to the Board concerning annual and long-term performance goals for the CEO…The Compensation Committee will take this evaluation into account when setting the CEO's incentive and equity compensation.

32.     Defendant's Corporate Governance Guidelines state in part:

6

> If the Board determines that an executive officer has engaged in conduct detrimental to the Company, the Board may take a range of actions to remedy the conduct, prevent its recurrence, and impose such discipline as would be appropriate. Discipline would vary depending on the facts and circumstances, and may include, without limit, (1) termination of employment, (2) initiating an action for breach of fiduciary duty, and (3) if the conduct resulted in a material inaccuracy in the Company's financial statements or performance metrics, which affect the executive officer's compensation, seeking reimbursement of any portion of performance-based or incentive compensation paid or awarded to the executive that is greater than would have been paid or awarded if calculated based on the accurate financial statements or performance metrics; provided that if the Board determines than an executive engaged in fraudulent misconduct it will seek such reimbursement.

33.     Defendant's Corporate Governance Guidelines apply to each of Defendant's Board members, as well as senior management officers of Defendant.

34.     Defendant's Board and senior management officers are responsible for enforcing Defendant's Corporate Governance Guidelines.

35.     SEC and New York Stock Exchange rules and regulations require that Defendant maintain and vigorously enforce a code of ethics.

36.     Pursuant to the SEC's requirement that Defendant maintain a code of ethics, Defendant adopted a "Code of Conduct" on June 27, 2007, which it subsequently amended on April 29, 2009 and January 25, 2012.

37.     Defendant's Code of Conduct as amended on January 25, 2012, states in part:

> All Directors, officers and employees of the Company are charged with the responsibility to comply with this Code of Conduct…violations of this Code of Conduct should be reported promptly pursuant to the Company's Whistleblower Policy…Anyone who does not choose to adhere to this Code of Conduct or who impedes adherence by others should remove herself or himself from the Company voluntarily or he or she will be subject to discipline, up to and including discharge, as mentioned above.

7

> No retribution will be taken against a Director, officer or employee
> for providing information or assisting in an investigation that person
> reasonably believed constituted a violation of this Code of Conduct.

38.     Defendant's Code of Conduct applies to each of Defendant's Board members, as well as senior management officers of Defendant.

39.     Defendant's Board and senior management officers are responsible for enforcing Defendant's Code of Conduct.

40.     As of January 1, 2012, Defendant maintained a "Whistleblower Policy."

41.     Defendant's Whistleblower Policy states in part:

> The Company will not discharge, demote, suspend, threaten, harass
> or in any other manner discriminate or retaliate against any
> employee of the Company for submitting a good faith complaint or
> concern or otherwise take, or cause to be taken, any action in
> connection with any such submission in violation of applicable
> law.

## MR. VERFUERTH'S POSITIONS WITH AND EMPLOYMENT AT DEFENDANT

42.     Mr. Verfuerth founded Defendant in or about April 1996.

43.     Mr. Verfuerth held the position of Vice-President of Defendant from approximately 1996 until 1998.

44.     In or about 1998, Defendant named Mr. Verfuerth President of and a Director at Defendant.

45.     In or about 2005, Defendant named Mr. Verfuerth President and CEO of Defendant.

46.     In his positions as President and CEO at Defendant, Mr. Verfuerth was considered an employee of Defendant.

47.     Mr. Verfuerth was President of Defendant from approximately 1998 until in or about

8

July 2009, at which time Kackley became President.

48.     Subsequent to Kackley becoming President in or about July 2009, and as CEO of Defendant, Mr. Verfuerth did not have any day-to-day management responsibilities at Defendant.

49.     Subsequent to Kackley becoming President in or about July 2009, and as CEO of Defendant, Mr. Verfuerth did not have any direct reports.

50.     Mr. Verfuerth was CEO of Defendant from approximately the year 2005 until his termination from that position on September 27, 2012.

51.     As an employee of Defendant (while President and/or CEO), Mr. Verfuerth could serve on Defendant's Board, but could not serve as a member of any Board committees.

52.     As President and/or CEO of Defendant, Mr. Verfuerth did not exercise any superseding or superior authority or power over Defendant's Board as compared to any other members of the Board.

53.     As President and/or CEO of Defendant, Defendant's Board exercised supervisory authority and power over Mr. Verfuerth.

54.     Mr. Verfuerth resigned from his position as a member of Defendant's Board on November 27, 2012.

55.     At various times throughout its existence, Mr. Verfuerth owned more of Defendant's stock than any other individual.  As of February 1, 2012, Mr. Verfuerth owned 9.6% of Defendant's Common Stock.

56.     At all times during his employment, Mr. Verfuerth did all he could do to further the success of Defendant.  As a result of the time and effort he put into the founding, development and management of Defendant, and because of his ownership interest in Defendant, Mr. Verfuerth had a

9

vested and personal interest in Defendant's proper management and success.

## MR. VERFUERTH'S EMPLOYMENT AGREEMENT

57.     Mr. Verfuerth's employment at Defendant was subject to and controlled by an Executive Employment and Severance Agreement.  His relationship with Defendant was also subject to other agreements, including regarding intellectual property and stock options.

58.     As of September 27, 2012, Mr. Verfuerth's employment at Defendant was subject to a purported Executive Employment and Severance Agreement dated April 14, 2008 and ostensibly electronically signed by Mr. Verfuerth ("Employment Agreement").

59.     As of September 27, 2012, Mr. Verfuerth was CEO of Defendant, although the Employment Agreement referred to his position as "President and Chief Executive Officer."

60.     The Employment Agreement was tied specifically to Mr. Verfuerth's continued employment as CEO at Defendant: "3. **Employment of Executive**…(i) Executive shall serve in the position set forth above [CEO] in a full-time capacity."

61.     Upon information and belief, in accordance with the Employment Agreement, Defendant's termination of Mr. Verfuerth as CEO constituted a termination of the Employment Agreement.

62.     Mr. Verfuerth's Employment Agreement stated in part that Mr. Verfuerth's employment as CEO and thus, the Agreement itself, could be terminated for "with or without Cause" or by "Good Reason."

63.     Mr. Verfuerth's Employment Agreement defined "cause" as the occurrence of one of six different events that were listed in the Employment Agreement.

64.     Mr. Verfuerth's Employment Agreement defined "good reason" as the occurrence of

10

certain events without Mr. Verfuerth's consent, including but not limited to: "(ii) a material diminution in the Executive's authority, duties or responsibilities; … (iv) a material diminution in the budget of which the Executive retains authority; … or (vi) a material breach by Orion of any provisions of this agreement or any option agreement with the Company to which the Executive is a party

65.     Mr. Verfuerth's Employment Agreement stated that he would be entitled to accrued and severance benefits if he terminated the Agreement for "good reason" or if Defendant terminated the Agreement "without cause."   Mr. Verfuerth's Employment Agreement also stated that if Defendant terminated the Agreement for "cause," Mr. Verfuerth might not be entitled to severance benefits.

66.     According to Mr. Verfuerth's Employment Agreement, in the event his employment was terminated for "good reason" or without "cause," Mr. Verfuerth was entitled to a lump sum severance benefit equal to two times his annual salary, or three times his annual salary, depending on the circumstances.  In addition, he would be entitled to the average of the prior three years' bonuses, plus a pro rata bonus for the year of termination, as well as COBRA premiums for the duration of his COBRA continuation coverage period, in addition to any and all accrued benefits through his termination date.

## MR. VERFUERTH'S DIVORCE

67.     Pursuant to Wis. Stats. § 180.1142(2), "A person's beneficial ownership of at least 10% of the voting power of a corporation's outstanding voting stock creates a presumption that a person has control of the corporation."

68.     Mr. Verfuerth and his now ex-wife, Patricia Verfuerth, were involved in the

11

founding and managing of Defendant in its early years. While still married and jointly involved in the management of Defendant, Mr. Verfuerth and Patricia Verfuerth were beneficial owners of control shares of Defendant's stock. Upon information and belief, those shares were subject to restrictions imposed by SEC Rule 144.

69.    Upon and information and belief, when Mr. Verfuerth and Patricia Verfuerth were married, their beneficial ownership of Defendant's stock exceeded 10%.

70.    In or about 2009, Mr. Verfuerth filed for divorce from Patricia Verfuerth.

71.    In or about March 2011, Linda Balisle of Balisle and Robertson, S.C., became counsel for Mr. Verfuerth in connection with his divorce from his then-current wife.

72.    Carl Kugler, Partner at Foley & Lardner, Defendant's outside counsel, recommended Balisle to Mr. Verfuerth as a replacement for his then-current attorney, Lee Kummer.

73.    During Mr. Verfuerth's divorce proceedings, and at other times, Barth provided personal, legal advice to Mr. Verfuerth.

74.    Effective on or about January 30, 2012, the Compensation Committee of Defendant's Board passed a Unanimous Written Consent Action (the "Consent Action"), through which Defendant agreed to pay Mr. Verfuerth cash bonuses to cover any and all legal fees, disbursements, and/or other out-of-pocket costs Mr. Verfuerth incurred in connection with his divorce.

75.    The Compensation Committee did not make Mr. Verfuerth aware of the Consent Action at the time it became effective on or about January 30, 2012.

76.    Mr. Verfuerth first became aware of the Consent Action in or about late July or early August, 2012.

77.     Upon information and belief, and as outlined in an email from Barth to Mr. Verfuerth, Barth recommended the creation and passage of the Consent Action to the Compensation Committee.

78.     The Consent Action was apparently approved by the Compensation Committee in response to the Board's desire to not have Mr. Verfuerth sell or borrow against his shares of Defendant's stock to cover his legal costs associated with his divorce.

79.     The Consent Action did not call for or include any resolutions regarding Mr. Verfuerth repaying the monies expended by Defendant in connection with Mr. Verfuerth's divorce.

80.     The Consent Action did not authorize Defendant to withhold wages from Mr. Verfuerth as a repayment for the monies expended by Defendant in connection with Mr. Verfuerth's divorce.

81.     The Consent Action had no limits on the amount of costs Mr. Verfuerth could submit for inclusion within the operation of the Consent Action.

82.     The Consent Action had no time limits or deadlines regarding when the covered costs could be incurred.

83.     As part of Mr. Verfuerth's divorce proceedings, Foley & Lardner recommended, paid for, and participated in an evaluation of the value of Mr. Verfuerth's shares of Defendant's stock.  Foley & Lardner subsequently billed Defendant for its work and outside evaluation.

84.     To conclude Mr. Verfuerth's divorce proceedings, Mr. Verfuerth agreed to make 144 fixed monthly payments to Patricia Verfuerth totaling in excess of two million dollars.

85.     Defendant's Board and its outside counsel, Foley & Lardner, specifically Barth, was aware of Mr. Verfuerth's divorce proceedings and the resulting obligation that he make non-

13

dischargeable monthly payments to Patricia Verfuerth.

86.     Defendant's Board encouraged Mr. Verfuerth to enter into a divorce agreement that required him to make monthly payments to Patricia Verfuerth.

87.     Mr. Verfuerth entered into the divorce agreement as encouraged by Defendant's Board with the expectation of continued employment at Defendant.

88.     Mr. Verfuerth would not have been able to enter into the divorce agreement as it was constructed if his continued employment was in any way in jeopardy at Defendant.

89.     On or about July 9, 2012, Mr. Verfuerth's divorce was finalized.  At that time he was unaware of the Consent Action.

90.     In or about late July or early August Scott Jensen, Defendant's Chief Financial Officer, first informed Mr. Verfuerth of the Consent Action.  After he became aware of the Consent Action in or about late July or early August 2012, Mr. Verfuerth provided invoices he had received from his divorce attorney to Defendant.

91.     Subsequently, Mr. Jensen provided Mr. Verfuerth with a letter dated August 3, 2012 related to the Consent Action and Respondent's payment for the legal fees, disbursements, and/or other out-of-pocket costs he incurred with his divorce ("Jensen's August 3, 2012 letter").

92.     Jensen's August 3, 2012 letter stated in part:

> I have audited the expenses and agree with the total cost submitted of $170,418.22.  As documented and approved, the Company will cover all out-of-pocket costs, including taxes, and will gross-up the amount at the marginal ordinary income levels…The gross-up of this reimbursement will result in 2012 taxable W-2 income of $305,409.00 and will be processed with the August 15, 2012 payroll.

93.     Pursuant to the Consent Action, Defendant issued one check to Mr. Verfuerth as a cash bonus that was taxed as payroll, "grossed-up" for tax purposes, and reported as income to Mr.

14

Verfuerth on his year-end W-2 as issued by Defendant.

**EVENTS GIVING RISE TO MR. VERFUERTH'S CONCERNS WITH THE
CONDUCT OF DEFENDANT'S BOARD AND THE CONDUCT OF
DEFENDANT'S OUTSIDE COUNSEL**

**The February 6, 2008 After-Hours Communications**

94.     At all times material hereto, Foley & Lardner was retained as Defendant's outside legal counsel.  For many years Foley attorney Barth managed the Defendant's account for Foley. For many years Barth also served as the Secretary of the Defendant's Board of Directors.

95.     In or about July 2007, Defendant announced its intention to become a publicly traded company and conduct an initial public offering ("IPO").

96.     On December 17, 2007, Defendant had its IPO.

97.     After the close of business on February 6, 2008, upon information and belief, a communication went out to the public that contained negative allegations about the Defendant, and provided negative information about the Defendant ("the after-hours communication").

98.     Among other things, the after-hours communication resulted in significant after-hours trading of approximately 4.7 million shares, which caused Defendant's stock to drop from $14.90 per share on February 6, 2008, to a low of $6.39 on February 7, 2008, before closing at $8.51. It additionally resulted in a shareholder lawsuit against Defendant.

99.     In response to the after-hours communication and the drop in stock price, Mr. Verfuerth requested that Foley & Lardner conduct an investigation into the after-hours communication because he suspected stock manipulation.

100.     Foley & Lardner represented to Mr. Verfuerth that it conducted an investigation; however, no explanation was ever offered for the after-hours communication and/or suspected stock

15

manipulation.

## The Wisconsin Energy Employment Act

101.    On May 19, 2010, James Doyle, then-Wisconsin Governor, signed the Wisconsin Energy Employment Act ("WEEA"), or 2009 Wisconsin Act 406, amending Wisconsin's Renewable Portfolio Standard (the "Renewable Portfolio Standard") to include technologies such as Defendant's "Apollo solar light pipes."

102.    Defendant anticipated that passage of the WEEA and the inclusion of Defendant's "Apollo solar light pipes" in the Renewable Portfolio Standard would be a driver for exponential growth for Defendant, Defendant's profits, and Defendant's share price.

103.    Prior to the WEEA's enactment, and in connection with Defendant's efforts to ensure passage of the WEEA and the inclusion of Defendant's "Apollo solar light pipes" in the Renewable Portfolio Standard, Defendant launched a major, company-wide initiative that included, but was not limited to, the hiring of lobbyists and the hiring of Kevin Crawford as Defendant's Vice President of Governmental Affairs.

104.    Prior to the WEEA's enactment, Defendant invested several years and considerable financial resources, and Mr. Verfuerth and Crawford personally worked closely with Governor Doyle, to ensure passage of the WEEA and the inclusion of Defendant's "Apollo solar light pipes" in the Renewable Portfolio Standard.

105.    On or about May 19, 2010, and prior to signing the WEEA, Governor Doyle called Mr. Verfuerth and told him that he was considering not signing the WEEA because "at the last minute," another company, Alliance Federated Energy ("AFE"), was "riding [Defendant's] coattails" and "snuck" its technology into the legislation as well.   Governor Doyle told Mr.

16

Verfuerth that AFE's technology bore the name "Project Apollo." Governor Doyle further told Mr. Verfuerth that he was "extremely upset" with AFE's last minute attempts to "sneak" into the legislation because its "trash burning" incinerator was neither renewable nor clean.

106.    The inclusion of AFE's "Project Apollo" into the WEEA meant that if the Act passed, AFE's technology would also be characterized as a renewable energy source under the Renewable Portfolio Standard.

107.    In relation to Defendant's "Apollo solar light pipes" and their inclusion in the anticipated Renewable Portfolio Standard, Williamson called Potts and urged him to hire Bryan Brooks as a lobbyist.

108.    Based on Williamson's recommendation, Defendant hired Brooks as a lobbyist in connection with its efforts to ensure passage of the WEEA and the inclusion of Defendant's "Apollo solar light pipes" in the Renewable Portfolio Standard.

109.    Potts hired Brooks as a lobbyist for Defendant without Board approval.

110.    Subsequent to Governor Doyle's signing of the WEEA, Mr. Verfuerth learned that Brooks also represented AFE and its "Project Apollo" at the time that Defendant hired him as a lobbyist for its "Apollo solar light pipes."

111.    Prior to Governor Doyle's signing of the WEEA, Foley & Lardner represented Defendant regarding its intellectual property related to Defendant's "Apollo solar light pipes."

112.    Subsequent to Governor Doyle's signing of the WEEA, Mr. Verfuerth received information that caused him to believe that Foley & Lardner may have represented AFE and its "Project Apollo" technology at the same time that Foley & Lardner was representing Defendant and its "Apollo solar light pipes" prior to Governor Doyle's signing of the WEEA.

17

113.    After enactment of the WEEA, Defendant's "Apollo solar light pipes" were included as part of the legislation; however, the funds made available through the Renewable Portfolio Standard were allocated to AFE's "Project Apollo" and an incinerator project at Domtar Corporation's site in Rothschild, Wisconsin.

114.    Upon information and belief, Foley & Lardner represented Domtar Corporation with respect to its inclusion in and receipt of funds through the Renewable Portfolio Standard.

115.    Upon information and belief, Williamson's conduct in having Defendant hire a conflicted lobbyist and Foley & Lardner's competing representation of two companies who were included in and received funds through the Renewable Portfolio Standard caused significant harm to Defendant and Defendant's shareholders.

116.    Prior to enactment of the WEEA, comprehensive studies estimated that installation of Defendant's "Apollo solar light pipes" would exceed one million man hours.  Based on these estimates, Defendant's financial benefit from its inclusion in and receipt of funds through the Renewable Portfolio Standard could have resulted in millions of dollars in additional and incremental sales for the Defendant.

117.    Prior to enactment of the WEEA, the projected benefit to shareholders of the inclusion of Defendant's "Apollo solar light pipes" into the Renewable Portfolio Standard was a significant increase in Defendant's stock price due to increased sales in Wisconsin and nationally.

**Termination of Employment, and Litigation Regarding, James Prange**

118.    In March 2007, Defendant terminated the employment of one of its Vice Presidents, James Prange.  The details and implementation of the Prange termination were handled by attorneys from Foley & Lardner.

18

119. On or about June 4, 2010, Barth authored an email to a third party which contained alleged defamatory comments about Prange. Although authored by Barth, the email was actually sent by Williamson on that date.

120. In April 2012, Prange sued Defendant alleging, among other things, that Foley & Lardner had not followed Defendant's rules and procedures regarding the Prange termination.

121. At least by August 1, 2012, Verfuerth, Potts and Jensen became aware of the Barth email, and became aware that the email formed the basis for a defamation cause of action filed by Prange against Defendant, Williamson and Potts.

122. At least by August 1, 2012, Mr. Verfuerth became aware that the manner in which Foley & Lardner handled the Prange termination in 2007, along with the Barth email from 2010, were significant issues in the Prange litigation. Defendant paid significant legal fees to Foley & Lardner to defend Defendant in the Prange litigation. Many of Foley & Lardner's legal fees were necessitated by the conduct of Foley & Lardner and how it handled Prange.

123. The issues surrounding Foley & Lardner's work on the Prange matter were brought to the attention of Defendant's Board at least by the end of August, 2012.

**Defendant's "Intelite Control System"**

124. In or about May 2012, Sheena Conners, then-in-house patent attorney at Defendant, informed Mr. Verfuerth that Defendant's "Intelite Control System," a core product of Defendant, was not proprietary to it. Specifically, she informed Mr. Verfuerth that Digital Lumens, Inc. ("Digital Lumens") had already received one or more patents for its technology called the "LightRules Management System."

125. In May 2012, and at the time that she informed Mr. Verfuerth of Digital Lumens'

Case 1:14-cv-00352-WCG   Filed 03/27/14   Page 19 of 96   Document 1

patent(s), Conners told Mr. Verfuerth that the Digital Lumens' patent filing would "likely compromise the validity of Orion's patents for Intelite," or words to that effect.

126. Digital Lumens' "LightRules Management System" was similar to Defendant's "Intelite Control System."

127. Foley & Lardner filed patents for and on behalf of Defendant related to its "Intelite Control System."

128. From approximately the time of Defendant's IPO in December 2007, Mr. Verfuerth had touted Defendant's "Intelite Control System" to current and prospective customers and investors of Defendant as proprietary technology based on representations made to him by Foley & Lardner that Defendant's patents were filed and that the technology was protected and proprietary to Defendant.

129. Based on representations made to Defendant by Foley & Lardner that its "Intelite Control System" was proprietary to Defendant, Defendant represented the proprietary nature of same in SEC documents filed in connection with Defendant's IPO in December 2007, as well as in subsequent 10-K filings.

130. Upon information and belief, as represented on the Foley & Lardner website, attorneys at Foley & Lardner prepared and filed the patents for the "LightRules Management System" on behalf of Digital Lumens.

131. At the time Defendant first filed its patents for the "Intelite Control System," Mr. Verfuerth asked Paul S. Hunter, Partner at Foley & Lardner, to use the fast-track process.

132. Foley & Lardner used the fast-track process to process Digital Lumens' patents related to its "LightRules Management System."

20

133.     Foley & Lardner did not use the fast-track process to process Defendant's patents related to its "Intelite Control System."

134.     Upon information and belief, Defendant's patents related to its "Intelite Control System" were filed before Digital Lumens' patents were filed related to its "LightRules Management System."

135.     Upon information and belief, although Defendant's patents were filed first, Digital Lumens was able to get its technology patented before Defendant via the fast-track process.

136.     In or about July 2012, Mr. Verfuerth learned that EmbedTek, LLC ("EmbedTek") also received a provisional patent on technology identical to Defendant's "Intelite Control System."

137.     At the time EmbedTek filed a patent on technology identical to Defendant's "Intelite Control System," EmbedTek was the software developer, technical collaborator and adviser, and contract manufacturer for Defendant's "Intelite Control System" product line.

138.     In or about July 2012, Kent Tabor, President of EmbedTek, told Mr. Verfuerth that Potts had told him (Tabor) that Defendant did not want to file a patent on the "Intelite Control System" so EmbedTek filed it instead.

## FACTUAL ALLEGATIONS

**In the Summer of 2012, Mr. Verfuerth Investigates and Reports to Defendant's Board Numerous Issues with Members of Defendant's Board and Defendant's Outside Counsel**

139.     On October 25, 2011, Defendant hired Kardish as its Vice President – General Counsel and Corporate Secretary.

140.     Prior to being employed by Defendant, Kardish had been employed as an attorney at law firms and other large corporations.   He was also employed by the Federal Bureau of Investigation for seven years as a Field Agent.

21

141.     Mr. Verfuerth had Kardish conduct investigations into various aspects of Defendant. Said investigations were conducted on behalf of and in concert with Mr. Verfuerth, pursuant to his legal and ethical obligations.

142.     For instance, in or about early-July 2012, Mr. Verfuerth instructed Kardish to review Foley & Lardner's invoices for legal services Foley rendered to Defendant.

143.     Mr. Verfuerth instructed Kardish to review Foley & Lardner's invoices to Defendant in or about early-July 2012 out of concern that Foley & Lardner was overcharging Defendant while providing substandard work product, resulting in lost money for Defendant and ultimately adversely affecting Defendant's shareholders.

144.     In or about early-July 2012, Kardish reviewed Foley & Lardner's invoices for legal services rendered to Defendant as instructed by Mr. Verfuerth.

145.     Kardish's review of Foley & Lardner's invoices revealed that Foley & Lardner was billing Defendant for legal services that were not a part of its fee agreement with Defendant and that this had been occurring for at least several months. Kardish reported these findings to Mr. Verfuerth.

146.     On July 20, 2012, Mr. Verfuerth participated in a teleconference with Kackley, Williamson, Potts, and Kardish (the "July 20, 2012 teleconference").

147.     During the July 20, 2012 teleconference, Kardish discussed his findings as a result of his review of Foley & Lardner's invoices for legal services rendered to Defendant.

148.     During the July 20, 2012 teleconference, Mr. Verfuerth expressed his concerns with Foley & Lardner's "inappropriate" billing and "substandard" work product.

149.     During the July 20, 2012 teleconference, Mr. Verfuerth expressed his concerns with

22

Defendant's potential liability relating to statements to shareholders and potential investors that Defendant's "Intelite Control System" was proprietary technology, as represented to him by Foley & Lardner.

150.     During the July 20, 2012 teleconference, Mr. Verfuerth expressed his concern that Defendant may have to make a financial restatement to the SEC, relating to statements to shareholders and potential investors that Defendant's "Intelite Control System" was proprietary technology, as represented to him by Foley & Lardner.

151.     Upon information and belief, on July 24, 2012, and in relation to Kardish's findings as a result of his review of Foley & Lardner's invoices for legal services rendered to Defendant, Williamson told Kardish in Kardish's office that he (Williamson) had saved him (Kardish) from being fired and that Kardish needed to work on his relationship with Barth.

152.     During the summer of 2012, members of the Board of Directors considered a program to have Defendant buy back some of its stock.  Any shares purchased by Defendant would tend to increase Mr. Verfuerth's percentage of ownership of outstanding stock.

153.     Upon information and belief, Kackley, Barth, Williamson, and others opposed any plan that might increase Mr. Verfuerth's ownership, and his controlling position in Defendant.

154.     On July 25, 2012, Defendant held a Board of Directors meeting (the "July 25, 2012 Board meeting").

155.     Prior to the July 25, 2012 Board meeting, Mr. Verfuerth received a sex discrimination and/or harassment complaint from Scott Gilson, Vice President of Human Resources, which was brought to Gilson's attention by one of his female subordinates in Human Resources.  In response, Mr. Verfuerth had Kardish conduct an investigation.

23

156.     Through Kardish's investigation of the sex discrimination and/or harassment complaint relating to Scribante, Kardish learned and subsequently reported to Mr. Verfuerth that during an interview process involving Scribante and a female subordinate, Scribante became frustrated with the candidates that were selected for interview and, when asked by the female subordinate what he was looking for, he called in another female employee of Defendant, had her stand before them, and told the female subordinate that she was what he was looking for.

157.     Through Kardish's investigation of the sex discrimination and/or harassment complaint relating to Scribante, Kardish learned and subsequently reported to Mr. Verfuerth that, upon information and belief, one of Defendant's female employees who reported to Scribante dyed her hair in order to be "one of John's girls" or words to that effect.

158.     Prior to the July 25, 2012 Board meeting, Mr. Verfuerth received multiple complaints regarding Scribante's non-participation in meetings and poor customer service.

159.     During the July 25, 2012 Board meeting, Mr. Verfuerth informed the Board that: (1) Scribante had not been participating in meetings or returning customer calls, including last-minute cancellations or complete no-shows with several major accounts; (2) Scribante likely engaged in actionable sexual harassment and employment discrimination that put Defendant at risk for liability; and (3) Scribante had approached Scott Jensen, Defendant's Chief Financial Officer, with a $300,000 rebate kickback scheme to a developer Defendant was already working with to ensure that Defendant would be awarded its next deal.

160.     In addition to his more recent findings as shared with the Board during the July 25, 2012 Board meeting, in or about 2011, Mr. Verfuerth received information that Scribante had reportedly started a second company that appeared to be in competition with Defendant.  At that

24

time, Mr. Verfuerth reported this information to Kackley and Barth.

161.    During the July 25, 2012 Board meeting, Mr. Verfuerth recommended to the Board that Scribante immediately be removed from Defendant's CEO succession list and that he further be removed from his position as President of Orion Engineered Systems.

162.    Defendant did not remove Scribante from its CEO succession list or remove him as President of Orion Engineered Systems during or after the July 25, 2012 Board meeting.

163.    The Compensation Committee of Defendant's Board was to hold its meeting on July 25, 2012.

164.    Barth emailed Mr. Verfuerth at 10:45 p.m. on July 24, 2012, indicating that the Compensation Committee of Defendant's Board already held an unsanctioned meeting at a local bar/restaurant.

165.    After the July 25, 2012 Board meeting, Mr. Verfuerth learned that not all members of the Compensation Committee were present at its July 24, 2012 unsanctioned meeting.

166.    After the July 25, 2012 Board meeting, Mr. Verfuerth learned that the members of the Compensation Committee who participated in the unsanctioned meeting on July 24, 2012 at a local bar/restaurant discussed Defendant's confidential business matters, including, but not limited to extending Patricia Verfuerth's stock options, "say on pay," and Defendant's upcoming proxy statement and shareholders meeting, in the presence of the public and while drinking alcohol.

167.    After the July 25, 2012 Board meeting, and in relation to the Compensation Committee's unsanctioned meeting on July 24, 2012, Mr. Verfuerth learned that Barth may have altered the Committee's meeting minutes to conceal its inappropriate, unsanctioned, and unethical conduct on July 24, 2012.

25

168.    On August 1, 2012, Kardish, Potts, and Jensen met with Mr. Verfuerth (the "August 1, 2012 meeting").

169.    During the August 1, 2012 meeting, Kardish informed Mr. Verfuerth that: (1) Barth had authored an email dated June 4, 2010 to Lon Frederick, President of Frederick & Company, Inc., an investor in Defendant, that Jim Prange, former Vice President of Business Development at Defendant, eventually obtained; (2) although authored by Barth, the June 4, 2010 email was sent to Frederick by Williamson; (3) Barth's June 4, 2010 email to Frederick referred to Prange as having "serious and potentially dangerous psychological issues"; (4) Barth's June 4, 2010 email formed the basis for a defamation cause of action filed by Prange against Defendant, Mr. Verfuerth, Williamson, and Potts; and (5) Barth's conduct resulted in Defendant paying significant legal fees to Foley & Lardner, adversely affecting Defendant's financial performance, as well as entering into a significant financial settlement.

170.    During the August 1, 2012 meeting, Mr. Verfuerth and Kardish discussed their concerns with Foley & Lardner's unethical billing of Defendant.

171.    On August 2, 2012, Kackley received an email from Mr. Verfuerth stating in part:

> (I just found out today that Barth drafted the 'smoking gun' e-mail Williamson sent to Lon Frederick)…And last but not least, the recent conduct of our board members and outside counsel…."Frat Party" binge drinking at the local establishment. Conducting company business, while at the bar to include a late night e-mail documenting the activity. Stopping for morning Bloody[] Mary's en route to BOD meeting. Participating in the meeting while likely impaired. Sharing all or parts of what I believed to be a confidential conversation among fellow Board members. Championing a service provider who clearly has been doing substandard work while charging excessive fees. Seems to me as a major shareholder, that I have every right to expect the board to honor their Fiduciary Responsibilities, Duty of Loyalty, and let's not forget one of our former member[']s crusades for 'Duty of Care' compliance. As the compan[y's] CEO, I expect

26

and demand all members of this organization including our Board members to maintain the highest ethical standards, treat their position with the respect it deserves.

172. On August 2, 2012, Kackley emailed Mr. Verfuerth apologizing for the Compensation Committee's conduct.

173. On August 7, 2012, the SEC issued a subpoena to Defendant.

174. On August 10, 2012, Kardish and Potts received an email from Mr. Verfuerth stating in part and in regard to the SEC subpoena: "I want to use this investigation as an entrée into the SEC in the hopes of getting some traction with the real violations we feel occurred going back to the 1st qtr earnings call in 08." Mr. Verfuerth was referring to the after-hours communication and potential stock manipulation from February 6, 2008.

175. On August 10, 2012, Mr. Verfuerth instructed Kardish to speak and arrange for a meeting with Scott Tandy, the SEC attorney who issued the subpoena to Defendant on August 7, 2012.

176. On August 10, 2012, Kardish spoke with Tandy.

177. On August 10, 2012 and in response to Kardish speaking with Tandy, Barth contacted Kardish and questioned his actions in contacting the SEC.

178. On August 10, 2012, Williamson contacted Kardish and questioned why he had contacted Tandy.

179. On August 11, 2012, Kardish informed Mr. Verfuerth that he consulted with an attorney at Michael Best & Friedrich LLP regarding the SEC subpoena.

180. On August 11, 2012, Barth emailed Kardish stating that he wished to handle the SEC subpoena matter, along with another Partner at Foley & Lardner.

27

181.    In response to Barth's August 11, 2012 email stating that he wished to handle the SEC subpoena matter, Mr. Verfuerth met with Kardish, Potts, and Jensen ("the August 11, 2012 meeting").

182.    During the August 11, 2012 meeting, Mr. Verfuerth discussed what he believed to be a conflict of interest for Foley & Lardner to handle the SEC subpoena matter, as well as Foley & Lardner's inappropriate and excessive billing of Defendant.

183.    Upon information and belief, Elizabeth Rich, an attorney and member of Defendant's Board, also believed that Foley & Lardner had a conflict of interest regarding the SEC subpoena matter.

184.    On August 14, 2012, and via email, Mr. Verfuerth instructed Kardish to email Kackley regarding his concerns over Foley & Lardner handling the SEC matter and to provide Kackley with information regarding Foley & Lardner's "'unsustainable' legal costs."

185.    On August 14, 2012, and in response to the email Mr. Verfuerth had Kardish send Kackley, Kardish emailed Mr. Verfuerth: "Spoke to Jim [Kackley]. He indicated a lot of unhappiness and concern with me. Said I was driving a wedge between the board and management."

186.    On August 14, 2012, Barth emailed Mr. Verfuerth telling him it was "unfortunate" that Mr. Verfuerth did not return a telephone call to Barth and, further, that he (Barth) was "concerned" with Defendant's use of a law firm other than Foley & Lardner for the handling of and responding to the SEC subpoena matter.

187.    On August 15, 2012, Barth received an email from Mr. Verfuerth stating in part:

> [W]e have paid Foley fees of $7.8 MILLION!!! I refuse to add this
> situation to the long list of (non securities) high cost/low value work

product…I can remember many years ago, a meeting room at your offices filled with lawyers, investment bankers. There was a lengthy discussion surrounding the 'Risk Factors' that I felt needed to be disclosed in the S 1 document. After considerable thought I stated the only thing I saw as a 'REAL' risk factor [was] Lousy/inconsistent/high priced advice from our legal and accounting professional services providers.

188. On August 24, 2012, the members of Defendant's Board received an email from Mr. Verfuerth informing them that Foley & Lardner filed an incorrect version of Defendant's 8-K with the SEC. Foley & Lardner filed Barth's draft Form 8-K from earlier that week, rather than the revised, finalized version of the document that Kardish had instructed Foley & Lardner to file ("the improperly-filed 8-K").

189. Defendant was unable to rescind the improperly-filed 8-K.

190. The improperly-filed 8-K suggested great uncertainty regarding the potential impact of the SEC subpoena on Defendant, which was not expressed in the Form 8-K that Defendant had approved for filing. Specifically, the improperly-filed 8-K stated in part:

> The Company is unable to predict what action, if any, might be taken in the future by the SEC as a result of the matters that are the subject of the subpoena or what impact, if any, the cost of responding to the subpoena might have on the Company's financial position, results of operations or cash flows.

191. Upon information and belief, the improperly-filed 8-K resulted in fear and uncertainty in Defendant's shareholders.

192. Upon information and belief, Defendant's stock price decreased as a result of the improperly-filed 8-K.

193. On August 26, 2012, Kackley received an email from Mr. Verfuerth regarding Foley & Lardner's misfiling of Defendant's 8-K with the SEC and stating in part:

29

This is not another 'awe shucks' type of mistake. This is…another example of high priced incompetence. Unfortunately the damage is done to the reputation of the company, and to me as the CEO…Any/All filings/documents that are submitted to the SEC are signed by Scott [Jensen] or I. This is and has been our SOP [Standard Operating Procedure] within the company.

194.     On August 26, 2012, Kackley received a second email from Mr. Verfuerth stating in

part:

I'm sensing a repeat of a situation, where mis-guided [sic], ill-founded information, exclusion of management, influences our Board of Directors' perceptions/actions. This time Paul Kardish seems to be in the cross hairs, for simply doing his job. (Paul is not the problem)[.] When we hired Paul, a top priority was to reduce the outrageous and UNSUSTAINABLE legal expenses. Which I tried to do awhile back when I tried to get a local firm to do some of our legal work, Mark Williamson nuked it at the Board. In case you need reminding, we have spent $7.8 MILLION with Foley since the IPO. Plus another $1.2 MILLION with Skaden [sic] defending a shareholder lawsuit. I have attached for your review, a high level billing summary of other major initiatives. When you analyze the charges by project, it's not difficult to see that we have paid MILLIONS of dollars for work product that was marginal at best, and/or provided ZERO value, arguably even to the detriment of the company…the excessive billing continued without regard to the ongoing discussions/commitments to flat fee and/or reduced billing rates by engaging less expensive Foley lawyers. With my approval Paul called out Barth & Kugler in a July 11 e-mail telling them he was disappointed at their refusal to do what they agreed to…As I read through all of these attachments, they further validate a theory I have. This theory ties into several conversations you and I have had about getting several of our fellow members to contribute/earn their pay. With the exception of our Board Chairman and Audit Committee Chairman, Steve Barth does their work and is paid substantial fees. Plus we pay the individual Board member $100k plus year [sic]. I'm telling you Jim as a fellow board member/CEO and fellow shareholder, this is unacceptable and we cannot allow it to continue.

195.     On August 29, 2012, Kardish emailed Mr. Verfuerth and Potts, informing them that

Marcus Sprow, Partner at Foley & Lardner, had contacted him regarding a "strange call" he had

received from Kackley on August 28, 2012, during which Kackley told Sprow how happy he and Defendant's Board have been with Barth.

196. On August 31, 2012, Mr. Verfuerth asked Kardish for a summary of the payments Defendant had made to Williamson's firm, Putnam Roby Williamson Communications, while he had been a member of the Board, as he had reason to believe Williamson was billing Defendant for work performed that Mr. Verfuerth believed was covered by Williamson's Board compensation.

197. In response to Mr. Verfuerth's request on August 31, 2012, Kardish investigated Defendant's payments to Putnam Roby Williamson Communications and found that Defendant paid Williamson's firm $54,500 from 2010 to 2011. In response, Mr. Verfuerth terminated Defendant's fees to Williamson's firm.

198. In or about August 2012, Mr. Verfuerth spoke with Kardish and Potts about potentially removing Mark Williamson from Defendant's Board.

199. Mr. Verfuerth sought to remove Williamson from Defendant's Board in or about August 2012 because Mr. Verfuerth believed that Williamson being on Defendant's Board was a conflict of interest.

200. Upon information and belief, in or about August 2012, Potts informed Kardish that, at the behest of Williamson, he agreed to retain Bryan Brooks in connection with the Wisconsin Energy Employment Act against the advice of and despite staunch opposition from Kevin Crawford, Defendant's Vice President of Governmental Affairs.

201. Upon information and belief, in or about August 2012, and in relation to Brooks, Potts told Kardish that prior to Defendant retaining Brooks as its lobbyist, Brooks had unsuccessfully attempted to get AFE's technology included in Wisconsin's Renewable Portfolio

31

Standard.

202.    Upon information and belief, in or about August 2012, Potts told Kardish that Williamson was "severely conflicted" in relation to Defendant.

203.    Upon information and belief, in or about August 2012, Potts told Kardish that Williamson often represented clients who are directly in competition with or opposed to Defendant and Defendant's business strategy.

204.    Upon information and belief, in or about August 2012, Potts told Kardish that Williamson had "no business being on the Board," or words to that effect.

205.    Upon information and belief, Potts, Crawford, Kardish, and others at Defendant believed Williamson had a serious conflict of interest due to his work behind the scenes in favor of AFE, and against Defendant.

206.    In or about August 2012, Kardish advised Mr. Verfuerth that Williamson's conduct in recommending a lobbyist (Brooks, in connection with the WEEA) whom he knew had a conflict of interest with Defendant constituted a violation of Defendant's Code of Conduct and was a breach of Williamson's fiduciary duty to Defendant.

207.    In or about August 2012, Mr. Verfuerth spoke with Kardish and Potts about removing Michael Altschaefl from Defendant's Board.

208.    Mr. Verfuerth sought to remove Altschaefl from Defendant's Board in or about August 2012 because he believed that Altschaefl being on Defendant's Board was a conflict of interest, that Altschaefl did not meet the SEC requirements with respect to independence, and that Altschaefl did not meet the requirements of being a financial expert.

209.    At the time that Mr. Verfuerth sought to remove Altschaefl from Defendant's Board

32

in or about August 2012, Verfuerth had learned that Altschaefl's Certified Public Accountant ("CPA") license had expired in or about December 2009.

210.    Prior to August 2012, Mr. Verfuerth believed that Altschaefl was a licensed CPA based on representations made by Barth.

211.    At the time that Mr. Verfuerth sought to remove Altschaefl from Defendant's Board in or about August 2012, Defendant publicly represented that Altschaefl was a licensed CPA.

212.    At the time that Mr. Verfuerth sought to remove Altschaefl from Defendant's Board in or about August 2012, Defendant had previously been a client of Grant Thornton, an audit, tax and advisory organization.

213.    Altschaefl was once employed as a Partner at Grant Thornton and helped open Grant Thornton's Milwaukee office.

214.    At the time that Mr. Verfuerth sought to remove Altschaefl from Defendant's Board in or about August 2012, Mr. Verfuerth had been repeatedly challenging the revenue recognition practices utilized by Defendant as previously recommended by Grant Thornton and Altschaefl. Subsequently, Defendant underwent a two-year restatement of company financials which then resulted in a material weakness opinion being issued by Grant Thornton because of the revenue recognition practices utilized by Defendant as previously recommended by Grant Thornton and Altschaefl.

215.    On September 6, 2012, Kackley received an email from Mr. Verfuerth in which Mr. Verfuerth refused to terminate Kardish. Mr. Verfuerth's September 6, 2012 email stated, in part:

> Been quite busy with my day job along with the 'Damage Control' resulting from the 8k. The effect is not only external, but a major effect internally as well. To include people asking their managers if we're going out of business…Given the fact base, my conclusion is

Case 1:14-cv-00352-WCG   Filed 03/27/14   Page 33 of 96   Document 1

that we would be compromising our fiduciary duty as officers and Board members allowing Steve Barth to continue in his capacity as our Outside Counsel, and the BOD position contemplated is no longer viable as well. The bottom line is that we've been 'Grossly Overcharged' for non value added redundancy on most matters for a sub-standard work product…Kardish stays where he is, I can't see my way clear to follow the advice of the board and terminate Paul Kardish for doing his job with honesty and integrity. Lastly Jim, I would love to have back half of the money and time wasted in the last several years. We wouldn't need to have the discussion about stranded NOLs [net operating losses], and highly likely our stock would likely have performed better during this time.

216. Kackley forwarded Mr. Verfuerth's September 6, 2012 email to Defendant's Board.

217. On September 11, 2012, and via email to Kackley and Mr. Verfuerth, Barth resigned from his position as Secretary of Defendant's Board. In his email, Barth stated, in part: "I must submit my resignation as Board Secretary and otherwise personally withdraw from providing any other legal services to Orion and your Board."

218. On September 11, 2012, Kackley emailed Barth in response to his September 11, 2012 email, stating that he accepted Barth's resignation with "great regret" and that he "will be sorely missed," and thanking him "for being so gracious in setting the terms of [his] transition." Kackley copied Mr. Verfuerth on the email.

219. On September 11, 2012, Kackley emailed Mr. Verfuerth, telling him that he (Mr. Verfuerth) was responsible for Barth's resignation and telling him to thank Barth for his service to Defendant. Kackley copied Defendant's Board on the email.

220. Subsequent to Barth's resignation on September 11, 2012, Defendant's Board indicated to Kardish that it intended for him to replace Barth as Board Secretary.

221. On or about September 19, 2012, and at Mr. Verfuerth's direction, Kardish advised the Board of the business risk associated with the language of Scribante's employment contract and

34

Defendant's purchase agreement with Solyndra.

222.     Scribante's employment contract and Defendant's purchase agreement with Solyndra were drafted by Foley & Lardner.

223.     Mr. Verfuerth directed Kardish to advise the Board of the business risk associated with the language of Scribante's employment contract because Mr. Verfuerth was concerned that it did not specifically cover and/or address Orion Engineered Systems, over which Scribante was President, meaning that, should he want to, Scribante could leave Defendant and take Orion Engineered Systems' business with him without recourse, exposing Defendant to irreparable harm.

224.     Mr. Verfuerth directed Kardish to advise the Board of the business risk associated with the language of Defendant's purchase agreement with Solyndra because Mr. Verfuerth was concerned that it did not insulate Defendant through insurance and indemnification.

225.     On or about September 6, 2011, Solyndra declared bankruptcy.

226.     As a result of Solyndra declaring bankruptcy on or about September 6, 2011, Defendant was left with millions of dollars in liabilities and losses.

227.     Defendant would not have been left with millions of dollars in liabilities and losses when Solyndra declared bankruptcy on or about September 6, 2011, if Defendant's purchase agreement with Solyndra had been drafted properly.

228.     On September 25, 2012, ISS Proxy Advisory Services ("ISS"), after a comprehensive analysis of proxy issues and vote recommendations, determined that it would not recommend voting in favor of Williamson and Altschaefl continuing their roles as members of Defendant's Board.

229.     ISS's September 25, 2012 determination that it would not recommend voting in

favor of Williamson and Altschaefl continuing in their roles as members of Defendant's Board was not posted to Defendant's Director's Desk until on or about October 3, 2012.

## Defendant Unexpectedly Terminates Mr. Verfuerth as its CEO

230.    On September 25, 2012, Kackley emailed Mr. Verfuerth and Defendant's Board, providing them with notice of a "special in-person meeting of our Board on Thursday September 27, 2012."

231.    According to Kackley's September 25, 2012 email, the purpose of the "special in-person meeting" on September 27, 2012 was "to discuss various matters related to Orion's financial performance and prospects."

232.    In response to Kackley's September 25, 2012 email and also on September 25, 2012, Mr. Verfuerth emailed Kackley multiple times asking him what his role would be at the September 27, 2012 meeting and whether there was anything he should bring.

233.    In response to Mr. Verfuerth's September 25, 2012 emails regarding the "special in-person meeting on September 27, 2012," and via email dated September 25, 2012, Kackley stated: "I just want to have a discussion among us directors re operating results and our prospects and plans as to what to tell the shareholders and analysts at upcoming meetings."

234.    Subsequent to receiving notice of the "special in-person meeting on September 27, 2012," Mr. Verfuerth, with the assistance of Jensen and Susan Marland, Executive Assistant to Mr. Verfuerth and Kackley, created a PowerPoint presentation that Mr. Verfuerth intended to present at the September 27, 2012 meeting.

235.    In the PowerPoint presentation Mr. Verfuerth created with the assistance of Jensen and Marland for the September 27, 2012 meeting, Mr. Verfuerth proposed, among other things, cost

36

reduction initiatives to include reduction in board fees and disgorgement of multiple invoices from Foley & Lardner, moves that were projected to result in a seven-cent gain in earnings per share per an analysis conducted by Jensen.

236.    On September 27, 2012, Defendant's Board held its "special in-person meeting" off-site (away from Defendant) at Riverbend in Kohler, Wisconsin (the "September 27, 2012 meeting").

237.    Prior to the September 27, 2012 meeting, Defendant's Board did not provide Mr. Verfuerth with an agenda for the meeting.

238.    Upon Mr. Verfuerth's arrival at the September 27, 2012 meeting, an agenda was waiting for him.  The agenda did not state the purpose of the meeting or what would be discussed at the meeting.

239.    During the September 27, 2012 meeting, Defendant terminated Mr. Verfuerth as its CEO.

240.    During the September 27, 2012 meeting and after it terminated Mr. Verfuerth as its CEO, Defendant named Scribante as its new CEO.

241.    During the September 27, 2012 meeting and after it terminated Mr. Verfuerth as its CEO during the September 27, 2012 meeting, Defendant reappointed Barth as Board Secretary.

242.    Prior to and through September 27, 2012, neither Defendant nor Defendant's Board took any disciplinary actions against Mr. Verfuerth, issued Mr. Verfuerth a negative or critical performance review or evaluation as CEO, or criticized Mr. Verfuerth's work performance as CEO.

243.    Prior to the September 27, 2012 meeting, Defendant did not notify or inform Mr. Verfuerth that he would be terminated as Defendant's CEO during the September 27, 2012 meeting.

37

244.    Prior to the September 27, 2012 meeting, Defendant did not notify or inform Mr. Verfuerth that it was considering terminating Mr. Verfuerth as its CEO.

245.    Prior to the September 27, 2012 meeting, Defendant actively mislead Mr. Verfuerth regarding the subject and purpose of the September 27, 2012 meeting.

246.    During Mr. Verfuerth's employment and prior to the September 27, 2012 meeting, Defendant did not make Mr. Verfuerth aware of any meetings or discussions regarding his potential termination as Defendant's CEO.

247.    The minutes for the September 27, 2012 meeting as presented for the approval of Defendant's Board during its special meeting on October 24, 2012, stated in part: "Three executive session meetings of the non-employee directors had been held prior to the meeting to discuss the principal subject matter to be discussed at the Board meeting."

248.    According to the Board's calendar, neither Defendant's Board nor any committees thereof held any meetings between July 25, 2012 and September 27, 2012.

249.    Any and all meetings Defendant's Board and/or any members of Defendants' Board may have held regarding Mr. Verfuerth's potential termination as its CEO were held in secret, not properly noticed, did not have any specified agenda, and were not recorded via meeting minutes.

250.    Mr. Verfuerth did not vote on his termination as Defendant's CEO during the September 27, 2012 meeting.

251.    Upon information and belief, prior to September 27, 2012, Defendant did not inform Potts that it was considering terminating Mr. Verfuerth as its CEO at the September 27, 2012 meeting.

252.    Upon information and belief, Potts did not vote on Mr. Verfuerth's termination as

38

Defendant's CEO during the September 27, 2012 meeting.

253.     Upon information and belief, prior to September 27, 2012, Defendant did not inform Kardish that it was considering terminating Mr. Verfuerth as its CEO.

254.     Upon information and belief, Defendant notified Scribante that he was to be Defendant's CEO only a few days prior to the September 27, 2012 meeting.

255.     During the September 27, 2012 meeting and after terminating Mr. Verfuerth as its CEO, Defendant gave Mr. Verfuerth the newly-created title of "Chairman Emeritus/Founder."

256.     Subsequent to Defendant's termination of Mr. Verfuerth as its CEO during the September 27, 2012 meeting, Mr. Verfuerth remained, at least in title, a member of Defendant's Board.

257.     Upon information and belief and pursuant to the language of Mr. Verfuerth's Employment Agreement, Defendant's termination of Mr. Verfuerth as its CEO on September 27, 2012 additionally terminated that Agreement.

258.     Defendant terminated Mr. Verfuerth as its CEO on September 27, 2012 without "cause" as defined by Mr. Verfuerth's Employment Agreement.

259.     Pursuant to Mr. Verfuerth's Employment Agreement, Defendant's termination of Mr. Verfuerth as its CEO on September 27, 2012 without "cause" triggered Defendant's obligation to pay Mr. Verfuerth a lump sum severance benefit equal to either two times his annual salary or three times his annual salary, depending upon the circumstances, plus the average of the prior three years' bonuses, plus a pro rata bonus for the year of termination, as well as COBRA premiums for the duration of his COBRA continuation coverage period, in addition to any and all accrued benefits through his termination date.

260. Upon information and belief, as a result of Defendant's termination of Mr. Verfuerth as its CEO on September 27, 2012, Defendant was obligated to provide Mr. Verfuerth with all monetary benefits he was entitled under the Employment Agreement.

261. Subsequent to Defendant's termination of Mr. Verfuerth as its CEO on September 27, 2012, Defendant did not provide Mr. Verfuerth with monetary benefits it was obligated to give him pursuant to the Employment Agreement.

262. Upon information and belief, Defendant purposefully and in bad faith withheld the monetary benefits it was obligated to provide Mr. Verfuerth as a result of its termination of Mr. Verfuerth as its CEO on September 27, 2012.

263. Mr. Verfuerth's removal as Defendant's CEO, and the manner in which it was accomplished, left Mr. Verfuerth with no expectation that he would be allowed to continue as an employee of Defendant or as a viable Board member. Mr. Verfuerth lost all authority or control that he had at Defendant. Mr. Verfuerth had no expectation that Defendant would honor its obligations to him with respect to a fair and reasonable compensation package, whether he stayed at Defendant or not.

**Defendant Begins Severing All Ties to Mr. Verfuerth and Exiles Him from Defendant**

264. On September 27, 2012, and in addition to terminating Mr. Verfuerth as its CEO, Defendant terminated the employment of Becky Schroeder, Business Development.

265. As of September 27, 2012, Schroeder was engaged to Mr. Verfuerth.

266. At no time did Schroeder report to or otherwise work under the control of Mr. Verfuerth prior to her termination from Defendant.

267. As of September 27, 2012 Schroeder reported to Potts. Prior to reporting to Potts,

Case 1:14-cv-00352-WCG    Filed 03/27/14    Page 40 of 96    Document 1

Schroeder reported to Kackley.

268.     On September 29, 2012, Marland, Kackley's Executive Assistant, sent an email to Mr. Verfuerth on behalf of Kackley with a letter from Kackley as an attachment. That letter, dated September 27, 2012, was written on behalf of Defendant's Board ("the September 27, 2012 Board Directives letter").

269.     The September 27, 2012 Board Directives letter set forth "the terms and conditions of [Mr. Verfuerth's] new position as Chairman Emeritus/Founder, as a result of the Board's action taken today to appoint John Scribante as the successor to your role as Chief Executive Officer."

270.     In the September 27, 2012 Board Directives letter, Defendant directed Mr. Verfuerth "to take a six-month, off-site sabbatical and leave of absence."

271.     In the September 27, 2012 Board Directives letter, Defendant further instructed that during Mr. Verfuerth's six-month leave of absence, he must not:

> (i) be present at Orion's facilities; (ii) contact or communicate in any way with (including accepting any communications from) any of Orion's employees, customers, vendors, analysts or shareholders with respect to Orion's business, employees, officers, or directors; (iii) try to direct or influence any aspects of Orion's business; or (iv) otherwise disparage Orion or any of its employees, officers or directors.

272.     The September 27, 2012 Board Directives letter informed Mr. Verfuerth that Defendant was "discontinuing all of [his] Company communications and access devices and [he] will need to return all such devices and other Company property."

273.     The September 27, 2012 Board Directives letter stated that if Mr. Verfuerth "compl[ied] with all of these restrictions, [he] will continue to receive [his] normal salary and benefits during this sabbatical and leave of absence period."

41

274.     The September 27, 2012 Board Directives letter stated that "[a]fter [Mr. Verfuerth's] successful completion of [his] off-site sabbatical and leave of absence, the Board will consider allowing [him] to return to an emeritus advisor role involved in product innovation and development or some other mutually acceptable emeritus advisory role."

275.     The September 27, 2012 Board Directives letter stated that if Mr. Verfuerth decided "not to accept these terms, [he] may resign and [Defendant] will honor [his] severance arrangements provided for in [his] current employment and severance agreement."

276.     The September 27, 2012 Board Directives letter gave Mr. Verfuerth two options: (1) cut all ties with Defendant for six months and continue being compensated during that period; or (2) resign.

277.     The September 27, 2012 Board Directives letter was impossible to abide by as written, given Mr. Verfuerth's continued role as a member of Defendant's Board and his ongoing fiduciary duties and responsibilities to Defendant and its shareholders.

278.     On September 27, 2012, Defendant issued a "Confidentiality Directive to Key Employees."

279.     Defendant's Confidentiality Directive to Key Employees dated September 27, 2012, stated in part:

> The Board of Directors is specifically directing all employees not to contact or communicate in any way with Neal about any aspects of our business, any Company-related matter or otherwise any information about the Company. Additionally, a specific term and condition of your continued employment is to maintain the strict confidentiality of the business and affairs of our Company. You also signed a non-disclosure agreement to this effect and our employment policies make this obligation very specific.
>
> If it should ever come to our attention that you have communicated

42

with Neal about our business or any Company-related matter, or
disclosed any information about our Company to Neal, then we will
have a basis for terminating your employment for cause.

280.     Upon information and belief, Barth drafted Defendant's Confidentiality Directive to

Key Employees dated September 27, 2012, as indicated by the file number on the bottom left-hand

side of the letter.

281.     On September 27, 2012, Defendant issued an "Internal Company Announcement."

282.     Defendant's Internal Company Announcement dated September 27, 2012, stated in

part:

> This afternoon, your Board of Directors took action to appoint John
> Scribante as Orion's new CEO, with full power and authority to
> direct and manage our business. Neal's title has been changed to
> Chairman Emeritus/Founder. After some well deserved time off,
> Neal will have the opportunity to focus on his passion – product
> innovation and development. During Neal's time off, you are not to
> communicate with Neal or otherwise share any Company
> information with him, and he is not to have access to our facilities or
> information systems.

283.     Upon information and belief, Barth drafted Defendant's Internal Company

Announcement dated September 27, 2012, as indicated by the file number on the bottom left-hand

side of the letter.

284.     On September 27, 2012, Kackley emailed Kardish a letter with the same date.

285.     In Kackley's September 27, 2012 letter to Kardish, Kackley informed Kardish that:

(1) Defendant terminated Mr. Verfuerth as CEO; (2) Scribante was the new CEO; (3) Defendant

"offered" Mr. Verfuerth the position of Chairman Emeritus/Founder; (4) Defendant told Mr.

Verfuerth to take a six-month sabbatical; and (5) Defendant placed four conditions upon Mr.

Verfuerth during the mandated sabbatical, as outlined in the September 27, 2012 Board Directives

43

letter.

286.    In Kackley's September 27, 2012 letter to Kardish, and with respect to the four conditions Defendant placed upon Mr. Verfuerth during his mandatory six-month sabbatical, Kackley told Kardish:

> To help ensure Neal's compliance with these requirements, on behalf of the Board of Directors, you are hereby directed to take any and all actions to immediately (a) secure Orion's facilities so that Neal may no longer have any access and (b) repossess all of Neal's Company property (including his cell phone, i-Pad, PDA, computer, etc.). I have directed Jason Young to immediately discontinue all of Neal's electronic, telephonic and other communications and informational access to any and all of Orion's communications and informational systems.

287.    Upon information and belief, Barth drafted Kackley's September 27, 2012 letter to Kardish, as indicated by the file number on the bottom left-hand side of the letter.

### Defendant Internally and Publicly Praised Mr. Verfuerth's Value to Defendant and His Performance as Defendant's CEO Prior to his Removal as CEO

288.    Four months prior to Defendant's termination of Mr. Verfuerth as its CEO, Kackley wrote a letter addressed to Mr. Verfuerth and dated May 7, 2012 ("the May 7, 2012 letter").

289.    The May 7, 2012 letter was written by Kackley on behalf of Defendant's Board.

290.    In the May 7, 2012 letter, Kackley provided Mr. Verfuerth with Defendant's "thoughts about [his] performance as [its] Chief Executive Officer."

291.    The May 7, 2012 letter stated in part: "Neal, in you we see not only a founder and creative genius, but that rare person who can also lead a growing public company. As a student of business broadly, not just Orion and our industry, there is scarcely a topic you're not well-versed in."

292.    The May 7, 2012 letter stated in part: "You have been an exceptional representative

44

of Orion—constantly explaining what we do and answering endless questions with respect and intelligence. Your treatment of customers is superb. You are a thoughtful listener and an articulate explainer."

293. The May 7, 2012 letter stated in part: "In terms of products, it goes without saying that you're the creative genius of Orion."

294. The May 7, 2012 letter stated in part: "A vision of what Orion can be has always been a strong suit for you…You have the uncanny ability to visualize the solution to a problem that's never been solved before."

295. The May 7, 2012 letter stated in part: "As Board members we applaud the progress Orion has made under your leadership."

296. The May 7, 2012 letter stated in part: "Neal, we value our relationship with Orion and are supportive of your leadership. We are most excited about our future together."

297. On September 10, 2012, seventeen days before Defendant terminated Mr. Verfuerth as its CEO, Defendant issued a Form 10-K.

298. Defendant's September 10, 2012 Form 10-K stated in part that a risk factor to Defendant was the potential loss of Mr. Verfuerth:

> Our continued success depends upon the continued availability, contributions, skills, experience and effort of our senior management. We are particularly dependent on the services of Neal R. Verfuerth, our chief executive officer and principal founder…The loss or interruption of the service of our members of our senior management, particularly [Mr.] Verfuerth…could have a material adverse effect on our ability to expand our business, implement our strategy or achieve profitable operations.

299. On September 10, 2012, seventeen days before Defendant terminated Mr. Verfuerth as its CEO, Defendant issued a proxy statement.

45

300.     Defendant's September 10, 2012 proxy statement was issued in advance and in anticipation of Defendant's Annual Meeting of Shareholders on October 24, 2012.

301.     Defendant's September 10, 2012 proxy statement stated in part that it approved an increase of 18.5% in Mr. Verfuerth's base salary for fiscal year 2013, based at least in part on Mr. Verfuerth's "critical importance to the Company, his leadership skills and his significant role in the Company's ongoing sales organization and its innovative product research and development."

302.     As a result of Defendant's approved increase in Mr. Verfuerth's base salary, Mr. Verfuerth's base salary increased from $460,000 for fiscal year 2012 to $545,000 for fiscal year 2013.

### Defendant Publicizes its Removal of Mr. Verfuerth as CEO

303.     On September 27, 2012, and continuing thereafter, Defendant began a campaign suggesting that Mr. Verfuerth agreed with his removal as CEO and, after taking time off, he would come back to Defendant and perform other tasks outside of Defendant's management.   This campaign was false and was a misrepresentation to Defendant's shareholders, the public, and the SEC.

304.     On September 28, 2012, Defendant issued a press release regarding its termination of Mr. Verfuerth as CEO on September 27, 2012 ("the September 28, 2012 press release").

305.     The September 28, 2012 press release was included in Defendant's Form 8-K filed on September 28, 2012.

306.     In the September 28, 2012 press release, Defendant provided the public with a misleading understanding of the events of September 27, 2012.

307.     The September 28, 2012 press release stated in part:

46

In the tradition of other renown entrepreneurial company founders, this change of leadership reflects Neal's natural transition away from being involved in the ongoing demands of running Orion's day-to-day operations into a more advisory role focusing on product innovation and development…Our board felt it was time for Neal, after some well-deserved time off, to have the opportunity to direct his full time attention to his first love and passion – innovative product development, while John [Scribante] can direct his proven disciplined bottom-line orientation to improve our profitability and share price.

**Defendant Constructively Terminates Kardish's Employment**

308.　Upon information and belief, on September 27, 2012, Defendant informed Kardish that he would not become Board Secretary, as had been Defendant's stated intention after Barth's resignation on September 11, 2012.

309.　Prior to Defendant's termination of Mr. Verfuerth as CEO on September 27, 2012, Potts represented to Kardish that he had signed Kardish's employment contract.

310.　On October 2, 2012, Defendant informed Kardish that his employment contract had not been signed by the Board.

311.　As a result of the Board not signing Kardish's employment contract, Kardish may have been exposed to termination of his employment without contractual recourse.

312.　On October 2, 2012, Kardish emailed a letter to Scribante with the same date and with the subject "RE: Employment Status of Paul J. Kardish."

313.　Kardish's October 2, 2012 letter to Scribante stated in part:

As you may be aware, I have voiced some concerns to both members of the board and senior management regarding some inappropriate activities at the board level that would negatively impact shareholder value. I am sure some of these concerns were communicated to the board shortly after reporting. In addition, the board and Steve Barth seemed to take offense that I would propose using some firm other than Foley and Lardner to represent Orion in the pending SEC

47

enforcement action. As communicated to me by both Jim Kackley and Mark Williamson on August 10, 2012, the expectation was to have Foley represent Orion regardless of whether any factors needed to be considered which might undermine shareholder value. It should be noted that I communicated these reasons at the August 14, 2012 board meeting when I stated it did not seem appropriate to use Foley for an enforcement action when that firm represented Orion as both board secretary and for Orion's SEC regulatory filings and advice…I was ultimately concerned about Orion not having sufficient checks and balances with respect to its legal representation and governance model and how that would be viewed with respect to the SEC enforcement action. Clearly an unfavorable view by the SEC for the current inquiry would seriously undermine shareholder value.

Finally, I raised the potential issue of Foley's excessive billing to both members of the board and senior management and provided breakdowns of this analysis to Neal (who I believed forwarded such information to the board). Foley's billing of approximately $7.8 million over a 5 year period which included an amount of approximately $3.2 million directly attributable to Steve Barth's billing seemed to be a very good opportunity for the board to at least consider some of this analysis in an attempt to better maximize shareholder value by wanting to control legal spend…Unfortunately, and in spite of my efforts to maximize shareholder value and effectively manage my budget, the board, on multiple occasions, has requested that my employment be terminated…Based on the above and the attached, Orion has clearly constructively terminated my employment.

### The Events Preceding and Mr. Verfuerth's Termination of His Employment Agreement for "Good Reason"

314. On October 1, 2012, Kackley received an email from Mr. Verfuerth stating in part: "Jim, I certainly did not expect nor do I deserve to be treated as public enemy number 1 by the company I founded and invested much of my life to."

315. Kackley drafted a hand-written letter to Mr. Verfuerth dated October 1, 2012.

316. Kackley's October 1, 2012 letter to Mr. Verfuerth stated in part: "I understand I'm not your favorite person right now. I just wanted you to know that regardless of recent events, my

48

enormous respect for you as an entrepreneur and a man has not diminished. I wish you great success either in continuing with Orion or in a new venture. You have so much to offer."

317. Upon information and belief, in early October 2012 Defendant suspended Mr. Verfuerth's electronic access to its Directors' Desk system, prohibiting him from accessing the Board's meeting documents.

318. On October 17, 2012, Kackley received an email from Mr. Verfuerth stating, "Directors Desk support desk advised me that my account has been suspended. [I]s there a reason for that[?]"

319. Upon information and belief, on October 17, 2012 and while Mr. Verfuerth was working on his computer in his home, documents and files on his computer were simultaneously deleted and/or corrupted. Thereafter, unlike all other directors, Verfuerth did not have computer access to relevant Board documents to which he was entitled.

320. On October 18, 2012, Kackley informed Mr. Verfuerth via email that he (Mr. Verfuerth) could not attend Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012, despite Mr. Verfuerth's role as a major shareholder and a member of Defendant's Board.

321. Upon information and belief and subsequent to Defendant's termination of Mr. Verfuerth as its CEO on September 27, 2012 and, correspondingly, Mr. Verfuerth's Employment Agreement, Mr. Verfuerth's continued employment as Chairman Emeritus/Founder was controlled by an implied employment agreement between Mr. Verfuerth and Defendant (the "implied Employment Agreement").

322. Upon information and belief and subsequent to Defendant's termination of Mr. Verfuerth as its CEO on September 27, 2012 and, correspondingly, Mr. Verfuerth's Employment

49

Agreement, Mr. Verfuerth and Defendant conducted themselves in accordance with the language and provisions of the Employment Agreement.

323. On October 19, 2012, Kackley received an email from Mr. Verfuerth with the subject "Notice," in which Mr. Verfuerth provided notice of termination of his implied Employment Agreement for "Good Reason," "pursuant to Sections 2(k) and 4(d) of [his] Executive Employment and Severance Agreement" ("Mr. Verfuerth's 'Good Reason' email").

324. In Mr. Verfuerth's "Good Reason" email, Mr. Verfuerth stated that "good reason" arose from Defendant's decision to "remove [him] as Chief Executive Officer…which, among other things, materially diminished: [his] authority, duties and responsibilities as Chief Executive Officer; and the budget [over which he] retain[ed] authority consistent with Section 2(k) of the [Employment Agreement]."

325. Mr. Verfuerth's "Good Reason" email stated in part: "Once I receive acknowledgement from Orion that it accepts my 'Good Reason' and does not plan to cure, my attorney will be forwarding a draft of a general release for Orion's consideration."

326. Mr. Verfuerth's "Good Reason" email stated in part: "At some point in the very near future, it would be a very good idea for you and I to meet and discuss what we can do to bring forth some final resolution of controversial matters which seem to distract Orion from greater success."

327. On October 19, 2012, Marland received a forwarded copy of Mr. Verfuerth's "Good Reason" email from Mr. Verfuerth. In the email, Mr. Verfuerth asked Marland to further forward the email to "Orion Corporate Counsel and CEO."

328. Upon information and belief, by terminating his implied Employment Agreement for "good reason" and per the parties' continued adherence to the language of the Employment

Agreement, Defendant should have paid Mr. Verfuerth a lump sum severance benefit equal to two or three times his annual salary, depending on the circumstances, plus the average of the prior three years' bonuses, plus a pro rata bonus for the year of termination, as well as COBRA premiums for the duration of his COBRA continuation coverage period, in addition to any and all accrued benefits through his termination date.

### Defendant's Obstruction of Mr. Verfuerth's Receipt of Severance Benefits Resulting from His "Good Reason" Termination, and Defendant's Ultimate Rejection of Mr. Verfuerth's "Good Reason" Termination

329.    Upon information and belief, as a result of Mr. Verfuerth's termination of his implied Employment Agreement for "good reason," Defendant was obligated to provide Mr. Verfuerth with all monetary benefits he was entitled under the Employment Agreement.

330.    Defendant did not file a Form 8-K subsequent to its receipt of Mr. Verfuerth's "Good Reason" email.

331.    Defendant should have filed a Form 8-K subsequent to its receipt of Mr. Verfuerth's "Good Reason" email based on its repeated public statements that its "continued success" was "particularly dependent on the services of" Mr. Verfuerth and that the loss of Mr. Verfuerth "could have a material adverse effect on [Defendant's] ability to expand [its] business, implement [its] strategy or achieve profitable operations."

332.    On October 22, 2012, Marland, on behalf of Kackley, emailed Mr. Verfuerth a letter from Kackley dated October 22, 2012 and acknowledging receipt of Mr. Verfuerth's "Good Reason" email.

333.    Kackley's October 22, 2012 letter stated in part:

> I am in receipt of your October 19 email notice of your termination of employment with Orion. I have asked Steve Barth to prepare the

51

appropriate documentation…One currently outstanding issue that has been brought to my attention will need to be addressed.  As you know, in January, Orion's Compensation Committee authorized the Company to reimburse you for your documented legal fees incurred in connection with your divorce from Pat…We understand that…you objected to paying Linda [Balisle, Mr. Verfuerth's divorce attorney] her invoices for $62,400.  We also understand that a hearing on this matter may have taken place on October 16.  Please advise us of the status of this fee dispute and the amount you actually paid to Linda on her invoices for $62,400.  If you have paid Linda less than what you have already received in reimbursements from the Company, then you will need to repay the Company the difference, plus the related tax gross-up amount.

334.    Upon information and belief, Barth drafted Kackley's October 22, 2012 letter to Mr. Verfuerth, as indicated by the file number at the bottom right corner of the letter.

335.    Kackley's October 22, 2012 letter did not indicate an intention by Defendant to cure Mr. Verfuerth's "good reason" termination of his implied Employment Agreement, but rather acknowledged and indicated an acceptance of Mr. Verfuerth's "good reason" termination of same.

336.    As of October 22, 2012, the amount specifically raised in Kackley's October 22, 2012 letter to Mr. Verfuerth was subject to a fee dispute between Mr. Verfuerth and Balisle.

337.    As of October 22, 2012, and as indicated in Kackley's October 22, 2012 letter, Defendant was aware that Mr. Verfuerth was engaged in a fee dispute with Balisle for the amount specifically raised in that letter.

338.    As of October 22, 2012, Defendant was aware that Mr. Verfuerth had not paid Balisle on her invoices for $62,400 because of the fee dispute between Mr. Verfuerth and Balisle.

339.    Prior to October 22, 2012, Defendant did not raise any "issues" relating to the monies involved in Mr. Verfuerth's fee dispute with Balisle.

340.    Mr. Verfuerth's fee dispute with Balisle was not resolved until in or about April

52

2013.

341.    On or about April 15, 2013, Mr. Verfuerth paid Balisle the full amount of attorney's fees at dispute with Balisle.

342.    On October 23, 2012, Kackley met with Mr. Verfuerth for dinner (the "October 23, 2012 dinner meeting").

343.    During the October 23, 2012 dinner meeting, Mr. Verfuerth provided Kackley with Defendant's standard executive severance agreement.

344.    During the October 23, 2012 dinner meeting, Kackley indicated that he would have the Board execute the standard executive severance agreement given to him by Mr. Verfuerth.

345.    During the October 23, 2012 dinner meeting, Kackley represented to Mr. Verfuerth that Defendant would provide him with a severance pursuant to Mr. Verfuerth's Employment Agreement.

346.    During the October 23, 2012 dinner meeting and in relation to the $62,400 amount raised in Kackley's October 22, 2012 letter to Mr. Verfuerth, Mr. Verfuerth offered to offset the amount of disputed fees with his unused, accrued paid time off.

347.    During the October 23, 2012 dinner meeting and in relation to the $62,400 raised in Kackley's October 22, 2012 letter to Mr. Verfuerth, Mr. Verfuerth offered to offset the amount of disputed fees by having that amount taken out of his severance payment(s).

348.    During the October 23, 2012 dinner meeting and in relation to the $62,400 raised in Kackley's October 22, 2012 letter to Mr. Verfuerth, Mr. Verfuerth offered to offset the amount of disputed fees with shares of his stock and/or stock options.

349.    Defendant held a Board of Directors meeting on October 24, 2012 (the "October 24,

53

2012 Board meeting").

350. The October 24, 2012 Board meeting was held off-site at The Club on Waldo Boulevard, Manitowoc, Wisconsin.

351. When Mr. Verfuerth arrived at The Club for the October 24, 2012 Board meeting, Williamson met him at the door, physically stopped him, and asked Mr. Verfuerth to sit down with him and discuss the severance agreement he had provided to Kackley during the October 23, 2012 dinner meeting.

352. At the time that Williamson discussed Mr. Verfuerth's severance agreement with him on October 24, 2012, Williamson proposed multiple changes to the document and made notations of same on the hardcopy version of the standard severance agreement that was in his possession at the time.

353. At the time that Williamson discussed Mr. Verfuerth's severance agreement with him on October 24, 2012, Mr. Verfuerth told Williamson that the revisions he was proposing constituted extortion and that if Defendant had nothing to hide, it had nothing to fear. Verfuerth further questioned Williamson's insistence on seeking additional indemnification from him and releases of claims against third-parties, such as Defendant's attorneys and accounting firms.

354. After the October 24, 2012 Board meeting, and the conclusion of the annual shareholders' meeting, Defendant emailed a "redlined" version of Mr. Verfuerth's severance agreement to Mr. Verfuerth requiring: (1) his immediate resignation from the Board; (2) removal of his title as Chairman Emeritus/Founder; (3) his immediate surrender of any and all shareholder rights, including his ability to purchase additional shares and a condition that his shares would automatically vote with management; (4) a release of any and all legal claims Mr. Verfuerth may

54

have against Defendant, its attorneys, and its accountants, its management and Board members, including any potential derivative or shareholder actions; and (5) his agreement to a substantially expanded indemnification agreement.

355.	The "redlined" severance agreement Defendant emailed to Mr. Verfuerth incorporated and expanded upon the handwritten notations Williamson made during his discussion with Mr. Verfuerth regarding same at the time of the October 24, 2012 Board meeting.  Upon information and belief, Barth was the one who drafted the "redlined" severance agreement that was emailed to Mr. Verfuerth.

356.	Among other things, the "redlined" severance agreement Defendant emailed Mr. Verfuerth on October 24, 2012 included a provision stating, "Mr. Verfuerth understands and agrees that his acceptance of this Agreement means that…he is forever waiving and giving up any and all rights and claims he may have…against Orion…relating to…any laws governing whistle blowing or retaliation, including but not limited to, the Sarbanes-Oxley Act."

357.	Section 29(a) of the Exchange Act prohibits waivers of prospective retaliation claims under the Sarbanes-Oxley Act of 2002, as amended, and the Dodd-Frank Wall Street Reform and Consumer Protection Act.

358.	Pursuant to section 29(a) of the Exchange Act, only mature or "ripe" whistleblower retaliation claims of which an employer is already aware can be waived via a severance or other agreement.

359.	Consistent with Mr. Verfuerth's October 23, 2012 dinner meeting with Kackley, the "redlined" severance agreement Defendant emailed to Mr. Verfuerth on October 24, 2012, contained an offset of Mr. Verfuerth's divorce attorney's fees that were in dispute in its "Severance

55

Pay" clause, stating:

> Twenty-four (24) months of severance at Verfuerth's regular monthly rate of salary pay in effect as of October 19, 2012, less withholding and deductions, and less $100,000 of undocumented divorce legal fees (including as grossed-up for the tax effect thereof) (unless Verfuerth provides proper documentation to Orion supporting his payment of such legal fees prior to the payment date below).

360. On October 24, 2012, and in addition to emailing Mr. Verfuerth the "redlined" severance agreement, Defendant delivered a "clean" version of the "redlined" severance agreement (a version that fully incorporated Defendant's "redline" changes) to Mr. Verfuerth via courier.

361. The "clean" version of the severance agreement Defendant delivered to Mr. Verfuerth via courier on October 24, 2012 was signed by Kackley.

362. On October 24, 2012, and in addition to providing Mr. Verfuerth the "redlined" and "clean" severance agreements, Defendant provided "redlined" and "clean" severance agreements to Schroeder, Mr. Verfuerth's fiancé, and Kardish.

363. The "redlined" and "clean" severance agreements Defendant provided to Kardish decreased Kardish's severance pay from twelve to six months.

364. The "redlined" and "clean" severance agreements Defendant provided to Schroeder increased her severance pay from twelve to eighteen months.

365. Defendant made the severance agreements it provided to Mr. Verfuerth, Schroeder, and Kardish on October 24, 2012, contingent on the executions of all three parties: if one of them did not execute his or her severance agreement, then none of them would receive a severance payment.

366. Mr. Verfuerth's "redlined" severance agreement specifically stated that it would not

56

be effective until: "seven (7) days after Verfuerth signs it and returns it to Orion's designated representative, Scott Gilson, subject to any law, and subject to the effectiveness of the separate settlement agreements and releases of Becky Schroeder and Paul Kardish with Orion."

367. Schroeder's "redlined" severance agreement specifically stated that it would not be effective until: "seven (7) days after Schroeder signs it and returns it to Orion's designated representative, Scott Gilson, and the effectiveness of the separate Separation Agreement and Mutual Release of Neal Verfuerth and Orion."

368. On October 24, 2012, Defendant held its 2012 Annual Meeting of Shareholders.

369. Mr. Verfuerth was prohibited from attending the 2012 Annual Meeting of Shareholders.

370. Schroeder, who also was a shareholder, attempted to attend Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012, but was met at the door, not allowed to enter, and escorted off of the premises.

371. By virtue of being banned from Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012, Defendant prohibited Mr. Verfuerth and Schroeder from voting their shares.

372. Had Mr. Verfuerth (or Schroeder on his behalf) been allowed to vote his shares at Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012, he could have joined with the institutional shareholders represented by ISS in voting their shares in favor of other candidates for the Board, thereby resulting in the removal of Williamson and Altschaefl as members of Defendant's Board.

373. Upon information and belief, although Defendant prohibited Mr. Verfuerth and Schroeder from attending Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012,

57

their shares were voted in favor (or were withheld) of all management positions.

374.    By virtue of being banned from the 2012 Annual Meeting of Shareholders, Mr. Verfuerth and Schroeder were not given access to the information shared at the Meeting and, thereafter, did not have the benefit of said information.

375.    During Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012, Kackley indicated to Defendant's shareholders that Mr. Verfuerth was still employed at Defendant.

376.    During Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012, Kackley reiterated Defendant's statements in the September 28, 2012 press release regarding Mr. Verfuerth's termination as CEO on September 27, 2012, by indicating to shareholders that Mr. Verfuerth was still employed at Defendant, but he was taking some "well-deserved time off," before returning to his roots of product innovation and development.

377.    Kackley's indications to Defendant's shareholders during the 2012 Annual Meeting of Shareholders that Mr. Verfuerth was still employed by Defendant, but taking some "well-deserved time off," were made five days after he received notice of Mr. Verfuerth's termination of his Employment Agreement for "good reason."

378.    Kackley's indications to Defendant's shareholders during the 2012 Annual Meeting of Shareholders that Mr. Verfuerth was still employed by Defendant, but taking some "well-deserved time off," were made after Defendant provided Mr. Verfuerth with a signed severance agreement stating in part, "Verfuerth's employment with Orion was mutually terminated by Orion effective October 19, 2012…Verfuerth also hereby immediately resigns as a director of Orion and each subsidiary…Mr. Verfuerth shall no longer have the title of Chairman Emeritus/Founder."

379.    During Defendant's 2012 Annual Meeting of Shareholders on October 24, 2012,

58

Kackley did not address the fact that Defendant was at "risk" due to the loss of Mr. Verfuerth. Yet, just two months before, Defendant publicly announced that its continued success was dependent upon Mr. Verfuerth.

380. On October 30, 2012, Williamson sent a text message to Mr. Verfuerth expressing his desire to reach a severance agreement between Mr. Verfuerth and Defendant "before stupid stuff happens."

381. On November 2, 2012, Kackley received an email from Mr. Verfuerth, on which Barth was copied ("Mr. Verfuerth's November 2, 2012 email").

382. Mr. Verfuerth's November 2, 2012 email stated in part: "I'm concerned about the likely potential for an adverse effect on our Shareholders investments in [Defendant]."

383. Mr. Verfuerth's November 2, 2012 email stated in part: "I've been cut off from my Orion email, denied access to the director's desk, and on the same day, many of my files seemed to disappear or get corrupted right in front of my eyes (as though someone from outside my home illegally breached my personal computer)."

384. In Mr. Verfuerth's November 2, 2012 email, Mr. Verfuerth, in part, detailed the unflattering and potentially damaging findings of an investigation into Scribante, as well as his belief that Scribante's promotion into the position of CEO was an "inducement to get him to sign a new employee agreement to replace an agreement that could have a significant negative and material impact on the company and its shareholders."

**Mr. Verfuerth Files a Formal Whistleblower Complaint with Defendant and the SEC, and Defendant Terminates Mr. Verfuerth as its Chairman Emeritus/Founder**

385. On November 6, 2012, Mr. Verfuerth received an email notice of a Special Board of Directors Meeting to be conducted via teleconference on November 8, 2012. The email stated in

59

part that the "purpose of the meeting will be to consider the termination of the employment of Neal Verfuerth for incurable 'Cause' under…his Executive Employment and Severance Agreement."

386.    At no time between Mr. Verfuerth's notice of termination of his implied Employment Agreement for "good reason" on October 19, 2012 and November 6, 2012, did Defendant state or communicate to Mr. Verfuerth an intention to terminate his implied Employment Agreement for "cause."

387.    At no time between Mr. Verfuerth's notice of termination of his implied Employment Agreement for "good reason" on October 19, 2012 and November 6, 2012, did Defendant inform or communicate to Mr. Verfuerth that it was considering terminating his implied Employment Agreement for "cause."

388.    Between Mr. Verfuerth's notice of termination of his implied Employment Agreement for "good reason" on October 19, 2012 and November 6, 2012, Defendant's Board acted in accordance with and acceptance of Mr. Verfuerth's "good cause" termination of his implied Employment Agreement.

389.    On November 6, 2012, Altschaefl emailed Mr. Verfuerth in part: "The board continues to desire to come to a resolution with you prior to the board meeting to be held this week Thursday. The offer negotiated between you and Mark Williamson resulting in the agreement delivered to your home late in the day on October 24th continues to be…on the table."

390.    On November 6, 2012, Altschaefl received an email from Mr. Verfuerth ("Mr. Verfuerth's November 6, 2012 email") stating in part:

> The severance agreement that I think you were referring to is unacceptable to me and was not what Mark and I had negotiated…I will accept the standard Orion Executive severance agreement and general release as delivered to Jim Kackley several weeks

> ago…Please see Mark Williamson for further detail regarding my counter offer with expanded release….I have made every effort to negotiate with the company discretely and in good faith to this point. The notice I received this morning with regards to the special board of directors meeting suggests the company wants to further escalate the situation to a point where 'stupid things happen.'

391. On November 8, 2012, and prior to the Special Board of Directors Meeting, Board members Schueller, Rich, Jacobson, and Potts received an email from Mr. Verfuerth with the subject "Whistleblower filing" ("Mr. Verfuerth's November 8, 2012 whistleblower email").

392. Mr. Verfuerth's November 8, 2012 whistleblower email stated that it constituted "a formal complaint…pursuant to the Orion Energy Systems Inc. Whistle Blower Policy, as well as the Sarbanes Oxley Act [of] 2002."

393. In Mr. Verfuerth's November 8, 2012 whistleblower email, Mr. Verfuerth stated that he had numerous concerns and complaints regarding Defendant's conduct, many of which he had already brought to Kackley's attention, including but not limited to issues with "Corporate Waste, Violations of the Orion Code of Conduct, Breach[es] of Fiduciary Duty, [and] Breach[es] of Attorney Client Privilege."

394. Mr. Verfuerth's November 8, 2012 whistleblower email stated in part that his "rapid demise within the company [w]as retaliation against [him] for pursuing/exposing actions and ongoing activities that have to date negatively impacted the price per share of [Defendant's] stock."

395. On November 8, 2012, Stuart Ralsky, Vice President of Human Resources, received via email a forwarded copy of Mr. Verfuerth's November 8, 2012 whistleblower email from Mr. Verfuerth with the subject "FW: Whistleblower filing." The email stated: "Stuart, Per our published whistle blower policy please accept this email as a formal filing of a complaint pursuant to the Orion Whistle Blower Policy and Sarbanes Oxley Act of 2002. Neal."

61

396. On November 8, 2012, Defendant forwarded a copy of Mr. Verfuerth's November 8, 2012 whistleblower email and a copy of Mr. Verfuerth's November 2, 2012 email to K&L Gates LLP ("K&L Gates"), which then conducted an investigation into the allegations contained therein.

397. Mr. Verfuerth, due to K&L Gates' attorneys previous suggesting to Mr. Verfuerth and Kardish that Defendant pursue malpractice claims against Foley & Lardner and Grant Thornton, was not interviewed during its investigation conducted in response to Mr. Verfuerth's November 8, 2012 whistleblower email.

398. K&L Gates' investigation did not conclude until January 14, 2013.

399. On November 12, 2012, Mr. Verfuerth emailed a copy of his November 8, 2012 whistleblower email to Tandy at the SEC.

400. During a Special Board of Directors Meeting on November 8, 2012, and after receiving Mr. Verfuerth's November 8, 2012 whistleblower complaint, the Board unanimously voted to terminate Mr. Verfuerth as its Chairman Emeritus/Founder.

401. During the Special Board of Directors Meeting on November 8, 2012, and after receiving Mr. Verfuerth's November 8, 2012 whistleblower complaint, the Board unanimously voted to terminate Mr. Verfuerth's implied Employment Agreement for "incurable cause."

402. By designating the termination of Mr. Verfuerth's implied Employment Agreement as "incurable," Defendant preemptively eliminated Mr. Verfuerth's ability to "cure" the alleged defects causing that termination, as outlined in Mr. Verfuerth's Employment Agreement.

403. Mr. Verfuerth attended a portion of the Special Board of Directors Meeting on November 8, 2012 via conference call, but did not participate in the Board's vote to terminate him as Chairman Emeritus/Founder and his implied Employment Agreement.

404.    Defendant's November 8, 2012 termination of Mr. Verfuerth as its Chairman Emeritus/Founder and his implied Employment Agreement occurred fifty-nine days after Defendant issued its September 10, 2012 Form 10-K, in which it stated that it was "particularly dependent on the services of" Mr. Verfuerth and that the "loss or interruption of the service of" Mr. Verfuerth "could have a material adverse effect on [Defendant's] ability to expand [its] business, implement [its] strategy or achieve profitable operations."

405.    Defendant's November 8, 2012 termination of Mr. Verfuerth as its Chairman Emeritus/Founder and his implied Employment Agreement occurred fifty-nine days after Defendant issued its September 10, 2012 proxy statement, in which it proposed that Mr. Verfuerth's salary be increased 18.5% for fiscal year 2013, based at least in part on his "critical importance to the Company, his leadership skills and his significant role in the Company's ongoing sales organization and its innovative product research and development."

406.    As a direct result of Defendant's termination of Mr. Verfuerth as its Chairman Emeritus/Founder and his implied Employment Agreement for "incurable cause," Mr. Verfuerth was disallowed from receiving no less than $1.7 million in severance and accrued benefits compensation that he was entitled to vis-à-vis his "good reason" termination of his implied Employment Agreement.

407.    In addition to terminating Mr. Verfuerth as its Chairman Emeritus/Founder and his implied Employment Agreement for "incurable cause," Defendant retained Mr. Verfuerth's entire prorated paycheck in the amount of $13,925.00 for monies allegedly owed to Defendant.

408.    Defendant filed a Form 8-K on November 8, 2012.

409.    Defendant's November 8, 2012 Form 8-K did not mention the termination of Mr.

Verfuerth as its Chairman Emeritus/Founder and his implied Employment Agreement.

410.     Defendant did not publicly announce its termination of Mr. Verfuerth as Chairman/Emeritus until November 30, 2012, at which time Defendant filed a Form 8-K.

411.     Defendant did not make any public filings disclosing the reason(s) for its termination of Mr. Verfuerth as Chairman Emeritus/Founder and his implied Employment Agreement on November 8, 2012.

412.     On November 9, 2012, Marland, on behalf of Kackley, emailed a letter to Mr. Verfuerth dated November 9, 2012, that constituted "written notice of [Mr. Verfuerth's] termination for 'Cause' under [his] Executive Employment and Severance Agreement, effective immediately."

413.     On November 9, 2012, Mr. Verfuerth was served with a Notice of Motion and Motion to create a Constructive Trust relating to his divorce proceedings with his ex-wife, Patricia Verfuerth.

414.     The Notice of Motion and Motion served upon Mr. Verfuerth on November 9, 2012 was supported by the affidavit of Patricia Verfuerth, in which she testified in part, "On information and belief, the Petitioner [Mr. Verfuerth] is no longer employed by Orion Energy Systems, Inc." The affidavit was signed and notarized on November 8, 2012.

415.     Upon information and belief, Barth notified Patricia Verfuerth's divorce attorney, Bruce Peckerman, of Defendant's termination of Mr. Verfuerth as Chairman Emeritus/Founder and his implied Employment Agreement on November 8, 2012.

### Defendant Completely Eliminates Mr. Verfuerth's Ability to Participate in the Business of Defendant

416.     On November 12, 2012, Kackley emailed Mr. Verfuerth, outlining and establishing "parameters and protocol for [his] communications with [Defendant's] Board and management."

64

As outlined in the email, if Mr. Verfuerth wanted any information from Defendant, he had to submit a written request to Kackley stating the specific information he required and the reason(s) he needed it. Defendant would then decide if Mr. Verfuerth should receive the information. Further, all informational requests, questions, and correspondence from Mr. Verfuerth had to be sent solely to Kackley for his evaluation.

417. The "parameters and protocols" set forth in Kackley's November 12, 2012 email to Mr. Verfuerth eliminated Mr. Verfuerth's ability to actively engage in Board matters, despite his alleged continuing role on Defendant's Board.

418. The "parameters and protocols" set forth in Kackley's November 12, 2012 email to Mr. Verfuerth eliminated Mr. Verfuerth's ability to actively engage in Defendant's business, despite his alleged continuing role on Defendant's Board.

419. Kackley's November 12, 2012 email to Mr. Verfuerth additionally stated in part:

> [N]ow that your employment with Orion has been terminated, as a non-employee director, you are entitled to begin receiving non-employee director fees while you remain on the Board. However, since you still owe Orion approximately $76,000, we will withhold such director fees from you as they are earned and we will offset them against the amount you owe to Orion to mitigate your liability to Orion.

420. On November 13, 2012, Kackley received an email from Mr. Verfuerth. The email stated, in part:

> The actions of the Orion Board of Directors continue to violate the Orion Code of Conduct. The Board meeting last week on 11/8/12 was another example of the continual retaliation against me the Board insists on perpetuating. The accusations made as the agenda for the meeting are absurd and non[-]factual…If the company would not continue to pursue extortion as their bargaining strategy, this deal would have been done. As an alternative to this latest round of retaliation, a side note could have been drafted to protect the interests

65

of the company to be paid out of the severance payment I'm entitled to. Furthermore, your well documented and continuous actions will be quite inconsistent with the representations that you personally have made to our shareholders.

421. On November 20, 2012, Kackley emailed his "last direct response" to Mr. Verfuerth, in which he instructed Mr. Verfuerth to "direct all Orion correspondence to Steve Barth at Foley."

## Mr. Verfuerth Resigns from Defendant's Board

422. On November 27, 2012, Kackley, Schueller, Rich, and Jacobson received an email form Mr. Verfuerth stating in part:

> The Orion Board of Directors ha[s] allowed and/or sanctioned numerous deliberate actions that include but [are] not limited to: Activities that are adversely affecting my ability to perform my duties as a Board Member[,] Causing me considerable emotional and financial duress, and likely damaging my reputation in the industry/community. Furthermore[,] I cannot by virtue of my presence, condone the behavior and certain actions taken by the board, that I believe to be at a minimum a violation of our 'Code of Conduct' and adversely affecting our shareholders. Therefore[,] I must resign as a member of the Orion Board of Directors effective immediately.

423. Defendant accepted Mr. Verfuerth's resignation from the Board, effective November 27, 2012.

424. On November 29, 2012, Kackley received an email from Mr. Verfuerth stating: "Jim, Just so we are clear, the reasons I am resigning include but are not limited to many, if not all of the issues I discovered and reported to you, and as were filed in my Whistleblower complaint as reported to Tom Schueller and Stuart Ralsky." Mr. Verfuerth copied Schueller, Ralsky, and Conners on the email.

425. On November 30, 2012, Defendant filed a Form 8-K.

66

426.    In Defendant's November 30, 2012 Form 8-K, Defendant stated in part:

> Mr. Verfuerth resigned from the Company's Board of Directors effective immediately as a result of an alleged disagreement with the Company…[t]he Company believes that Mr. Verfuerth's alleged disagreement relates to the Board of Directors' appointment of John H. Scribante…in replacement of Mr. Verfuerth, and/or the…subsequent termination of Mr. Verfuerth's employment as Chairman Emeritus/Founder for cause on November 9, 2012.

### Mr. Verfuerth's Complaint under the Sarbanes-Oxley Act of 2002, and Defendant's Reaction to and Public Misrepresentations of that Complaint

427.    During his employment at Defendant, Mr. Verfuerth believed that the conduct he reported to Defendant's Board, particularly Kackley, violated the Sarbanes-Oxley Act of 2002, as amended ("SOX").

428.    During his employment at Defendant, Mr. Verfuerth believed that the conduct he reported to Defendant's Board, particularly Kackley, violated SEC rules and regulations.

429.    During his employment at Defendant, Mr. Verfuerth believed that the conduct he reported to Defendant's Board, specifically Kackley, adversely impacted and was purposefully hidden from Defendant's shareholders.

430.    During his employment at Defendant, Mr. Verfuerth did not have specialized training in securities or SEC rules and regulations.

431.    Upon information and belief, during Kardish's employment at Defendant, Kardish had specialized training in securities and SEC rules and regulations.

432.    Upon information and belief, and as demonstrated by Kardish's October 2, 2012 letter to Scribante, Kardish believed that the conduct he reported to Defendant's Board violated SEC rules and/or regulations.

433.    Upon information and belief, and as demonstrated by Kardish's October 2, 2012

67

letter to Scribante, Kardish believed that the conduct he reported to Defendant's Board adversely impacted and was purposefully hidden from Defendant's shareholders.

434. During his employment at Defendant, Mr. Verfuerth had Kardish conduct investigations into various aspects of Defendant on behalf of and in concert with Mr. Verfuerth pursuant to his legal and ethical obligations under Section 307 of SOX.

435. On November 8, 2012, Mr. Verfuerth filed a complaint under Section 806 of SOX with the United States Department of Labor ("DOL"). As his complaint, Mr. Verfuerth provided the DOL with a copy of his November 8, 2012 whistleblower email (collectively, "SOX complaint").

436. The Occupational Safety and Health Administration ("OSHA") investigated Mr. Verfuerth's SOX complaint.

437. The investigation into Mr. Verfuerth's SOX complaint remained ongoing until he requested removal of that complaint to federal court on October 28, 2013.

438. A potential legal remedy available to Mr. Verfuerth vis-à-vis his SOX complaint was reinstatement at Defendant.

439. Defendant filed a Form 8-K on December 6, 2012, approximately one month after Mr. Verfuerth filed his SOX complaint.

440. The purpose of Defendant's December 6, 2012 8-K was to provide notice that the Executive Employment and Severance Agreements of Scribante, Potts, and Jensen were modified to include the employment of Mr. Verfuerth as a senior executive officer into the definition of "Good Reason" in those Agreements, meaning that if Defendant ever again employed or reinstated Mr. Verfuerth, Scribante, Potts, and Jensen could terminate their Agreements for "Good Reason,"

68

thereby allowing them to essentially quit and receive severance payments from Defendant.

441. On February 5, 2013, while OSHA's investigation of Mr. Verfuerth's SOX complaint remained ongoing, Defendant held its Fiscal Third Quarter 2013 Conference Call, in which Scribante and Jensen participated.

442. During Defendant's Fiscal Third Quarter 2013 Conference Call on February 5, 2013, Jensen stated, "We did incur several unusual expenses during the third quarter...These legal expenses relate to the SEC solar restatement inquiry, a whistleblower claim which has been investigated and dismissed and other legacy legal matters."

443. Defendant filed a Form 10-Q on February 8, 2013, while OSHA's investigation of Mr. Verfuerth's SOX complaint remained ongoing.

444. In Defendant's February 8, 2013 Form 10-Q, Defendant stated in part: "During the fiscal 2013 third quarter, we incurred legal expenses of $0.4 million related to unusual items, including the SEC investigation related to our solar revenue recognition restatement, the favorable investigation and dismissal of a whistleblower complaint from our former CEO and other legal matters."

## Defendant's Post-Employment Retaliation against Mr. Verfuerth

445. On or about November, 30, 2012, Mr. Verfuerth learned that a "restrictive legend" had been placed on his shares of Defendant's stocks, disallowing him from transferring them.

446. On or about December 31, 2012, and with respect to the removal of the "restrictive legend" from Mr. Verfuerth's shares, Jensen informed Mr. Verfuerth, "looks like they are getting close to having this done."

447. On April 3, 2013, Mr. Verfuerth requested the transfer of 604,491 shares of

69

Defendant's stock (certificate number 2937) to Energy Bank, Inc., Mr. Verfuerth's new venture, in a private transaction. The documentation Mr. Verfuerth submitted to Wells Fargo Shareholder Services, the transfer agent, included an opinion letter from a securities attorney confirming that the transfer is permitted and that the restrictive legend could be removed from the shares.

448.    On April 8, 2013, Wells Fargo transferred ownership of Mr. Verfuerth's shares of Defendant's stock (certificate number 2937) to Energy Bank, Inc.

449.    On April 10, 2013, Mr. Verfuerth's shares of Defendant's stock, now certificate number 2938 and listing Energy Bank, Inc. as their owner, were deposited into an Edward Jones account.

450.    By virtue of Mr. Verfuerth's shares of Defendant's stock (certificate number 2938) being transferred to Energy Bank, Inc., and then being deposited into an Edward Jones account on April 10, 2013, the shares became a financial asset of Energy Bank, Inc. valued at $1,474,958.04.

451.    On April 17, 2013, Carla Liban, an Edward Jones Representative, contacted Mr. Verfuerth and told him "something odd is going on with the account" or words to that effect.

452.    On April 19, 2013, Liban sent a facsimile transmission to Mr. Verfuerth indicating that Wells Fargo instructed Edward Jones to "confiscate" shares that had been deposited into Energy Bank, Inc.'s account on April 10, 2013.

453.    Over the course of multiple conversations between Mr. Verfuerth and Wells Fargo, Mr. Verfuerth was informed that Barth instructed Wells Fargo to reverse Mr. Verfuerth's/Energy Bank, Inc's transaction, and that he had suggested to it that Wells Fargo Shareholder Services may be in violation of securities laws if it did not comply.

454.    On April 24, 2013, and according to a statement of account from Edward Jones,

70

$1,474,958.04 was removed from Energy Bank, Inc.'s account.

455.    Subsequent to the removal of $1,474,958.04 from Energy Bank, Inc.'s account on April 24, 2013, an Edward Jones representative informed Mr. Verfuerth that Defendant was restricting the sale or transfer of Mr. Verfuerth's shares because, as determined by Barth, they were control shares that could not be sold or transferred for fear of compromising Defendant's share price.

456.    As of April 8, 2013, the date upon which Wells Fargo transferred ownership of Mr. Verfuerth's shares of Defendant's stock (certificate number 2937) to Energy Bank, Inc., those shares were not control shares.

457.    As of April 10, 2013, the shares had been converted to a financial asset of Energy Bank, Inc., and thus were not control shares.

458.    Subsequent to Edward Jones' informing Mr. Verfuerth that Defendant had asserted that his confiscated shares (or the cash they represented) were control shares and thus could not be sold or transferred for fear of compromising Defendant's share price, Mr. Verfuerth learned that Defendant placed that same restriction on shares of Defendant's stock owned by Mr. Verfuerth's mother.

459.    On or about May 20, 2013, Wells Fargo returned the shares of Defendant's stock it had confiscated from Mr. Verfuerth back to Mr. Verfuerth (now as certificate number 2939), with Mr. Verfuerth listed as their owner.

460.    On or about June 13, 2013, Defendant cancelled 20,168 of Mr. Verfuerth's shares of Defendant's stock from those contained under certificate number 2939.

461.    Although owned by Mr. Verfuerth, Defendant refused to release Mr. Verfuerth's

71

shares of Defendant's stock (certificate number 2939) unless he authorized it to cancel 20,168 of those shares as a "repayment" of the remaining amount of compensation Defendant had provided to him in connection with his divorce pursuant to the Consent Action.

462.    On August 7, 2013, Defendant held its 2013 Annual Meeting of Shareholders.

463.    On August 7, 2013, Mr. Verfuerth and his wife (nee Schroeder), attempted to attend Defendant's 2013 Annual Meeting of Shareholders; however, they were met in the parking lot by two individuals who held themselves out as private security hired by Defendant. The Verfuerths were told that they were not allowed in the meeting. When Mr. Verfuerth asked why, he was told that, per Marland, Defendant considered Mr. Verfuerth a threat to the safety of the other shareholders in attendance and feared that he would disrupt the meeting.

464.    On August 7, 2013, and as a result of Defendant's conduct, the Verfuerths were prohibited from voting their shares.

465.    Upon information and belief, on August 7, 2013, and despite Defendant's prohibiting the Verfuerths from voting their shares, the Verfuerths' shares were voted in favor of all the management positions.

466.    On August 7, 2013, Steve Huntington, CPA, Chief Financial Officer of Energy Bank, Inc., attempted to attend Defendant's 2013 Annual Meeting of Shareholders; however, Defendant did not allow him to enter the meeting.

467.    On August 7, 2013, and as a result of Defendant's conduct, Mr. Huntington was prohibited from voting Energy Bank, Inc.'s shares of Defendant's stock.

## CONDITIONS PRECEDENT

468.    On October 28, 2013, Mr. Verfuerth notified OSHA that he wished to pursue his

72

SOX complaint in Federal District Court.

469.    OSHA issued a letter to Mr. Verfuerth dated October 29, 2013, stating that Mr. Verfuerth could bring a *de novo* action in Federal District Court.

470.    Mr. Verfuerth has satisfied all conditions precedent prior to bringing this action.

## DAMAGES

471.    The conduct alleged above in this Complaint, and in the following Causes of Action, caused and resulted in damages and injuries to Mr. Verfuerth.

472.    Based upon the causal conduct of Defendant, and consistent with the Causes of Action set forth herein, some of which are pled in the alternative, Mr. Verfuerth is entitled to pecuniary, compensatory and other damages and relief, the nature, extent and amount of which will be determined at trial.

473.    The damages and relief to which Mr. Verfuerth is entitled include but are not limited to the following:

A.      Double back pay;

B.      Front pay and/or reinstatement at Defendant;

C.      Repayment of his attorneys' fees, costs, and disbursements;

D.      Compensatory damages;

E.      Severance pay, with the appropriate multiplier;

F.      Appropriate bonuses;

G.      Continuation of his salary and benefits, for the appropriate renewal period, up to at least three years;

73

H.  The difference between what he could have sold his stock for, at various times, and what he ultimately sold his stock for;

I.  The value of his stock options that were improperly taken from him;

J.  Compensation for Defendant's use of his patents;

K.  The monthly payments made by Mr. Verfuerth to his ex-wife as a result of their divorce; and

L.  Pre-judgment and post-judgment interest.

474.  The conduct of Defendant has been outrageous. Defendant has acted with indifference to and with reckless disregard for the rights of Mr. Verfuerth. Defendant's intentional and deceitful conduct is of such a nature and severity that entitles Mr. Verfuerth to an award of punitive damages.

## CAUSES OF ACTION

The following Causes of Action, where appropriate, are pled in the alternative.

### FIRST CAUSE OF ACTION – VIOLATION OF SECTION 806 OF THE SARBANES-OXLEY ACT OF 2002, AS AMENDED

475.  Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

476.  Defendant intentionally engaged in ongoing retaliation against Plaintiff in reckless disregard for his federally protected rights under Section 806 of the Sarbanes-Oxley Act of 2002, as amended, specifically 18 U.S.C. § 1514A, by, among other things, terminating him as CEO of Defendant, terminating him as Chairman Emeritus/Founder of Defendant, terminating his Employment Agreement without cause, and terminating his implied Employment Agreement for "incurable cause," in response to complaints he made to Defendant's Board regarding ongoing

74

conduct he believed to be violative of the Sarbanes-Oxley Act of 2002, the Exchange Act, and SEC rules and regulations, and conduct that he believed adversely impacted and was purposefully hidden from Defendant's shareholders.

477. As a result of Defendant's intentional retaliation, Plaintiff has suffered damages in the form of humiliation, embarrassment, emotional distress, loss of professional reputation, lost wages and benefits, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION – VIOLATION OF THE DODD-FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT

478. Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

479. Defendant intentionally engaged in ongoing retaliation against Plaintiff in reckless disregard for his federally protected rights under the Dodd-Frank Wall Street Reform and Consumer Protection Act, specifically 15 U.S.C. § 78u-6(h)(1)(A), by, among other things, terminating him as CEO of Defendant, terminating him as Chairman Emeritus/Founder of Defendant, terminating his Employment Agreement without cause, and terminating his implied Employment Agreement for "incurable cause," in response to complaints he made to Defendant's Board regarding conduct he believed to be violative of the Sarbanes-Oxley Act of 2002, the Exchange Act, and SEC rules and regulations, and conduct that he believed adversely impacted and was purposefully hidden from Defendant's shareholders.

480. As a result of Defendant's intentional retaliation, Plaintiff has suffered damages in the form of lost wages and benefits and attorneys' fees and costs.

## THIRD CAUSE OF ACTION – BREACH OF CONTRACT

481. Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint

75

by reference.

482.    Mr. Verfuerth's purported Employment Agreement stated in part that the Agreement could be terminated for "good reason" or "Cause."

483.    The purported 2008 Employment Agreement contained the following definition for "Cause":

> 2.    **Definitions**...
>
> d.    '**Cause**' shall mean a good faith finding by the Board that Executive has (i) failed, neglected or refused to perform the lawful employment duties related to his or her position or as from time-to-time assigned to him (other than due to disability); (ii) committed any willful, intentional or grossly negligent act having the affect of materially injuring the interest, business or reputation of the Company; (iii) violated or failed to comply in any material respect with the Company's published rules, regulations or policies, as in effect or amended from time-to-time; (iv) committed an act constituting a felony or misdemeanor involving moral turpitude, fraud, theft or dishonesty; (v) misappropriated or embezzled any property of the Company (whether or not an act constituted a felony or misdemeanor); or (vi) breached any material provision of this Agreement or any other applicable confidentiality, non-compete, non-solicit, general release, covenant not to sue, or other Agreement with the Company.

484.    In the purported Employment Agreement bearing the date of April 14, 2008, Mr. Verfuerth was employed as and was entitled to be the CEO of Defendant.  On September 27, 2012, Defendant removed Mr. Verfuerth as CEO and made the representation that Mr. Verfuerth had been reassigned to a different role in the Company.  Defendant did not at that time terminate Mr. Verfuerth's employment, but rather terminated only his role as CEO of Defendant.

485.    The reasons given by Defendant for the September 27, 2012 removal of Mr. Verfuerth as CEO did not satisfy the "with cause" requirements of the purported Employment

76

Agreement.

486. Defendant did not have "Cause" to reassign Mr. Verfuerth on September 27, 2012, and the Board made no good faith finding of "Cause."

487. When it reassigned Mr. Verfuerth and removed him as the CEO without "Cause" on September 27, 2012, Defendant breached the purported Employment Agreement.

488. Reassigning Mr. Verfuerth so as to remove him as CEO was conducted in bad faith.

489. When it removed Mr. Verfuerth as the CEO of Defendant without "Cause," on September 27, 2012, Defendant also imposed unfair, burdensome, and restrictive limitations upon Mr. Verfuerth's right and ability to participate in the conduct of the business of Defendant, as an employee, as a CEO (to which he was entitled) and as a continuing Board Member.

490. The September 27, 2012 restrictions were oppressive as to Mr. Verfuerth for many reasons, including that they created financial hardship for him and prohibited him from satisfying his fiduciary and other duties to Defendant.

491. Removing Mr. Verfuerth as CEO, at a minimum, was a material diminution in his authority, duties and responsibilities at Defendant; was a material diminution in the budget over which he retained authority; and was otherwise a material breach by Defendant of provisions in the purported Employment Agreement.

492. Defendant had no intention of renewing his employment after the six month "sabbatical" on which Defendant placed him on September 27, 2012, and Defendant had no intention of compensating him fairly for having been the founder, the largest individual investor, the inventor, and the "face" of Defendant.

77

493. In the alternative, the removal of Mr. Verfuerth as CEO, and the restrictive limitations placed upon him, left him with no option but to unwillingly terminate his Employment Agreement with Defendant for "Good Reason."

494. Having forced Mr. Verfuerth to resign for "Good Reason," Defendant then launched a campaign to bar him from receiving a fair severance package. Rather than negotiate with Mr. Verfuerth in good faith, Defendant fabricated "cause" to terminate his employment.

495. Kackley, Williamson, Potts, Barth, and others on Defendant's Board knew that Mr. Verfuerth was in a dispute with his divorce attorney over certain legal fees, and that any payment of fees to said attorney was pending the resolution of the well-known fee dispute.

496. In response to Kackley's purported concern over the disputed fees, Mr. Verfuerth assured Kackley that all the funds associated with those legal fees were accounted for and that he was attempting to resolve the dispute with his divorce attorney.

497. Although Kackley initially affirmed Mr. Verfuerth's right to a fair, negotiated severance, ultimately the Board instead fabricated false reasons to unfairly trigger the termination of Mr. Verfuerth's Employment Agreement, and thereafter fraudulently asserted that Defendant had "cause" to do so based on those false reasons.

498. Following the November 8, 2012 Board Meeting, Kackley issued his November 9, 2012 letter that set forth the reasons for the Board's termination of Mr. Verfuerth's Employment Agreement, allegedly for cause (the "November 9, 2012 termination letter")

499. The November 9, 2012 termination letter alleged incurable "cause" for such reasons as dishonesty, misappropriation, and conversion, including as those allegations related to the divorce attorney fees issue and alleged violations of the September 27, 2012 Board

78

Directives letter.

500. The reasons given by Kackley for Defendant's termination of Mr. Verfuerth's Employment Agreement as stated in the November 9, 2012 termination letter were unsubstantiated and false. The reasons given were a pretext, and were fabricated so as to try to justify and cover up the Board's scheme to eliminate Mr. Verfuerth from Defendant in response to the legitimate concerns he raised to it regarding ongoing conduct he believed to be violative of the Sarbanes-Oxley Act of 2002, the Exchange Act, and SEC rules and regulations, and conduct that he believed adversely impacted and was purposefully hidden from Defendant's shareholders.

501. Defendant's Board unlawfully retaliated against Mr. Verfuerth for making complaints regarding ongoing conduct he believed to be violative of the Sarbanes-Oxley Act of 2002, the Exchange Act, and SEC rules and regulations, and conduct that he believed adversely impacted and was purposefully hidden from Defendant's shareholders.

502. As a result of Defendant's wrongful and unlawfully retaliatory termination of Mr. Verfuerth's Employment Agreement for cause, Defendant ceased all further compensation to Mr. Verfuerth and terminated all of Mr. Verfuerth's stock options and restricted stocks. Defendant also advised it would retain the entire prorated check for money due and owing to Mr. Verfuerth, in the amount of $13,925. Defendant threatened "further action to collect" any amounts allegedly still due and owing by Mr. Verfuerth to Defendant.

503. Further, Defendant made no timely public filings disclosing that Mr. Verfuerth's Employment Agreement was terminated for the alleged dishonesty, or for the alleged misappropriation of Defendant's funds, or for the alleged conversion of Defendant's funds. Mr. Verfuerth denies all such allegations.

504.     Misappropriation and conversion of Defendant's funds by a member of Defendant's Board would constitute a reportable event of material importance under SEC regulations.

505.     Relying upon the fees that had not been paid to his divorce attorney, notwithstanding the genuine dispute over said fees, the Board's knowledge of said dispute, and the multiple methods for "curing" any problem, Defendant deemed the issue as incurable, and terminated Mr. Verfuerth's Employment Agreement for alleged "cause".

506.     As part of the "cause" finding, Defendant raised the unfair restrictive limitations it had placed upon Mr. Verfuerth on September 27, 2012, as if they fell within the "cause" definition in the purported Employment Agreement.

507.     Defendant was not justified in terminating Mr. Verfuerth's Employment Agreement for the alleged incurable cause.

508.     Defendant had no "cause" to terminate Mr. Verfuerth's Employment Agreement on or about November 8, 2012, or at anytime.

509.     The foregoing conduct of Defendant was a breach of the purported Employment Agreement.

510.     Defendant's breach of the contract has caused Mr. Verfuerth damages, the nature, amount and extent of which are to be determined at trial.  At a minimum he is entitled to all the damages set forth in paragraphs 471 – 474, above.

**FOURTH CAUSE OF ACTION – CONSTRUCTIVE DISCHARGE
IN BREACH OF CONTRACT**

511.     Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

512.     The deliberate removal of Mr. Verfuerth as CEO, reassigning him to a new,

undefined role, forcing him to take a six-month sabbatical, and imposing upon him the restrictive limitations, were material breaches of Mr. Verfuerth's contractual relationship with Defendant.

513.    The foregoing breaches of the contract with Mr. Verfuerth created working conditions that were so intolerable that they forced Mr. Verfuerth to resign for "good reason" from Defendant.

514.    Mr. Verfuerth did not want to resign from Defendant.  He did not want to be relieved of his CEO position.

515.    Mr. Verfuerth's resignation from Defendant for good reason was involuntary.

516.    Said resignation was in response to the duress and other improper actions imposed upon him by Defendant.

517.    Defendant's conduct and treatment of Mr. Verfuerth established conditions that were so intolerable that a reasonable person confronted with the same circumstances would have been compelled to resign.

518.    Defendant's constructive discharge of Mr. Verfuerth in breach of Defendant's contractual relationship with him has caused Mr. Verfuerth damages, the nature, amount and extent of which are to be determined at trial.  At a minimum he is entitled to all the damages set forth in paragraphs 471 – 474, above.

### FIFTH CAUSE OF ACTION – BREACH OF CONTRACT – STOCK OPTION AGREEMENT

519.    Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

520.    In 2003, Defendant created Defendant's 2003 Stock Option Plan ("Stock Option Plan") for the purpose of, among other things, allowing Defendant to award warrants or stock

options to qualified and deserving employees.

521. On or about March 31, 2004, Mr. Verfuerth and Defendant entered into a Stock Option Agreement ("Stock Option Agreement") whereby Mr. Verfuerth became entitled to warrants or options to purchase shares of stock in Defendant, and to have such warrants vested. The Mr. Verfuerth/Defendant Stock Option Agreement was in part governed by the terms and conditions of Defendant's 2003 Stock Option Plan.

522. At all times, Mr. Verfuerth performed as required pursuant to his Stock Option Agreement, and pursuant to all other agreements between Mr. Verfuerth and Defendant.

523. Defendant has failed, neglected and refused to comply with the provisions of the Stock Option Agreement between Mr. Verfuerth and Defendant.

524. Under the Stock Option Agreement, Mr. Verfuerth had the right to exercise his stock options within ninety days after the termination of his Employment Agreement.

525. Defendant prohibited and prevented Mr. Verfuerth from exercising his stock options or warrants within ninety days after the termination of his Employment Agreement, or any time thereafter.

526. Defendant's refusal to permit Mr. Verfuerth to exercise his stock options or warrants constitutes a breach of the Stock Option Agreement.

527. Mr. Verfuerth has sustained pecuniary damages as a result of Defendant's breach of the Stock Option Agreement.

528. In addition to the damages set forth in paragraphs 471 – 474, as a result of Defendant's conduct, Mr. Verfuerth is entitled to an award of damages in an amount sufficient to reasonably compensate him for the loss of the right to exercise his warrants, and to sell the

resulting shares when he desired to do so, and at a price that would have been most beneficial to him.

**SIXTH CAUSE OF ACTION – BREACH OF CONTRACT – SEVERANCE PAYMENT**

529.    Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

530.    The conduct of Defendant including the deliberate removal of Mr. Verfuerth as CEO, reassigning him to a new, undefined role, forcing him to take a six-month sabbatical, and imposing upon him the restrictive limitations, constituted "Good Reason" for Mr. Verfuerth's resignation under the purported Employment Agreement.

531.    As a result of his reassignment, and again as a result of his resignation for "Good Reason," Mr. Verfuerth is entitled to a severance payment under the Employment Agreement, including two times his annual salary, or three times his annual salary, depending on the circumstances, plus the average of the prior three years' bonuses, plus a pro rata bonus for the year of termination, as well as COBRA premiums for the duration of his COBRA continuation coverage period.

532.    Defendant represented and promised to Mr. Verfuerth that he would receive the amounts owed to him as a severance payment.

533.    Defendant has, in breach of its contractual relationship with Mr. Verfuerth, failed and refused to pay Mr. Verfuerth the amounts due and owing to him as a severance payment and has thus caused damages to Mr. Verfuerth.

534.    As a result of the conduct alleged herein, Mr. Verfuerth is entitled to damages, the nature, amount and extent of which are to be determined at trial.  At a minimum he is entitled to

83

all the damages set forth in paragraphs 471 – 474, above.

## SEVENTH CAUSE OF ACTION – DEFAMATION

535. Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

536. On November 9, 2012, Defendant terminated Mr. Verfuerth's Employment Agreement for alleged "cause."

537. On November 9, 2012, Defendant issued the following statement regarding the termination of Mr. Verfuerth's Employment Agreement:

> 1. Your acts of dishonesty, misappropriation and conversion of Company funds in connection with your retention of the Company's "reimbursement" to you of $90,000 of attorney fees (grossed up for taxes). These attorney fees were claimed by you to have been incurred in connection with your divorce, but you have not paid these fees to your divorce attorney and you have not accounted for such fees, even after the October 22 written request to do so.
>
> 2. Your serial violations of the terms and conditions of your September 27, 2012 Board Directives letter (including after the Company's October 22 written warning to you) as a result of your:
>
>> a. Disparagement of John Scribante
>>
>> b. Contacting Scott Jensen to obtain information about the Company's significant shareholders
>>
>> c. Contacting shareholders in an attempt to form a dissenting shareholders group.

538. The foregoing statement was false and defamatory, and defamed Mr. Verfuerth.

539. The foregoing statement was published and shared among all Board members, Defendant's senior management, and upon information and belief, others.

84

540.    Defendant made the foregoing statement with the intent to defame Mr. Verfuerth and to hold him up to ridicule and scorn in the community and the statement is of such nature as to harm Mr. Verfuerth's reputation and lower him in the estimation in the community and deter others from associating or dealing with him

541.    Defendant's false statement that Mr. Verfuerth had been fired for "cause" was made, in part, to deprive Mr. Verfuerth of the benefits he was entitled under the Stock Option Agreement and the purported Employment Agreement.

542.    The foregoing statement has caused damage to Mr. Verfuerth's reputation.

543.    As a result of Defendant's defamatory statement, Mr. Verfuerth has been held up to ridicule in the community and his reputation has been damaged.

544.    As a result of Defendant's defamatory statement, Mr. Verfuerth has sustained pecuniary damages such as to be entitled to compensation, including compensatory and punitive damages, in amounts to be proven at trial.

545.    The false and defamatory statement alleged above was made without privilege.  In the alternative, if there is any privilege that might apply to the false and defamatory statement alleged above, such privilege has been waived and abused, and Defendant may not rely upon any such privilege.

## EIGHTH CAUSE OF ACTION - CONVERSION

546.    Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

547.    In April 2013, Mr. Verfuerth attempted to get his shares of Defendant's stock into a position that would allow him to trade/sell them.

548.    On April 8, 2013, Mr. Verfuerth transferred his shares of Defendant's stock to Energy Bank, Inc.

549.    On April 10, 2013, these shares were then deposited into a trading account with Edward Jones.

550.    On April 19, 2013, Mr. Verfuerth received a facsimile indicating that Wells Fargo instructed Edward Jones to "confiscate" the shares. The reversal of this transaction and the "confiscation" of the shares (or the money the shares represented) were directed by Barth.

551.    On April 24, 2013 these same shares (or the cash) were removed from Energy Bank, Inc.'s trading account at Edward Jones.

552.    At about this same time, Barth issued a directive restricting the sale or transfer of Mr. Verfuerth's shares based on his determination that they were "control shares" that could not be sold or transferred for fear of compromising Defendant's share price. This same "control share" restriction was placed on shares of stock owned by Mr. Verfuerth's mother.

553.    Barth's actions, on behalf of Defendant, prohibited Mr. Verfuerth from selling, trading, or otherwise transacting business using these shares.

554.    Without the consent of Mr. Verfuerth, Defendant took control of his shares so as to interfere with his right to control said shares.

555.    Defendant's interference with Mr. Verfuerth's shares was deliberate and was in reckless disregard of Mr. Verfuerth's rights.

556.    As a result of the conduct alleged herein, Mr. Verfuerth is entitled to damages, the nature, amount and extent of which are to be determined at trial. At a minimum he is entitled to all the damages set forth in paragraphs 471 – 474, above.

## NINTH CAUSE OF ACTION – DECLARATORY JUDGMENT
## REGARDING PLAINTIFF'S PATENTS

557.   Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

558.   In an "Employment Agreement" made as of April 1, 2005 between Mr. Verfuerth and Defendant ("2005 Employment Agreement"), Intellectual Property Work Product was defined and was further deemed to be the property of the employee, Mr. Verfuerth. Under the 2005 Employment Agreement, Defendant had the option to acquire and own Intellectual Property Work Product belonging to Mr. Verfuerth.

559.   During the course of his employment at Defendant, Mr. Verfuerth invented and owned approximately seventy items of Intellectual Property Work Product.

560.   In 2007, leading up to Defendant's IPO, and with Barth's approval and encouragement, Mr. Verfuerth correctly reported to investors, shareholders and the public that he was the owner of Intellectual Property Work Product being used and relied upon by Defendant.

561.   During the term of the 2005 Employment Agreement, Mr. Verfuerth assigned to Defendant, and Defendant acquired ownership of, eight Intellectual Property Work Products by virtue of eight Intellectual Property Assignment Agreements. Regarding said eight items, Defendant agreed to pay Mr. Verfuerth $1,500 per month for each Intellectual Property Work Product, for a period of time prescribed in the Intellectual Property Assignment Agreement.

562.   Prior to and around the expiration of the 2005 Employment Agreement, Defendant and Mr. Verfuerth negotiated a buyout of the eight Intellectual Property Work Products for which there were Intellectual Property Assignment Agreements. Upon information and belief, a present value calculation or other analysis was performed by Defendant and/or Mr.

Verfuerth regarding the value of the eight Intellectual Property Work Products. As of approximately April 2008, Defendant deemed the total present value of the eight Intellectual Property Work Products to be approximately $950,000.

563. In consideration for a buyout of the eight items of Intellectual Property Work Products that were covered by the previously-executed Intellectual Property Assignment Agreements, Defendant agreed to pay Mr. Verfuerth $950,000 to obtain Mr. Verfuerth's right, title and interest to said eight items.

564. Prior to or upon the expiration of the 2005 Employment Agreement, Mr. Verfuerth and Defendant discussed terms and conditions of a possible successor Employment Agreement. There is in existence a purported "Executive Employment and Severance Agreement" bearing the date of April 14, 2008 ("purported 2008 Employment Agreement").

565. Upon information and belief, Defendant has taken the position that it owns all of Mr. Verfuerth's Intellectual Property Work Products.

566. Upon information and belief, Mr. Verfuerth, not Defendant, is the owner of all of Mr. Verfuerth's Intellectual Property Work Product except those items covered in the eight executed Intellectual Property Assignment Agreements. Upon information and belief, up to sixty-two patents are still owned by Mr. Verfuerth, yet Defendant has represented that it is the owner of said Intellectual Property Work Product.

567. Defendant has paid nothing and Mr. Verfuerth has received no consideration for the remaining approximately sixty-two Intellectual Property Work Products that are not covered by the eight Intellectual Property Assignment Agreements.

568. 28 U.S.C. §2201, as well as Federal Rule of Civil Procedure 57, permits parties to

88

seek a judgment declaring their rights and legal relations, and to settle uncertainty regarding their rights, status and legal relations.

569.    Mr. Verfuerth is the owner of the approximate sixty-two Intellectual Property Work Products that were not the subject of the eight Intellectual Property Assignment Agreements.

570.    The purpose of this cause of action is to seek a judicial declaration that Mr. Verfuerth is the owner of the approximate sixty-two Intellectual Property Work Products as previously described.

571.    A judgment or decree in this cause of action will remove any uncertainty giving rise to this cause of action.

## TENTH CAUSE OF ACTION – ACCOUNTING AND DAMAGES FOR DEFENDANT'S USE OF MR. VERFUERTH'S INTELLECTUAL PROPERTY WORK PRODUCTS

572.    Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

573.    While Mr. Verfuerth was employed at Defendant, he was not compensated for Defendant's use of his Intellectual Property Work Products, unless a particular Intellectual Property Work Product was subject to an Intellectual Property Assignment Agreement.  As the CEO of Defendant, he was willing to allow Defendant to use said Intellectual Property Work Products because it was in the best interest of Defendant and its shareholders, including Mr. Verfuerth, to have the Intellectual Property Work Products available for Defendant's use.

574.    When Mr. Verfuerth was terminated as CEO by Defendant on September 27, 2012, he was no longer willing to allow Defendant to use his Intellectual Property Work Products without fair compensation.

89

575. Since September 27, 2012, Defendant has been unjustly enriched by using Mr. Verfuerth's Intellectual Property Work Products without his approval and without compensating him for said use.

576. Mr. Verfuerth demands that Defendant cease and desist from using his Intellectual Property Work Products. Mr. Verfuerth seeks an accounting of all methods and manners in which his Intellectual Property Work Products have been used by Defendant since September 27, 2012.

577. Further, Mr. Verfuerth seeks damages in amounts that are fair and reasonable to compensate him for Defendant's use of his Intellectual Property Work Products from September 27, 2012, through the date of the conclusion of these proceedings, and beyond.

## ELEVENTH CAUSE OF ACTION- BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

578. Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

579. The purported Employment Agreement bearing the date of April 14, 2008, included, by operation of law, a covenant of good faith and fair dealing, which is implied in every contract.

580. Defendant owed Mr. Verfuerth the duty of good faith and fair dealing.

581. Defendant breached its duty of good faith and fair dealing to Mr. Verfuerth by, among other actions, terminating his Employment Agreement for no valid reason, and refusing to compensate Mr. Verfuerth in accordance with that Agreement.

582. Defendant breached its duty of good faith and fair dealing by asserting economic duress against Mr. Verfuerth as it tried to force him to accept a Separation Agreement that did

90

not fairly compensate him as he was entitled. This duress included trying to impose upon Mr. Verfuerth unreasonable demands that tied his Separation Agreement with the Separation Agreements of others.

583. The foregoing actions of Defendant constitute a breach of its duty of good faith and fair dealing owed to Plaintiff, which is implied in every contract.

584. Defendant's breach of its duty of good faith and fair dealing caused Plaintiff damages, the extent and amount of which are to be determined at trial. At a minimum, Mr. Verfuerth is entitled to all of his damages set forth in paragraphs 471 – 474, above.

## TWELFTH CAUSE OF ACTION – CONVERSION REGARDING PLAINTIFF'S SEVERANCE PACKAGE

585. Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

586. By virtue of Plaintiff's termination of his Employment Agreement for "Good Reason," Plaintiff was entitled to receive a severance package from Defendant.

587. Defendant has withheld and barred Mr. Verfuerth's recovery of his severance package.

588. By keeping his severance entitlements which otherwise would be due to Mr. Verfuerth, Defendant has intentionally controlled or taken property belonging to Plaintiff.

589. Defendant has controlled and has taken the property of Mr. Verfuerth without his consent and without lawful authority.

590. Defendant's actions with respect to the severance package have seriously interfered with Mr. Verfuerth's right to receive and possess the amount to which he was entitled as a severance package.

91

591. As a direct and proximate result of Defendant's actions as set forth herein, Plaintiff has suffered damages in an amount of his severance package as outlined in the purported Employment Agreement.

## THIRTEENTH CAUSE OF ACTION – ECONOMIC DURESS

592. Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

593. Defendant engaged in wrongful conduct toward Mr. Verfuerth when it stated he was not entitled to any of the benefits due under the purported Employment Agreement between Defendant and Mr. Verfuerth. Such wrongful conduct caused economic duress and hardship to Mr. Verfuerth.

594. Defendant engaged in wrongful conduct when it refused to negotiate in good faith regarding the impact of the involuntary "good reason" termination of Mr. Verfuerth's Employment Agreement and, instead, made unreasonable proposals regarding the content of a severance agreement.

595. The foregoing wrongful conduct was engaged in by Defendant intentionally for the purpose of causing economic duress to Mr. Verfuerth so that it could obtain a purported Settlement Agreement consisting of one-sided terms favorable only to Defendant.

596. The foregoing conduct constituted a threat by Defendant that it would not pay anything to Mr. Verfuerth, either under the purported Employment Agreement or the Stock Option Agreement, unless Mr. Verfuerth agreed to terms that were not acceptable and were not fair or reasonable. In the end, Defendant followed through on this threat and paid Mr. Verfuerth nothing.

92

597.     Defendant did not have the legal right to refuse to honor Mr. Verfuerth's rights to severance and other economic benefits under the purported Employment Agreement and the Stock Option Agreement.

598.     Mr. Verfuerth had no adequate legal remedy to resist the consistent and effective economic duress imposed by the wrongful conduct of Defendant.

599.     As a direct and proximate result of Defendant's actions as set forth herein, Plaintiff has suffered damages in an amount of his severance package as outlined in the purported Employment Agreement.  Mr. Verfuerth is also entitled to other damages, including the damages set forth in paragraphs 471 – 474, above.

## FOURTEENTH CAUSE OF ACTION – EXCLUSION FROM ANNUAL SHAREHOLDERS MEETINGS

600.     Plaintiff realleges and incorporates all of the foregoing paragraphs of this Complaint by reference.

601.     At all relevant times, Mr. Verfuerth has been a shareholder of Defendant entitled to all the benefits and privileges incidental to ownership of Defendant's stock.

602.     One of Mr. Verfuerth's rights, as an owner of shares of Defendant's stock, is the right to attend the annual meeting of the corporation, and to participate therein, including voting his shares at said annual meeting.

603.     Defendant wrongfully refused to permit Mr. Verfuerth to attend the annual public meeting of Defendant's shareholders in 2012 and 2013 contrary to law, and has wrongfully denied his admission to such meetings by intimidation and threat of force.

604.     Pursuant to Section 180.0721, Wis. Stats., Mr. Verfuerth was entitled to exercise one vote for each share he owned on each matter voted on at each of the annual shareholders

meetings.

605.    Pursuant to Defendant's Articles of Incorporation, filed with the State of Wisconsin, Mr. Verfuerth was entitled to exercise one vote for each share he owned at each of the annual shareholders meetings.

606.    Pursuant to the Bylaws adopted by Defendant, Mr. Verfuerth was entitled to exercise one vote for each share he owned at each of the annual shareholders meetings.

607.    Therefore, pursuant to Wisconsin law and Defendant's own Articles and Bylaws, Mr. Verfuerth was entitled to attend and vote at each of the annual shareholders meetings.

608.    Defendant made no effort to obtain any legal order from any court to prohibit or prevent Mr. Verfuerth from attending any annual shareholders meeting.

609.    Defendant had no right to prohibit Mr. Verfuerth from attending the annual shareholders meetings.  The right to attend an annual shareholders meeting, to vote and to participate in the annual shareholders meeting is a valuable right incident to the ownership of shares in Defendant.

610.    Defendant's conduct in prohibiting Mr. Verfuerth from attending annual meetings was willful, wanton and in reckless disregard of his rights, and for the purpose of portraying Mr. Verfuerth to the public as an undesirable, all without cause or justification.

611.    Defendant's refusal to permit Mr. Verfuerth to attend the annual meetings has resulted in the impairment of his rights as a shareholder, has caused him to sustain pecuniary damages, and has caused him embarrassment, humiliation and emotional distress, all of which were intended by Defendant.

612.    As a result of the foregoing, Mr. Verfuerth is entitled to an award compensating

94

him for the reasonable value of the loss of his rights as a shareholder, and for the resulting embarrassment, humiliation and emotional distress, and other damages, the extent and amount of which are to be determined at trial, including the damages set forth in paragraphs 471 - 474, above.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

1.  For Judgment making Plaintiff whole by providing double back pay, front pay and/or reinstatement, compensatory and punitive damages, pre-judgment and post-judgment interest, and reimbursement for other benefits and expenses in an amount to be shown at trial;

2.  For Judgment in favor of Plaintiff on each of his Causes of Action;

3.  For pecuniary, compensatory and other damages in amounts sufficient to reasonably compensate him for the losses he has sustained due to the conduct of Defendant;

4.  For such other relief and damages as the circumstances warrant, including but not limited to the relief set forth in paragraphs 471 - 474 above;

5.  For punitive damages in an amount determined by the finder of fact;

6.  For his attorneys' fees, costs and disbursements as provided by law; and

7.  For such other and further relief as deemed just, equitable and appropriate by the Court in favor of the Plaintiff.

**PLAINTIFF DEMANDS A JURY AS TO ALL TRIABLE ISSUES.**

Dated this 27th day of March, 2014.

WALCHESKE & LUZI, LLC
Counsel for Plaintiff


/s/ James A. Walcheske
James A. Walcheske, State Bar No. 1065635
Scott S. Luzi, State Bar No. 1067405
Jesse R. Dill, State Bar No. 1061704

WALCHESKE & LUZI, LLC
200 South Executive Drive, Suite 101
Brookfield, Wisconsin 53005
Phone: (262) 780-1953
Fax: (262) 565-6469
jwalcheske@walcheskeluzi.com
sluzi@walcheskeluzi.com
jdill@walcheskeluzi.com


NELSON, CONNELL, CONRAD,
TALLMADGE & SLEIN, S.C.
Counsel for Plaintiff

/s/ Mark S. Nelson
Mark S. Nelson, State Bar No. 1014760
Philip J. Tallmadge, State Bar. No. 1021414

NELSON, CONNELL, CONRAD,
TALLMADGE & SLEIN, S.C.
N14 W23755 Stone Ridge Drive
Suite 150
P. O. Box 1109
Waukesha, WI 53187
Phone: (262) 347-0303
Fax: (262) 347-0606
mnelson@ncctslaw.com
ptallmadge@ncctslaw.com