# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

NEAL VERFUERTH,

        Plaintiff,

v.                                                                       Case No. 14-C-352

ORION ENERGY SYSTEMS, INC.,

        Defendant.

## DECISION AND ORDER

Plaintiff Neal Verfuerth filed a 96-page complaint alleging 14 claims arising out of the termination of his employment as CEO of Defendant Orion Energy Systems, Inc. The Defendant has filed a motion seeking dismissal of some of these claims. As for the remaining claims, the Defendant moves to strike them on the grounds that they do not comply with Rule 8. For the reasons given below, the motions will be granted.

**I. Background**

Neal Verfuerth started Orion Energy in 1996 and became the company's CEO in 2005, shortly before it went public in 2007. At one point, Verfuerth divorced his wife, and the company agreed to reimburse him for his legal expenses. Eventually (it will suffice to say) Verfuerth did not see eye-to-eye with the company's board of directors. On September 27, 2012, at a special meeting of the board, the board removed Verfuerth as the company's CEO and made him "chairman emeritus," which was designed as an honorary, merely advisory role. It also offered him the option of resigning. Plaintiff resigned in October 2012. On November 8, Verfuerth sent an email titled

"Whistleblower Filing" to several board members, describing the email as a complaint pursuant to the company's whistleblower policy as well as the Sarbanes-Oxley Act. (Compl., ¶ 392.) The same day, the board terminated Plaintiff's employment for cause. In a letter to Plaintiff, which was copied to the board, the CFO, and counsel, the board chairman explained that the termination was the result of:

> 1. Your acts of dishonesty, misappropriation and conversion of Company funds in connection with your retention of the Company's "reimbursement" to you of $90,000 of attorney's fees (grossed-up for taxes). These attorney fees were claimed by you to have been incurred in connection with your divorce, but you have not paid these fees to your divorce attorney and you have not accounted for such fees, even after the October 22 written request to do so.
>
> 2. Your serial violations of the terms and conditions of your September 27, 2012 Board Directives letter (including after the Company's October 22 written warning to you) as a result of your:
>
> a. Disparagement of John Scribante
>
> b. Contacting Scott Jensen to obtain information about the Company's significant shareholders
>
> c. Contacting shareholders in an attempt to form a dissenting shareholders group.

(Compl. ¶ 537).

Soon after being terminated, Plaintiff forwarded a copy of his "whistleblower" email to an attorney for the Securities and Exchange Commission, which had been conducting an investigation of the company for other matters apparently unrelated to this action. In March 2014 he commenced this action. Further facts are set forth below, where relevant.

**II. Analysis**

In ruling on a motion to dismiss, I must construe all well-pleaded facts and draw all inferences in the light most favorable to the nonmoving party. *Reynolds v. CB Sports Bar, Inc.,* 623

F.3d 1143, 1146 (7th Cir. 2010). In order to survive a motion to dismiss, a plaintiff must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). And while all reasonable inferences and facts must be viewed in favor of the nonmovant, I need not accept as true any legal assertions or recital of the elements of a cause of action "supported by mere conclusory statements." *Alam v. Miller Brewing Co.,* 709 F.3d 662, 666 (7th Cir. 2013).

**A. Dodd-Frank Act**

Plaintiff's second claim asserts that Orion retaliated against him for making complaints about possible securities law violations. Orion argues that Plaintiff never complained to the SEC in the manner established by the Dodd-Frank Act itself, and thus he cannot be entitled to its protections.

The Act, passed in 2010, defines a whistleblower as "any individual who provides . . . information relating to a violation of the securities laws to the Commission, in any manner established by rule or regulation by the Commission." 15 U.S.C. § 78u-6(a)(6). And according to the implementing regulations, a whistleblower must either submit his information to the www.sec.gov website or by mailing a "Form TCR" to the Office of the Whistleblower in Washington, DC. 17 C.F.R. § 240.21F-9(a). Plaintiff concedes that he does not qualify as a "whistleblower" under the Act.

Even so, Plaintiff argues that the Act is ambiguous and that the SEC's own guidance would deem him a whistleblower entitled to the anti-retaliation provisions of the Act. The statute's anti-retaliation provision states:

3

> [n]o employer may discharge, demote, suspend, threaten, harass, directly or indirectly, or in any other manner discriminate against, a whistleblower in the terms and conditions of employment because of any lawful act done by the whistleblower—
>
> (i) in providing information to the Commission in accordance with this section;
>
> (ii) in initiating, testifying in, or assisting in any investigation or judicial or administrative action of the Commission based upon or related to such information; or
>
> (iii) in making disclosures that are required or protected under the Sarbanes–Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including section 78j–1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission.

15 U.S.C. § 78u–6(h)(1)(A).

In short, the anti-retaliation provision states that employers may not take adverse action against a "whistleblower" for: (i) reporting activity to the SEC, (ii) participating in judicial or administrative action, or (iii) making disclosures required or protected by the Sarbanes-Oxley Act or other securities laws.

The alleged ambiguity arises from the SEC's comments to its final rule implementing the Act, where the SEC explained "the third category includes individuals who report to persons or governmental authorities other than the Commission." SEC Securities Whistleblower Incentives and Protections, 76 Fed.Reg. 34300–01, at *34304, 2011 WL 2293084 (2011). Some district courts have agreed that the anti-retaliation provision is ambiguous and have given deference to the SEC's apparent belief that one can be entitled to whistleblower protections even if one does not qualify as a whistleblower under the Act. These courts adopt the view that the third category of protected activity—making Sarbanes-Oxley disclosures—is activity that, by its very nature, does not require reporting anything to the SEC. Thus, these courts perceive a direct conflict between the Act's

definition of whistleblower and the kinds of activity the statute protects.

There is no ambiguity in the statute at all, however. The surprising number of courts accepting the ambiguity argument appear to believe that because one may engage in protected activity and yet not qualify as a whistleblower, then there is something "ambiguous" in the statute. But that is an argument based solely on a disagreement about public policy, not statutory interpretation. These courts seem to believe, like the SEC, that it would have made more sense to provide whistleblower protection to any individual who engages in protected activity, regardless of whether he followed the rules for reporting to the SEC. Why, they ask, would the statute on the one hand protect from retaliation those who report matters to individuals *not* affiliated with the SEC but then define "whistleblower" to mean only individuals who *do* report to the SEC? But even if the statute produces a somewhat confusing public policy outcome (it does not, as discussed below), that does not mean there is any ambiguity in the statute itself.

Surprisingly, no court finding "ambiguity" has actually identified a clause or phrase whose terms are not readily susceptible to interpretation. Is it the term "whistleblower" itself? No. That definition is perfectly clear: "any individual who provides . . . information relating to a violation of the securities laws to the Commission, in any manner established by rule or regulation by the Commission." 15 U.S.C. § 78u-6(a)(6). The only other candidate for ambiguity would be 15 U.S.C. § 78u–6(h)(1)(A)(iii), the third anti-retaliation provision, which protects "making disclosures that are required or protected under the Sarbanes–Oxley Act of 2002 (15 U.S.C. 7201 et seq.), this chapter, including section 78j–1(m) of this title, section 1513(e) of Title 18, and any other law, rule, or regulation subject to the jurisdiction of the Commission." But these courts do not cite any ambiguity there, either. Instead, they simply believe that the protections of that clause should, as

5

a matter of policy, extend to people even if they did not report a securities violation to the SEC.

The statute is simple enough to understand. Reporting to the SEC is the precondition that triggers the anti-retaliation protections of the statute. Only when one has reported to the SEC is that employee protected under *all three* prongs of the anti-retaliation provision. It is true that these protections are *broader* than the definition of "whistleblower" itself, meaning that once one qualifies as a whistleblower (by reporting to the SEC), then he is entitled to protection not only for the act of reporting to the SEC but for engaging in *other* protected activity as well. But the fact that the retaliation protections are broader than the definition of whistleblower does not create any ambiguity. Creating a class of people (whistleblowers) and then protecting them from various discriminatory acts *in addition* to the act that qualified them for that class does not produce ambiguity or conflict. Instead, it simply means exactly what it says, which is that once an employee becomes a whistleblower, the employer may not take adverse action against him for (1) whistleblowing *or* (2) certain other activities specified in 15 U.S.C. § 78u–6(h)(1)(A)(iii). Ironically, one district court found that accepting the SEC's broader interpretation of the rule would "harmonize" the supposed contradictions "while not rendering any word or section superfluous." *Khazin v. TD Ameritrade Holding Corp.,* 2014 WL 940703, *6 (D. N.J., March 11, 2014). Yet the opposite is true. The SEC's interpretation renders an entire *section* of the statute superfluous, namely, the definition of "whistleblower" itself. Congress could not have defined "whistleblower" more clearly, and yet the SEC apparently believes that entire definition should be cast aside on the flimsy grounds that Congress really didn't mean it.

Luckily, the Fifth Circuit did not fall for this argument. In rejecting the notion that any ambiguity existed, the court noted that in the anti-retaliation clause, Congress used the defined term

6

"whistleblower" not once but twice, when it could just as easily have used a generic term like "employee." *Asadi v. G.E. Energy (USA), L.L.C.,* 720 F.3d 620, 626 (5th Cir. 2013). Using a broader term like "employee" would have been the simplest way to accomplish the policy goals that the Plaintiff and some courts evidently desire, and yet Congress went to the trouble of defining the term "whistleblower" and then limiting the anti-retaliation protections to people who qualify as whistleblowers. For example, Congress could simply have said that "no employer may discharge . . . an employee . . . for making disclosures protected under the Securities laws." Instead, it defined a term and then used it. To assume that Congress simply made an error under these circumstances is not warranted.

The Fifth Circuit also found that accepting the SEC's view would render the Sarbanes-Oxley (SOX) whistleblower protections moot. *Id.* at 628-29. That is, the Sarbanes-Oxley Act of 2002 already contains an anti-retaliation provision. If the Dodd-Frank protections were construed broadly, it would essentially replicate and render moot the SOX whistleblower protections already in place, which do not require reporting directly to the SEC. Thus, it makes much more sense to assume that Congress was attempting to create something *different* than pre-existing law, and it did so by defining "whistleblower" and then creating certain protections for those who qualify.

In short, the belief that there is some kind of conflict in the statute is based on a flawed understanding of the concept of statutory ambiguity. No term or phrase in the statute is actually ambiguous. Instead, courts perceiving ambiguity appear flummoxed by the simple fact that the protections in the statute extend to activity beyond the activity that qualifies an employee for protection. But, as discussed above, there is nothing "ambiguous" or conflicting about such a framework at all. Accordingly, the plain language Congress employed should be given full effect.

7

Because Plaintiff concedes he does not qualify as a whistleblower, as defined in the Act, the motion to dismiss the Dodd-Frank claim will therefore be granted.

**B. Defamation**

Plaintiff also brought a claim for defamation based on the November 9, 2012 termination letter that was circulated to the board, company executives and outside counsel. A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or deter third persons from associating or dealing with him. *Converters Equipment Corp. v. Condes Corp.,* 80 Wis.2d 257, 262, 258 N.W.2d 712 (Wis. 1977). The letter in question referred to "acts of dishonesty" in connection with Plaintiff's retention of funds that were supposed to have been paid to his divorce attorney, as well as his efforts to form a dissenting shareholders group. (Compl. ¶ 537).

**1. Privilege**

Orion argues that even if the letter is defamatory, the communication is protected by the common interest privilege. Section 596 of the Restatement 2d of Torts defines the "common interest" privilege as follows: "An occasion makes a publication conditionally privileged if the circumstances lead any one of several persons having a common interest in a particular subject matter correctly or reasonably to believe that there is information that another sharing the common interest is entitled to know." Rest. (2d) Torts § 596. *Zinda v. Louisiana Pacific Corp.,* 149 Wis.2d 913, 922, 440 N.W.2d 548, 552 (Wis. 1989). "The common interest privilege is based on the policy that one is entitled to learn from his associates what is being done in a matter in which he or she has an interest in common. Thus, defamatory statements are privileged which are made in furtherance of common property, business, or professional interests." *Id.* The privilege extends to "partners,

fellow officers of a corporation for profit, fellow shareholders, and fellow servants...." Rest. (2d) Torts, Comment d. at 597.

In *Zinda,* the state supreme court recognized that "the common interest privilege is particularly germane to the employer-employee relationship." 149 Wis.2d at 923, 440 N.W.2d at 552. This holding recognizes that candor in such relationships often trumps an employee's interest in his reputation. For example, employers should be allowed to make candid, and even incorrect, evaluations of employees without worrying that the employee will sue for defamation. This does not mean that an employer can recklessly slander an employee by falsely claiming he beats his wife or is a child molester; the privilege is conditional and requires that the speaker not recklessly disregard the truth. *Id.* In *Zinda,* like here, the employer explained to more than one hundred other employees why Zinda was fired, which was for "falsification of emp[loyment] forms." *Id.* at 918, 550. The court found the employer protected by the common interest privilege, because "Employees have a legitimate interest in knowing the reasons a fellow employee was discharged." *Id.* at 924, 553.

Here, Plaintiff argues that although the privilege might conceivably apply to the communications to the board of directors and other company officials, his complaint alleges that the allegedly defamatory letter was circulated to "others," "on information and belief." (ECF No. 1 at ¶ 539.) In several pages of briefing, the Plaintiff does not identify who these "others" were. Instead, he suggests that discovery will be required to determine whether others received the document. Pleading "on information and belief" is a common way of making allegations, particularly when the information is "peculiarly within the knowledge of the defendants." *Carroll v. Morrison Hotel Corp.,* 149 F.2d 404, 406 (7th Cir. 1945). But whether the document was

9

circulated to others is not something about which the Defendant might have "peculiar" knowledge. A defamation claim depends on injury, and the injury is only sustained when the plaintiff's reputation is harmed in the mind of another. In most defamation claims, the plaintiff can point specifically to individuals whose opinions turned unfavorable due to the defamatory statement. That injury is tied up with the claim itself. When the plaintiff does not even know if anyone even heard the defamatory statement, there is no injury.

Moreover, pleading "on information and belief" is not a license to undertake a fishing expedition. The phrase "information and belief" comes straight out of Rule 11: in presenting a pleading to the court, the attorney is

> certifying that, to the best of that person's knowledge, <u>information and belief</u>, formed after an inquiry reasonable under the circumstances,...
> (1) it is not presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are <u>likely to have evidentiary support after a reasonable opportunity for further investigation or discovery</u>[.]

Fed. R. Civ. P. 11(b) (emphasis added).

Here, there must be a belief that the claim is "likely to have evidentiary support" after further investigation, and Plaintiff has not taken the opportunity to explain why such a claim might be likely to have evidentiary support at some time. *See Twombly,* 550 U.S. at 551, 557 (declining to take as true the conclusory allegation "upon information and belief" that the companies had entered a conspiracy without enough facts to make that statement plausible); *In re Darvocet, Darvon, and Propoxyphene Products Liability Litigation,* 756 F.3d 917, 931 (6th Cir. 2014)("The mere fact that

someone believes something to be true does not create a plausible inference that it is true.")

Here, as the Defendant points out, the termination letter itself (which of course is quoted in the complaint) ends with the signature of James Kackley, the chairman of the board, and is followed by an indication that the letter was copied to the board of directors, Scott Jensen, Sheena Conners, Bernard Bobber and Steve Barth, all of whom were either Orion executives or outside counsel. (ECF No. 13-4 at 2.) Thus, based on the letter itself, there would be no reason to believe that it was circulated to members outside of the privileged group. Nor is there any external reason to believe such a letter would ever be circulated to individuals who were not part of the Orion team. Accordingly, I conclude that the bare assertion on information and belief that the letter might have been circulated to outside parties is not enough to survive a motion to dismiss based on privilege.

**2. Abuse of Privilege**

Plaintiff also argues that even if the letter was not circulated outside the company, the Defendant forfeited the common interest privilege by abusing it.

> [A] party abuses its common interest privilege-and therefore forfeits it-when (1) it makes a statement with reckless disregard for its truth or falsity; or (2) part or all of its statement is "not reasonably believed to be necessary for the accomplishment of the purpose of the particular privilege." *Olson v. 3M Co.,* 188 Wis.2d 25, 38, 523 N.W.2d 578 (Wis. Ct. App. 1994). A statement is made with reckless disregard for truth or falsity when the party has "a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." *Id.* at 39, 523 N.W.2d 578.

*Riley v. Schultz,* 2007 WI App 216, 305 Wis.2d 656, 739 N.W.2d 492 (Wis. Ct. App. 2007).

In particular, Plaintiff argues the company's statement that he was fired "for cause" was abusive because it was merely a ploy to deprive him of benefits under his employment contracts. But Plaintiff *was* fired "for cause." The legitimacy or merits of the cause are not at issue here because it is enough that the employer determines there is "cause." Here, the letter simply stated

11

that the board of directors had determined unanimously that an uncurable [sic] "cause" had occurred. (ECF No. 13-4 at 1.) Regardless of the wisdom of that decision, it is a *true* statement of what occurred at the meeting and thus not a ground for a defamation claim.

Plaintiff also cites the portion of the letter indicating that part of the "cause" for Plaintiff's termination was

> acts of dishonesty, misappropriation and conversion of Company funds in connection with your retention of the Company's "reimbursement" to you of $90,000 of attorney fees . . . . These attorney fees were claimed by you to have been incurred in connection with your divorce, but you have not paid these fees to your divorce attorney and you have not accounted for such fees, even after the October 22 written request to do so.

(ECF No. 13-4 at 1.)

Plaintiff alleges this was an abuse of the privilege because at the time he wrote the letter, the board chairman knew Plaintiff was engaged in a longstanding fee dispute with his divorce attorney, which explained why he had not paid the fees.

The above-quoted statement about the fees does not have anything to do with an underlying dispute Plaintiff might have had with his divorce lawyer, however. According to the letter, the company took offense to the fact that it had "reimbursed" Plaintiff (the term is in quotation marks) for the fees when in fact he actually had not paid his attorney those fees. "These attorney fees were claimed by you to have been incurred in connection with your divorce, but you have not paid these fees to your divorce attorney. . ." (*Id.*) The implication of the letter is that Plaintiff was dishonest because at some point the Plaintiff said he had already paid his lawyer, but he really had not. This statement has nothing to do with whether the company subsequently learned, by the time the letter was written, that he had a fee dispute with his lawyer. This is because the dishonesty the letter cites

had occurred at the time the company "reimbursed" him for fees he had not yet paid. The fact that the board chairman *later* learned about the fee dispute does not change anything about the fact that the company earlier believed it had been duped by the Plaintiff when it "reimbursed" him for fees he had never paid. In fact, the chairman's knowledge about the fee dispute underscores the point of the quoted paragraph because it emphasizes that the fees *still* had not been paid.

In sum, the company's letter expresses anger at Plaintiff for his dishonesty in accepting and not paying fees that the company believed had already been paid. Nothing about an ongoing dispute with Plaintiff's divorce lawyer bears on that issue. Accordingly, there is no reason to believe the privilege was abused.

**C. Intellectual Property**

The Defendant also moves to dismiss the ninth and tenth claims of the complaint. In these claims, Plaintiff seeks a declaratory judgment and an accounting relating to the intellectual property he developed at Orion. According to the complaint, Verfuerth created some seventy "items of Intellectual Property Work Product." (ECF No. 1 at 559.) During his employment, Verfuerth assigned eight of these items to the company, for which he received monthly payments, and ultimately he and the company negotiated a $950,000 payment to transfer ownership of the eight pieces of intellectual property. According to the complaint, the Defendant is unlawfully retaining ownership of all of the other intellectual property that was not part of that agreement.

The Defendant moves to dismiss these claims on the ground that a 2008 employment agreement assigned "all right, title and interest in and to all Intellectual Property Work Product . . . developed, discovered made, authored or conceived by [Plaintiff], whether prior to the date of [the] Agreement or during the term of [the] Agreement." (ECF No. 13, Ex. A at 2.) Thus, because the

13

agreement clearly assigns all of the intellectual property to Orion, Orion believes these claims lack any merit.

Plaintiff protests that the agreement Orion refers to was not made a part of the complaint, and in any event he disputes the authenticity of the document. Plaintiff concedes that he referred to the 2008 Employment Agreement in his complaint (describing it as a "purported" agreement), and thus in many cases it would be fair game for the defendant to cite the agreement itself even though it was not attached to the complaint.

The Seventh Circuit "has been relatively liberal in its approach to the rule articulated in *Tierney [v. Vahle,* 304 F.3d 734, 738 (7th Cir. 2002)] and other cases." *Hecker v. Deere & Co.,* 556 F.3d 575, 582 (7th Cir. 2009). That rule allows matters outside the pleadings to be considered if they were referred to in the complaint and central to the plaintiff's claim. "The concern is that, were it not for the exception, the plaintiff could evade dismissal under Rule 12(b)(6) simply by failing to attach to his complaint a document that proved that his claim had no merit." *Tierney,* 304 F.3d at 738. But Plaintiff argues this exception does not apply when the plaintiff contests the authenticity of the agreement, because that raises a factual issue that cannot be resolved in the Rule 12(b)(6) context. If discovery is required, the court would have to convert the motion into one for summary judgment under Rule 56. *Id.* at 739.

But can a motion to dismiss be overcome simply by raising a conclusory and unsupported claim of inauthenticity? The 2008 agreement is signed by someone purporting to be Neal Verfuerth, and nothing in the Plaintiff's complaint or response brief suggests the signature is a forgery. Being a publicly traded company, Orion had to file its material agreements with the Securities and Exchange Commission, and the 2008 agreement with its CEO was certainly material. The

14

agreement Orion filed in an April 17, 2008 8-K is exactly the same as the document the Defendant cites in this action, and its authenticity is attested to in that filing by the company's chief financial officer and treasurer. (ECF No. 20-1.) Moreover, in the same 8-K, the company's explanation of the agreement indicates that one of its key purposes was to transfer to the company *all* of Verfuerth's intellectual property. (*Id.*) In spite of these six-year-old public filings attesting to the agreement, and telling the investing world at large about the agreement, the Plaintiff asks the court to believe that he never signed the document. Surprisingly, Plaintiff's response brief gives no hint of what the "significant issues regarding the authenticity of the document" are. (ECF No. 16 at 22.) Instead, the dispute simply appears to be Plaintiff's subjective belief that his agreement did not cover any more than the eight pieces of intellectual property he had assigned to the company.

Under *Twombly, supra*, it is not enough to make noises about authenticity without backing them up with at least *something*. Here, any information about authenticity would be well within the Plaintiff's own knowledge base for the simple reason that his signature appears on the document. If it is not his signature, he would be able to claim forgery. But in the face of public filings not just alluding to the document but *highlighting* it, a claim cannot survive without something more than a conclusory assertion that the document is not legitimate.[1]

**D. Economic Duress**

Orion also moves to dismiss the Plaintiff's economic duress claim on the ground that "economic duress" is not itself a claim; it is a state of affairs. In some instances it can be a defense

---

[1] I am granting the motion to take judicial notice of the Securities and Exchange Commission filings, but I am not, at this stage, taking the matters asserted within those documents as true. The point for present purposes is simply that the documents were filed, not that they are rendered authentic by virtue of that filing.

to enforcement of an otherwise valid contract. But "economic duress is a creature of contract law that allows the victim to rescind a contract. It is not a tort in and of itself, which would allow damages." *Mancini v. Mathews,* 306 Wis.2d 850 n.7, 743 N.W. 2d 167, 2007 WL 3355460, *5 (Wis. Ct. App. 2007). *Mancini* is an unpublished opinion, and there is apparently some confusion in Wisconsin law as to whether economic duress can stand on its own as a tort. *See, e.g., JPM, Inc. v. John Deere Indus. Equipment Co.,* 934 F.Supp. 1043, 1046 (W.D. Wis. 1995). But in the state supreme court's decision addressing economic duress, it addressed the claim as a *defense* to a contract, not as some kind of independent claim. *Wurtz v. Fleishman,* 97 Wis.2d 100, 110, 293 N.W.2d 155 (1980). *See also* Calamari and Perillo On Contracts § 9.9 at 329 (5th ed. 2003) (recognizing that "the tort of duress has been recognized only in 'odd cases.'") Thus, absent some clear guidance from the Wisconsin courts, I could not conclude that economic duress exists as a stand-alone tort claim in Wisconsin.

But even assuming such a claim existed, Plaintiff has not adequately pled a claim for economic duress. The factors cited by the Supreme Court in *Wurtz* are as follows:

> 1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and
>
> 2. Such act or threat must be one which deprives the victim of his unfettered will. As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing. If the payment or exchange is made with the hope of obtaining a gain, there is not duress; it must be made solely for the purpose of protecting the victim's business or property interests. Finally, the party threatened must have no adequate legal remedy.

97 Wis.2d at 109-110, 293 N.W.2d at 160.

Here, Plaintiff alleges that he was forced to give up his role as CEO, his severance package and other economic benefits he would have received had he not been terminated for cause. In

16

addition, he was prohibited from communicating with the company even though he was a shareholder and director. In return for giving up his post and the financial benefits, he alleges he received absolutely nothing in return. Thus, he engaged in a "disproportionate exchange" in which he gave up something for nothing.

But this series of events would apply to almost any situation in which an employee was fired. The employee being sacked does not generally get to negotiate terms on the way out, but does that mean there is some kind of actionable economic duress? The reason "economic duress" does not come into play in the termination context is that it requires a "transaction" that the plaintiff was coerced into by virtue of an unlawful or wrongful act. Here, there is no such transaction—there is simply a run-of-the-mill firing. It is a one-sided event.

Finally, to constitute economic duress, "the party threatened must have no legal remedy." *Id.* It is hard to argue that there is no legal remedy here, when the Plaintiff filed a lawsuit bringing no fewer than fourteen causes of action based on the conduct he alleges to be economic duress. In sum, to the extent such a claim even exists, the economic duress claim will be dismissed.

**E. Exclusion from Shareholders' Meetings**

Finally, Orion moves to dismiss the fourteenth claim, which alleges "exclusion from annual shareholders meetings." Under Wisconsin law, as well as the company's bylaws, shareholders have the right to vote their shares. Wis. Stat. § 180.0721. But Orion points out that nowhere in the statutes or elsewhere is there a right to attend shareholder meetings in person. Attendance in person implicates the company's physical property rights, which include the right to admit or exclude anyone, including shareholders. Without any statutory authority to the contrary, we must presume that the company may reasonably exercise its property rights in its discretion. Here, according to

the complaint, the Defendant viewed Plaintiff as a security risk given the acrimonious termination and allegations. (ECF No. 1 at ¶ 463.) Indeed, it is common that employees who have been fired will become hostile, and many ex-employees of corporations are also stockholders. Given these circumstances, it is perfectly reasonable for a company to retain the right to police its own premises, and therefore it would be surprising if the mere ownership of stock entitled an individual to unqualified access to a company's premises every time it holds a shareholders' meeting. Without any precedent for such a claim, I will decline the invitation to find a cause of action based on being barred from shareholders' meetings.

**F. Motion to Strike**

The Defendant has also filed a motion to strike any portions of the complaint that were not the subject of the motion to dismiss. Citing Rule 8's requirement of a "short and plain statement of the claim," it notes that 96 pages and 612 paragraphs is neither short nor plain. Fed. R. Civ. P. 8(a). Some 73 of the complaint's pages fall into the category of background information.

The typical complaint filed in federal court is somewhere between four and twelve pages. *Bennett v. Schmidt,* 153 F.3d 516, 517 (7th Cir. 1998) (noting that "[t]welve pages is longer than the model complaints appended to the Rules of Civil Procedure.") Plaintiff concedes, as he must, that his complaint is unusually long—some ten times longer than average. He also concedes that there are several cases supporting the view that lengthy complaints may be dismissed. But he distinguishes the complaints addressed in those cases on the basis that in addition to their length, they were also confusing or unintelligible. By contrast, his complaint, though lengthy, is clear and does not prejudice the Defendant in any way by its length.

One helpful benchmark is the page limit on briefs filed in support of dispositive motions.

Under local rules, a brief may be no longer than thirty pages, and of course the brief is where parties argue the merits of their claims. Civil L. R. 7(f). It should go without saying that a complaint, which is really just a formal notification of what the claims *are*, should not be more than three times the length of a summary judgment brief.

The Plaintiff claims the Defendant is not prejudiced by the length, but that is not true. The rules require a response to each averment—an admission, a denial, or a statement that the Defendant lacks sufficient knowledge. Fed. R. Civ. P. 8(b). Requiring the Defendant to pay his attorneys to file considered responses to 73 pages of background facts definitely falls into the category of prejudice.

That the complaint is too lengthy is obvious, but the solution is less so. Dismissal *with* prejudice would clearly be unwarranted, given the Federal Rules' policy of reaching the merits of cases rather than dismissing them for procedural or rules violation. Dismissal without prejudice would allow the Plaintiff to cure the defects by filing an amended complaint. But that would take time, and there is no guarantee that the defects would be cured, which would generate additional motion practice. Having reviewed the complaint, I conclude that the best course is simply to strike, as immaterial, the entire "background" section from ¶ 17 to ¶ 470. Fed. R. Civ. P. 12(f). The practical effect of this is that the Defendant will not be required to draft and file responses to more than four-hundred paragraphs of background information. Instead, it need only confine its efforts to responding to the (surviving) claims lodged against it. Accordingly, the motion to strike will be granted.

**G. Supplemental Response**

Finally, Plaintiff recently filed a motion seeking leave to file a supplemental response, as

well as the supplemental response itself. The response purports to respond to the Defendant's reliance on SEC filings to establish its defense to the intellectual property claims. But the response simply cites documents that pre-date the 2008 SEC filing. There is still no indication as to why or how the 2008 agreement is somehow inauthentic, however. The entire purpose of the 2008 agreement was to transfer the intellectual property to Orion. Thus, it comes as no surprise that prior documents would show that Orion did not already own that intellectual property in, say, 2007. The motion will be denied.

**III. Conclusion**

For the reasons given above, the partial motion to dismiss is **GRANTED** and claims two, seven, nine, ten, thirteen and fourteen are **DISMISSED**. The motion to strike is also **GRANTED**. Paragraphs 17 through 470 are stricken from the complaint. The motion to take judicial notice of SEC filings is **GRANTED**. The motion to file a supplemental response is **DENIED**. Defendant shall file its answer to the complaint within twenty days of this order, or on or before November 24, 2014. In the meantime, the clerk is directed to place the case on the calendar for a telephonic scheduling conference.

**SO ORDERED** this 4th day of November, 2014.

/s William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court