# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

NEAL VERFUERTH,

        Plaintiff,

    v.                                   Case No. 14-C-352

ORION ENERGY SYSTEMS, INC.,

        Defendant.

## DECISION AND ORDER

The Plaintiff filed a lengthy complaint alleging no fewer than fourteen causes of action arising out of his termination from the position of CEO of Defendant Orion Energy Systems, Inc., a publicly-traded company.[1]  In a November 4, 2014 decision, this Court dismissed several claims that had been the subject of a motion to dismiss.  Following discovery, the Defendant filed a motion seeking summary judgment on the rest of the claims.  The Plaintiff also filed a motion seeking partial summary judgment.  For the reasons given below, the Defendant's motion will be granted and the Plaintiff's denied.

## I. Background

Some of the background underlying this action was provided in this Court's previous decision on the Defendant's motion to dismiss.  (ECF No. 35.)  The Plaintiff served as the CEO of

---

[1] As noted in this Court's decision on the motion to dismiss and herein, several of the claims are not even *bona fide* causes of action.  "[T]he shotgun approach may hit the target with something but it runs the risk of obscuring significant issues by dilution." *Gagan v. Am. Cablevision, Inc.,* 77 F.3d 951, 955 (7th Cir.1996) (Evans, J.).  "It goes without saying that a plaintiff with a solid case does not need to file a shotgun complaint." *Byrne v. Nezhat,* 261 F.3d 1075, 1130 n. 108 (11th Cir. 2001).

Orion Energy Systems, a public company he founded, for some five years. During his tenure, he alleges that he became bothered by a number of issues, including the conduct of his company's board of directors, the performance of outside counsel, and a lawsuit brought by a former employee. Throughout that period, he routinely certified that the company's SEC filings were complete and accurate, and that no material information had been omitted from its reports.

## A. Problems with Foley & Lardner

According to Verfuerth, in 2008 he learned from Foley & Lardner lawyer Steve Barth that a former employee, James Prange, had been involved in stock manipulation soon after the company went public. Verfuerth alleges he then "instructed" Barth to lead an investigation into the issue, but he never heard back from Barth. (ECF No. 83 ¶ 10.) In any event, four years later Verfuerth believed that the Foley & Lardner law firm might have had a conflict of interest with respect to an unrelated state contract. (*Id.* ¶ 18.) Verfuerth also "participated in a number of conversations" regarding holding Foley & Lardner accountable for other problems he perceived, including his belief that Foley had been overbilling the company, in violation of their retainer agreement. This became an issue in 2012 when the SEC began investigating the company for unrelated issues. Some board members wanted Foley to handle the SEC inquiry, but Verfuerth believed that would pose a "conflict" because Foley had been overbilling the company (in his view) and Foley had itself handled earlier SEC filings, such as 8-Ks. (ECF No. 84 at ¶ 52.) He also asked Foley's Steve Barth to resign as outside counsel, telling the board chairman that keeping Barth engaged would violate their fiduciary duties as directors. (*Id.* at ¶ 7.) Barth did appear to resign, but then became involved in September 2012 with other board members, operating (again, in Verfuerth's view) under a "code of silence," to develop a "game plan" for replacing Verfuerth. (ECF No. 80 at 5.) He remains the company's lawyer.

2

**B. Problems with the Board**

In addition to his concerns about Foley & Lardner, Verfuerth was also unhappy with his company's board of directors. In July 2012, Verfuerth learned that a board committee meeting had taken place at a bar on the night before the meeting was scheduled. He viewed this as a violation of fiduciary duties and possible SEC infraction. (*Id.* at ¶ 29.) "I believed this meeting was unethical and inappropriate conduct and a violation of the Board Members' fiduciary duties as well as the Orion Code of Conduct which is required by SEC. [Company lawyer] Paul Kardish informed me that this conduct violated our code of conduct as the meeting participants had been consuming alcohol all evening. Kardish informed me that this conduct likely violated bylaws and state statutes regarding proper notice for meetings and altering meeting minutes." (*Id.* at ¶ 43.) In addition to his concerns about the board meeting, he believed it was "fraud" for the company to represent in some of its public disclosures that a board member, Michael Altschaefl, was a CPA, because Altschaefl's CPA license had lapsed a few years earlier. Verfuerth sought to have Altschaefl removed from the board. (*Id.* at ¶ 38.) He also learned in August 2012 that board member Mark Williamson had a consulting business that had done work for competitors of Orion, and Verfuerth sought Williamson's removal from the board as well.

**C. SEC Investigation and 8-K**

In August 2012, the SEC subpoenaed Orion, seeking a variety of documents and information about inventory, revenue and other matters, apparently arising from its relationship with Solyndra, the failed solar startup company. The company filed an 8-K regarding the SEC matter, but in Verfuerth's mind the filing was not accurate. In his view, the company should have used the occasion to make additional disclosures, including information about his belief that two board members had conflicts of interest and that the company had been misrepresenting board

3

member Altschaefl as a CPA "despite the fact that his CPA license had expired." (ECF No. 83 at ¶ 41, 37.) Verfuerth does not say why those disclosures would have been relevant to the SEC inquiry, or why they would have been material.

Verfuerth decided he wanted to use the occasion of the SEC investigation into the company's Solyndra relationship to raise the other issues he had identified, including insider trading, violations of disclosure rules, problems with the company's intellectual property, and conflicts of interest among board members. (ECF No. 83 at ¶ 31.) To that end, he began voicing his intention to meet with the SEC and expressed a refusal to sign the upcoming 10-Q statement for the period ending September 30, 2012, despite having signed off on all of the company's previous filings. In a meeting with the company's chairman of the board, Verfuerth states that he expressed his litany of concerns as follows:

> On August 29, 2012 I met with Mr. Kackley, at his insistence, at my condominium in Minocqua, Wisconsin. During our conversation I informed him of the investigations that [lawyer] Mr. Kardish had been doing which had provided validation of the many issues of concern to me, including the matters mentioned in this declaration. These included Mr. Prange's stock manipulation, liabilities resulting from the Foley firm's substandard work product (including Mr. Prange's defamation lawsuit), Mr. Prange's involvement with Board members, and risks related to possible patent infringement claims related to Intelite. I reasonably believed the failure to make disclosures required per full disclosure rules would cause irreparable harm to the company's finances and reputation, and could be a fraudulent misrepresentation.

(*Id.* at ¶ 74.)

The "possible patent infringement" Verfuerth alludes to involves the fact that he had learned that another company had filed for a patent on a similar product. According to Verfuerth, the board was unaware of these problems until he brought them to light.

In 2012, according to the company, the board members became increasingly disenchanted with the Plaintiff's performance as CEO, citing the company's poor stock performance and what

4

some on the board viewed as his distraction by a lawsuit brought by Prange. It is not clear whether the board's decision was precipitated by Verfuerth's recent efforts to have two of its members removed. Board Chairman Kackley indicated that Verfuerth seemed preoccupied with things like fee disputes with Foley & Lardner and the firm's quality of work, as well as some of the other issues mentioned herein, rather than creating any kind of business strategy or taking responsibility for the company's course of action. (ECF No. 94-7 at 23.) (Despite countless pages of briefing, Verfuerth has not explained to this court why he was so interested in revisiting the "stock manipulation" that occurred in 2008.) In Kackley's view, Verfuerth had also done an about-face on their decision to place Steve Barth on the board of directors as corporate secretary. On September 21, 2012 the directors met to consider whether Verfuerth should be removed as CEO and, on September 27, they voted to reassign him from the CEO position to "chairman emeritus," essentially an honorary position.

This reassignment triggered a period of negotiations between Verfuerth and the company. In October, Verfuerth and the company were negotiating a severance package and release, as well as various consulting arrangements, but Verfuerth ultimately did not sign a completed agreement. One disputed item involved the fact that the company had earlier given him money intended to cover expenses relating to his divorce, but it came to light that Verfuerth had kept the money rather than paying his divorce attorney. Verfuerth said that he was in a fee dispute with his attorney, but the board demanded that he return the funds to the company. Without any agreement on the issue, the board chairman, James Kackley, began proceedings to terminate Verfuerth's employment entirely. A special meeting of the board was scheduled for 8:00 a.m. on November 8, 2012.

At 7:17 that morning, Verfuerth circulated what he described as a "whistleblower" email to several board members:

5

Please accept this e-mail as a formal complaint registered with you as the Chairman of the company Nominating and Governance Committee pursuant to the Orion Energy Systems Inc Whistle Blower Policy, as well as the Sarbanes Oxley Act [of] 2002. . . . My Concerns/Complaints are numerous with many of them being already brought to the attention of Jim Kackley as Chairman of the Board. I have considerable evidence that will document my rapid demise within the company as retaliation against me for pursuing/exposing actions and ongoing activities that have to date negatively impacted the price per share of our stock. These issues include but are not limited to . . . Corporate Waste, Violations of the Orion Code of Conduct, Breach(s) of Fiduciary Duty[,] Breach(s) of Attorney Client Privilege. Specific examples of these activities include but are not limited to 1) Tampering with/filing of false documents i.e. Compensation Committee meeting minutes and Documents included in the Prange vs. Orion legal proceeding 2) Unauthorized written communication(s) between our former Foley securities counsel and Joe Hildebrandt, and a non employee shareholder/consultant named Jim Naleid (April/May 2006 pre IPO) . . . 3) Evidence of a group of Orion senior executives organized by Naleid and Prange that were meeting regularly . . . to undermine my authority, and my business execution strategies. 4) I have sworn affidavits from several individuals that made statements under oath that Jim Prange has vowed to destroy me, these statements also contain numerous inferences as to Pranges abilities and / or direct involvement in the manipulation of our stock. 5) John Scribante being named as CEO after long and thoughtful deliberation. I believe the truth is John was offered the position as CEO because [inside counsel] Paul Kardish had just recently brought to the attention of the Comp Committee Chairman Mark Williamson the fact that the amended employment agreement drafted by [Foley attorney] Barth, executed by Kackley while he was Pres/COO had no non-compete language covering Solar panel sales. Consider the fact that the Employment agreement was drafted simultaneously with the Solyndra Contract and the establishment of the New Orion Division, set up to sell Solar. We had a situation that would allow the President of our new division to walk out the door, with 30-50 million dollars in business, and not be able to do a damn thing about it. There are numerous other issues relating to Scribante, that I describe in detail in a letter written to Kackley and cc to Barth just a few days ago which I will attach. As part of the preparation for the Prange lawsuit I was exposed to a considerable amount [of] evidence that's been deliberately suppressed as part of an ongoing Conspiracy to cover up these activities. Insider trading?? Given the overall dollars involved, the volatile history of our stock price, trading volume swings > 5 million shares opening day of trading. I suspect the participants in this conspiracy have much to lose financially, reputation, license to practice, maybe even criminal prosecution. They include members of the Orion Board of Directors past and present as well as our Outside Counsel Steve Barth of Foley. I will likely have another round of violations that I'm still in the process of collecting data, and discussing with my attorneys.

6

More recently the final cover-up is part of another multi faceted violation of our code of conduct. Driven primarily by Williamson, Barth and most recently Altschaefl have been trying to extort me into signing an extremely onerous non standard release as part of the Severance I'm entitled to, and should have received already. The problem is my unwillingness to forgo my rights as a Shareholder, to include the purchase of additional shares and my set on the board. Furthermore I question why the company insists on including an all encompassing indemnification, hold harmless, agree never to sue for their outside counsel. What are they afraid of . . . .

Respectfully submitted,
Neal R. Verfuerth
Founder / Shareholder
Board member

(ECF No. 63-5.)

Although Verfuerth described his email as a "whistleblower" email, he did not make any filings or otherwise communicate his concerns to the SEC. (ECF No. 104-4.)

Later that morning, the Board (including Verfuerth) met and voted to terminate his employment for cause. In a letter issued the next day, the Board explained that its action was due to the following:

1. Your acts of dishonesty, misappropriation and conversion of Company funds in connection with your retention of the Company's "reimbursement" to you of $90,000 of attorney fees (grossed up for taxes). These attorney fees were claimed by you to have been incurred in connection with your divorce, but you have not paid these fees to your divorce attorney and you have not accounted for such fees, even after the October 22 written request to do so.

2. Your serial violations of the terms and conditions of your September 27, 2012 Board Directives Letter (including the Company's October 22 written warning to you) as a result of your:
    a. Disparagement of John Scribante
    b. Contacting Scott Jensen to obtain information about the Company's significant shareholders
    c. Contacting shareholders in an attempt to form a dissident shareholder group.

(ECF No. 60-5.)

7

## II. Analysis

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P 56(c). When determining if a genuine issue of fact exists, the court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). When parties file cross-motions for summary judgment, each movant must satisfy Federal Rule of Civil Procedure 56's requirements. *See Cont'l Cas. Co. v. Northwestern Nat'l Ins. Co.,* 427 F.3d 1038, 1041 (7th Cir. 2005).

### A. Sarbanes-Oxley Whistleblower Claim

### 1. Protected Activity: Transforming Everyday Corporate Issues into "Fraud"

As will be seen below, this case presents the unusual scenario in which a CEO claims to have been a "whistleblower" about his company's failure to disclose material facts to shareholders during the same period he himself was certifying that his company's disclosures were complete. Section 1514A(a) of the Sarbanes–Oxley Act (SOX) provides whistleblower protection for employees of publicly-traded companies by prohibiting employers from retaliating against them for "any lawful act done by the employee . . . to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes" mail fraud, bank fraud, securities fraud, or violation of any rule or regulation of the SEC, or any federal law relating to fraud against shareholders, when the information or assistance is provided to a person with investigatory authority. 18 U.S.C. § 1514A(a). As noted earlier, Verfuerth did not provide any information to the SEC or any other

8

typical investigatory authority. Instead, he relies on the fact that he told various members of the Board of Directors about his concerns about the company's disclosures. I assume here (it is not argued otherwise) that a company's board of directors—the only entity to which the Plaintiff arguably provided any information—could be a "person with supervisory authority over" the CEO, and thus it is conceivable that a CEO could be a whistleblower if he reported qualifying information to his Board. 18 U.S.C. § 1514A(a)(1)(C).[2]

To prevail under this provision, an employee must prove by a preponderance of the evidence that "(1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity; (3) she suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action . . . . If the employee established these four elements, the employer may avoid liability if it can prove 'by clear and convincing evidence' that it 'would have taken the same unfavorable personnel action in the absence of that [protected] behavior.'" *Harp v. Charter Commc'ns, Inc.,* 558 F.3d 722, 723 (7th Cir. 2009) (quoting *Allen v. Administrative Review Board,* 514 F.3d 468, 475–76 (5th Cir. 2008)). To prevail on such a claim, the employee must subjectively believe that his employer was acting unlawfully, and that belief must also be objectively reasonable. *Id*.

As set forth in Verfuerth's own "whistleblower" email, he believed members of the board were engaged in "retaliation against me for pursuing/exposing actions and ongoing activities that have to date negatively impacted the price per share of our stock. These issues include but are not

---

[2]The Plaintiff claims he told board members that he wanted to arrange a meeting with a Scott Tandy of the SEC. (ECF No. 83 at ¶ 42.) But there is no evidence that he actually provided any information to the SEC, except for forwarding a copy of his "whistleblower" email to an SEC employee after he was terminated. There is no indication that the SEC ever took any action, nor that any shareholder lawsuits resulted from his disclosures.

limited to . . . Corporate Waste, Violations of the Orion Code of Conduct, Breach(s) of Fiduciary Duty[, and] Breach(s) of Attorney Client Privilege."  (ECF No. 63-5.) Sarbanes-Oxley, however, does not provide protection for complaining about things like "waste," violations of codes of conduct or breaches of fiduciary duty or attorney-client privilege.  Instead, under 18 U.S.C. § 1514A(a), only allegations about illegal fraud (mail fraud, wire fraud, securities fraud, etc.) are protected.  Based on Verfuerth's own "whistleblower" email, therefore, it would seem dismissal would be a simple matter—Sarbanes-Oxley simply is not concerned with a CEO's opinions about law firm billing or company waste because these concerns have nothing to do with fraud.

Perhaps recognizing that problem, in this case Verfuerth has developed a theory by which he attempts to transform his complaints about *non*-fraudulent, run-of-the-mill corporate problems into claims of securities fraud.  For example, as he sees it, he was not merely complaining about being undermined as the CEO or about corporate waste, for example, he was telling the board that the company needed to report these problems to shareholders.  Under this theory, by telling board members that certain things must be disclosed, he was simultaneously informing them (even if only implicitly) that their failure to disclose such things would constitute securities fraud.  That, in a nutshell, is how he attempts to recast his various grievances to board members into "whistleblowing" activity about fraud.

To support this effort, Verfuerth's proposed findings of fact set forth a litany of sometimes vague and almost off-handed observations and seemingly unrelated anecdotes about various events or issues that apparently made him uncomfortable during his tenure as CEO—all of which he now casts as potential securities law disclosure violations.  As set forth below, however, his claims face hurdles that prove insurmountable.

10

### a. A Person Cannot "Blow the Whistle" on the Entity to whom he Reports

Unlike the typical whistleblower action, the Plaintiff here has not uncovered some sort of underlying illegality or fraud and then presented that information to the board. Instead, Verfuerth is alleging that the "fraud" was being committed by the board itself when it failed to follow his advice and disclose certain information to shareholders.[3] The problem with this line of argument is that, even if true, Verfuerth's conduct does not constitute whistleblowing. Simply telling a person he might be committing fraud is not whistleblowing. The statute protects the providing of information to "a person with supervisory authority over the employee (or such other person working for the employer who has the authority to investigate, discover, or terminate misconduct)," the implication being that the supervisory person will then be able to investigate the reported misconduct and end it. 18 U.S.C. § 1514A(a)(1)(c). Thus, a typical whistleblower reports conduct by person X to agency Y, which then investigates the matter. It does not make sense, however, to report conduct by person X *to* person X. X cannot be expected to investigate itself. Here, Verfuerth was merely telling the Board about his opinions as to its disclosure obligations. Both logically, and as a matter of statutory interpretation, this means the reported misconduct has to involve someone *other* than the supervisory person who receives the report. Otherwise, all we have is simply a run-of-the-mill job-related dispute.

> Discussion and even disagreement with supervisors over job-related activities is a normal part of most occupations. It is entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision. In complaining to his supervisors, Willis has done no more than voice his

---

[3]It is unclear whether he is alleging that the board prevented him from making disclosures (as the CEO), or whether he believes the board itself was responsible for making the disclosures. Either way, his argument is that the board was engaging in fraud by not following his advice to make the disclosures described herein.

11

dissatisfaction with his superiors' decision. He has taken no action to bring an issue to the attention of authorities in a position to correct fraudulent or illegal activity.

*Willis v. Dep't of Agric.,* 141 F.3d 1139, 1143 (Fed. Cir. 1998).

Suppose Verfuerth caught a board member in the act of stealing company funds. Telling that person that he is stealing is not "whistleblowing," it is simply accusing that person of illegal activity. If he wanted to be a whistleblower, he could report the matter to the full Board, or to an appropriate agency. But if he simply voices an opinion about what the member should be doing, he has not blown any whistles.

In sum, Verfuerth seems to have voiced disagreements with various board members about the company's disclosure obligations, but simply telling someone he thinks they should disclose information is not blowing the whistle on anything. Essential to the concept of whistleblowing is the reporting of another person's conduct to an appropriate entity, and there is no evidence that such activity occurred here.

### b. Verfuerth's Opinions about Disclosure were not "Information" about Illegal "Conduct" to the Board

A second, related, problem is that the Plaintiff does not explain how telling someone to report things is the kind of communication that fits the statute's definition of "whistleblower." To recall, the statute protects a whistleblower who "provide[s] information . . . or otherwise assist[s] in an investigation regarding any conduct which the employee reasonably believes constitutes" mail fraud, bank fraud, securities fraud, etc. 18 U.S.C. § 1514A(a). A Plaintiff's beliefs about what information the company should make public are not themselves whistleblowing activity—they are simply his opinions about the company's reporting obligations. Simply saying "I think we should disclose X, Y, and Z" does not constitute "information" about fraudulent "conduct."

12

This is unwittingly demonstrated by the securities law expert the Plaintiff has hired. In discussing the alleged conflict of interest Verfuerth perceived in Foley & Lardner's representation of the company in its dealings with the SEC, the expert noted that "[e]ven if the board ultimately decided to retain Foley & Lardner for this task, Verfuerth airing his concerns was a critical part of making sure that such was an informed decision." (*Id.* at 12.) That, in a nutshell, is exactly what occurred here. Verfuerth might have been perfectly reasonable in "airing his concerns," but airing concerns is not whistleblowing. Instead, he and the Board were engaged in a give-and-take discussion so that the Board could make an informed decision.

This applies to all of Verfuerth's opinions about what the company should have disclosed. For example, supposing that there were valid concerns about the company's patents, that does not constitute "information" about "conduct" that Verfuerth could reasonably have believed would constitute fraud. 18 U.S.C. § 1514A(a). The fact that another company filed for a patent is not, of course, fraud. Nor is Orion committing fraud simply by investigating the potential issue. Once again, all we are left with is Verfuerth's assertion that he believed the company should disclose the patent issue to the public, and that he voiced that opinion to one or more members of the Board. But a belief that something should be disclosed is not itself information about conduct constituting fraud. Acting as the CEO, Verfuerth was giving advice, not reporting conduct. Section 1514A's "critical focus is on whether the employee reported conduct that he or she reasonably believes constituted a violation of federal law." *Villanueva v. U.S. Dep't of Labor,* 743 F.3d 103, 109 (5th Cir. 2014). Notably, nowhere did Verfuerth actually blow the whistle on conduct. Instead, all he alleges is that he told the board what kinds of things it should disclose. Naturally, the board itself already knew what it had and had not disclosed, and so Verfuerth's opinions were not "information."

13

The Plaintiff has not cited any precedent supporting the notion that the whistleblowing statute would consider an opinion about disclosure expressed in a live conference call or personal meeting to be providing information about fraudulent conduct. Nor is any such precedent imaginable. Accepting Verfuerth's line of argument would mean that thousands of corporate executives, compliance officers and lawyers are "whistleblowing" every time they give advice about information they believe should be disclosed. There is no indication the statute intended to protect such activity.

In sum, informing various board members of one's opinion that certain corporate problems should be disclosed does not fall within the statute's protections because (1) it is not "whistleblowing" activity and (2) it does not provide "information" about fraudulent conduct. 18 U.S.C. § 1514A(a).

### c. The "Stock Manipulation"

Above I have addressed the problems arising out of the fact that almost all of Verfuerth's complaints related to things like billing disputes, corporate waste, and other matters that do not constitute fraud, and so they do not receive whistleblower protection unless one accepts Verfuerth's theory that the Board's failure to disclose those things could have been securities fraud. In some communications, however, Verfuerth cites "stock manipulation," a reference to the former employee James Prange, who he believed had engaged in misconduct after the stock went public in 2007. In short, after the company's first public earnings call, the stock dropped some 40% in after-hours trading due to the release of some conflicting financial information. The matter was investigated by NASDAQ and was the subject of a shareholder lawsuit.

It is conceivable that reporting information about stock manipulation to the Board could constitute the reporting of information about fraudulent conduct, entitling a person to protection

14

under 18 U.S.C. § 1514A(a), and so such a report would not necessarily suffer from the same conceptual flaws described above. One problem, however, is that the information in question was already well-known to the board of directors. In his deposition, Verfuerth remarked that he relied on Steve Barth and the board "to do their jobs" after they learned about the alleged stock manipulation, which was when he and the then-CFO had reported the matter to the board in 2008, more than four years earlier. (ECF No. 98 at 197-201.) Moreover, the employee involved later sued the company for defamation, as Verfuerth's "whistleblower email" reflects. Thus, it is clear that the board already knew about the issue of "stock manipulation," which of course had occurred years earlier. Thus, Verfuerth was not "whistleblowing" because he was not reporting any "information" the board did not already know.[4] Accordingly, his concerns about the four-year-old stock manipulation incident do not constitute whistleblowing activity.

### d. Plaintiff has Failed to Establish *Why* the Disclosures would have been Material

Above I have concluded that Verfuerth's claim that telling board members to disclose things did not constitute whistleblowing activity. But even if his failure-to-disclose theory of whistleblowing were viable, his brief nowhere even attempts to demonstrate *why* it would have been fraudulent to keep the information he cited from shareholders. Summary judgment is often described as the "put up or shut up" moment in a lawsuit, *Schacht v. Wisconsin Dep't of Corr.*, 175 F.3d 497, 504 (7th Cir.1999), and yet the Plaintiff leaves it to the court's imagination to discern why all of the litany of his complaints were so material that their omission from public filings would have constituted fraud. Securities laws, of course, do not require the disclosure of every corporate problem or snafu. Instead, "[t]o have an objectively reasonable belief there has been

---

[4]And, as set forth below, Verfuerth never explains how the four-year-old information about what a former employee had done would have been material.

15

shareholder fraud, the complaining employee's theory of such fraud must at least approximate the basic elements of a claim of securities fraud . . . . The elements of a cause of action for securities fraud . . . typically include a material misrepresentation or omission, scienter, loss, and a causal connection between the misrepresentation or omission and the loss." *Day v. Staples, Inc.,* 555 F.3d 42, 56 (1st Cir. 2009). Thus, it is not enough to simply point to undisclosed information as though the very failure to disclose it is fraud. Instead, the Plaintiff must explain why the undisclosed information was material and why he reasonably believed its omission would have caused shareholder losses. (Notably, no shareholder losses stemming from the matters Verfuerth cited have ever been identified.) Here, the Plaintiff's brief is utterly silent as to why the failure to disclose the information in question would have satisfied these elements of a securities fraud claim. The closest he comes is a footnote citation to an expert report, but a footnote is inadequate to create genuine issues of material fact that require a trial. This, on its own, would warrant summary judgment in favor of Orion.

In the interests of completeness, I will consider the expert report cited in the footnote, but I conclude it does not create an issue of fact. In the report, University of Minnesota Professor Richard Painter opines that it was proper for Verfuerth to investigate claims related to stock manipulation in 2007 or 2008. (ECF No. 86-22 at 8-9.) Although it may have been proper for Verfuerth to investigate, nowhere does Painter explain why the company would have needed to *disclose* such matters in 2012, particularly since the matter was already the subject of an investigation. Nor could it be imagined how shareholders in 2012 would suffer any loss as a result of learning that a former employee had manipulated company stock four or five years prior. Such information could not impact the company's profitability outlook in any way, and so it would not have been a material fact in any shareholder's calculus as to whether to buy, sell, or hold.

16

Similarly, Painter opines that the company should have disclosed that Altschaefl's CPA license had lapsed, but does not explain *why* that disclosure would have been material or related to any loss suffered by shareholders. (*Id.* at 12.) He states that accounting expertise is important on a board of directors, but does not explain why an accountant whose license might be a year or two out of date could not provide substantially equivalent accounting experience, particularly when the accountant had extensive experience with the company. This also ignores the fact that Altschaefl was not the CFO of the company, but merely a member of the Board. Absent some kind of allegation about malfeasance or disciplinary actions taken against the accountant board member, it certainly is not reasonable to infer that a typical shareholder would have found the information material, and neither is it reasonable to infer that the stock price would have moved even a penny based on the information. (It is thus wholly unsurprising that the company did not disclose these things to shareholders.)

As noted earlier, Professor Painter also opined that Verfuerth was acting reasonably when he protested that Foley & Lardner should not be handling the SEC's inquiry on behalf of the company. Painter explains that it could have been a conflict of interest for Foley to represent the company when it had previously advised the company on securities disclosure issues. (*Id.* at 11.) But once again, Verfuerth's conduct is not on trial here, and whether or not his conduct was "reasonable" is of no moment. Instead, we are concerned with whether the Board of Directors was committing *fraud*, either when it decided to continue using Foley & Lardner, or when it failed to disclose to shareholders that it was using Foley. The fact that it might have been reasonable for Verfuerth to raise the issue has nothing to do with whether he was acting as a whistleblower about fraudulent conduct. In fact, Painter even acknowledges that there would have been nothing illegal if the board had decided to retain Foley. "Even if the board ultimately decided to retain Foley &

17

Lardner for this task, Verfuerth airing his concerns was a critical part of making sure that such was an informed decision." (*Id.* at 12.) But, as noted above, "airing one's concerns" does not meet the statute's definition of whistleblowing. Instead, to be a whistleblower one must provide "information" about "conduct" that constitutes fraud. 18 U.S.C. § 1514A(a).

Finally, Professor Painter opines that Verfuerth had uncovered a problem with rights to the company's Intelite Control System due to the fact that another company had recently patented similar technology. (*Id.* at 10.) Since the company had made statements about that system implying that the technology was propriety to Orion, Painter believes the company had an obligation to correct those statements. But again, the opinion is simply conclusory. There is no general obligation to issue corrections to every public statement a company makes. Instead, as set forth above, it is only considered fraud if the information would have been material and could have caused a loss to the investing public. In his declaration, Verfuerth explains that the Intelite system was important because the company might have to take a $12 million write-off of inventory. But he states that he later learned that the company took a large write-off because the product was not compatible with LED technology—*not* because of intellectual property issues. (ECF No. 84 at ¶ 24.) Thus, it remains opaque why the perceived issues surrounding the company's patents would necessarily have been material. And, as set forth below, Verfuerth had certified that the company's financial statements were accurate and lacked any material omissions.

Verfuerth also states that he learned about potential patent problems resulting from an application issued by a company called EmbedTek during the summer of 2012. But the document he cites is a memorandum documenting Orion's internal investigation of the issue. The report is preliminary and actually favorable to Orion, noting that the technology disclosed in the EmbedTek patent application may already be covered by Orion's prior application. (ECF No. 85-3.) Neither Verfuerth nor Painter explains why the company would have disclosed information about the

18

company's patents when its own investigation was ongoing and when initial results were positive. Notably, the Plaintiff never explains what the company *should* have disclosed. Accordingly, I conclude that the Plaintiff has not established a genuine issue of fact that he reasonably believed the disclosures he sought would have been required by securities laws or regulations.

### e. The Company's 2012 8-K was not Misleading

As noted earlier, Verfuerth believed one of the 8-K's the company filed was incorrect. He explains this belief as follows:

> Following receipt of the SEC subpoena [in 2012], the Board decided that Orion needed to file a Form 8-K with the SEC regarding the subpoena to be drafted by outside counsel as designated by the Board.
> [Atty. Steve] Barth was excused from the Board meeting for this discussion. Nonetheless, Barth took it upon himself to draft an 8-K, then subsequently allowed an unauthorized draft version of the 8-K to be filed with the SEC. Orion was unable to rescind this improperly filed document which suggested uncertainty regarding the potential impact of the subpoena, which was not expressed in the Form 8-K that had been approved for filing. The improperly-filed 8-K stated in part:
> > "The Company is unable to predict what action, if any, might be taken in the future by the SEC as a result of the matters are the subject of the subpoena or what impact, if any, the cost of responding to the subpoena might have on the Company's financial position, results of operations or cash flows."

(ECF No. 84 at ¶ 57.)

According to Verfuerth, therefore, the "error" in the 8-K was the statement that the company had been unable to predict the impact of the SEC investigation. It is difficult to see how a company's cautionary statement about being unable to predict the future could have constituted "fraud" or some other violation of the law. Verfuerth does not even attempt to explain. Moreover, since the 8-K had already been issued, he does not explain what he thought should have been done about it. In short, there was nothing to blow the whistle on because the company's disclosures were already public. As such, he did not "provide information" or "assist" with any investigation. 18 U.S.C. § 1514A(a).

19

**2. Verfuerth's own Certifications Demonstrate he did not Subjectively Believe Fraud was Occurring**

Above I have concluded that Verfuerth did not set forth a plausible case that fraud had occurred. For the reasons given below, I also conclude that Verfuerth cannot establish that he subjectively believed that fraud was occurring either. Verfuerth, as the CEO, was obligated to certify the company's annual and quarterly reports. In such filings, Verfuerth certified that the reports did not contain any untrue statements or omissions of material fact. (*See, e.g.,* ECF No. 61-10.) On August 9, 2012, just as he had for every previous quarter in the company's existence, he certified that the company's quarterly report for the period ending June 30, 2012, "fairly presents, in all material respects, the financial condition and results of operations of the Company." (http://www.sec.gov/Archives/edgar/data/1409375/000119312512347689/d376785dex321.htm (last visited August 15, 2016.)) The certifications were made pursuant to the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1350.

In 2013, long after his termination, Verfuerth made similar confirmations. The shares of stock that Verfuerth still owned had restrictions on them, and these restrictions could only be released if the company issued a legal opinion to Wells Fargo, the broker holding the stock. In connection with providing such an opinion, Orion required that Verfuerth sign an affidavit indicating that "Orion is in compliance with the Securities Exchange Act of 1934," and that he "knows of no material information with respect to Orion which has not been publicly disclosed by Orion, and Seller will not sell the Shares in advance of the Seller otherwise publicly disclosing or claiming previously undisclosed material information . . ." (ECF No. 61-5.) Verfuerth signed more than one of these letters at various times in 2013.

20

Thus, Verfuerth represented to the public and to Orion itself that there was no material information that had not been publicly disclosed. His explanation for signing off on every annual and quarterly report is unconvincing. He asserts that it was the subpoena from the SEC that made him realize all of the disclosures discussed herein might be warranted, and that subpoena also prompted his assertion that he would *not* be signing the 10-Q for the period ending September 30, 2012. (ECF No. 84 at ¶¶ 74-81.) But nowhere does he connect the subpoena from the SEC to any of the multifarious corporate problems he wanted to disclose, such as "stock manipulation" (dating from years earlier), billing disputes with Foley & Lardner, issues with various board members, or intellectual property concerns. In short, he does not explain why it would have been reasonable to believe the company's financial statements were accurate in 2008-2011, but suddenly inaccurate beginning in the summer of 2012.

This is bolstered by the fact that he confirmed to Orion in *2013*, after his supposedly dire disclosure concerns in 2012, that there were no material facts remaining undisclosed. His explanation for these confirmations, which were in the form of signed and notarized representation letters, is his belief that "through my whistleblower filing I had publicly disclosed what information I was aware of regarding Orion." (ECF No. 84 at ¶ 142.) First, Verfuerth did not make any "whistleblower filing" with the SEC; at best, he says, he has evidence that he visited the SEC's website several times. The SEC stated that it had no record of "any information responsive" to a whistleblower complaint filed by Neal Verfuerth relating to Orion Energy Systems, Inc. (ECF No. 60-1), and has more recently re-confirmed that he never filed a complaint. (ECF No. 104-4.)[5]

---

[5] The Plaintiff's efforts to manufacture a genuine issue of material fact are not convincing. He states that he pressed the "submit" button on the SEC's website several times, but the fact remains that the SEC has no record of any complaint from Verfuerth.

Thus, there is no evidence he actually submitted any kind of whistleblower complaint. Even if he had, Verfuerth does not explain why a complaint submitted on a government website would constitute public disclosure of the information he was concerned about. The fact is, in order to remove the restrictions on his stock, he represented and warranted to Orion that there was no material information remaining undisclosed. His present statements to the contrary do not suffice to create a genuine issue of fact.[6] *Essick v. Yellow Freight Sys., Inc.,* 965 F.2d 334, 335 (7th Cir. 1992) (party cannot create genuine issue of fact by contradicting earlier statements); *Babrocky v. Jewel Food Co.,* 773 F.2d 857, 861 (7th Cir. 1985) (same).[7]

In sum, Verfuerth has not established that he engaged in protected activity by expressing his views about company disclosures to the Board of Directors. Moreover, he has not established a reasonable belief that such disclosures would have been required in order to avoid committing securities fraud, and his own sworn statements to the contrary indicate that he did not believe the company had concealed any material non-public information. Instead, Verfuerth's actions are transparently suggestive of a pattern of last-ditch efforts to gain leverage over a board of directors that clearly no longer wanted him to serve as the company's CEO. Accordingly, his SOX whistleblower claim must fail.

---

[6]Notably, Verfuerth has never pointed to any concrete implications of any of the information he purports to have been so concerned about. In a typical 10b-5 securities fraud action, the defrauded shareholders can point to a drop in share price after a significant piece of negative information is disclosed. That drop is evidence of loss as well as materiality. Here, with all of the information now public, Verfuerth has not identified a single news story or drop in share price caused by any of the issues he thought have been disclosed earlier.

[7]With respect to his 2013 affidavit, Verfuerth has not suggested that somehow the company made all of the disclosures he wanted in the interim between his termination and the affidavit.

22

**B. Breach of Contract for Diminution of Duties**

Verfuerth also alleges that his reassignment from the CEO position on September 27, 2012 constituted a breach of his employment agreement. To compensate for the breach, he seeks damages, reinstatement, and other unspecified relief.[8]

Under his employment agreement, he was employed as the chief executive officer, and the agreement further provided that he "shall serve in the position set forth above [i.e., CEO] in a full-time capacity." (ECF No. 20-1 at 15, ¶ 3(a)(i).) In the same paragraph, the agreement indicates that "Executive shall have such duties and authority as is customarily associated with such position." (*Id.*) In Verfuerth's view, because the agreement did not provide any other capacity in which Verfuerth would serve, the demotion to "chairman emeritus"—a non-executive role—was a breach of that agreement.

Orion responds that the employment agreement was never a guarantee that Verfuerth would serve as CEO during the entirety of the agreement's term. For example, the agreement provides that the company could terminate his employment, with or without cause. (*Id.* at 17, ¶ 4(c).) And Verfuerth himself could end his employment voluntarily, of course. If the company terminated him without cause, then Verfuerth would be entitled to severance benefits. Similarly, if he terminated his own employment for Good Reason, as defined in the contract, he would also be entitled to benefits. Good Reason is defined as

> (i) a material diminution in the Executive's Base Salary; (ii) a material diminution
> in the Executive's authority, duties or responsibilities; (iii) a material diminution in

---

[8] Both parties appear to want this court to decide the state law claims. "A district court should consider and weigh the factors of judicial economy, convenience, fairness and comity in deciding whether to exercise jurisdiction over pendent state-law claims." *Wright v. Associated Ins. Companies Inc.,* 29 F.3d 1244, 1251 (7th Cir. 1994). Here, it would be inefficient and cause undue delay to require another court to familiarize itself with this complex dispute.

23

the authority, duties or responsibilities of the supervisor to whom the Executive is required to report; (iv) a material diminution in the budget over which the Executive retains authority; (v) a material change in the geographic location at which the Executive must perform services; or (vi) a material breach by Orion of any provisions of this Agreement or any option agreement with the Company to which the Executive is a party.

(*Id.* at 14, ¶ (k).)

If Verfuerth wanted to resign for Good Reason, he had to give the Board notice within 90 days of the occurrence of the offending condition, plus an opportunity to cure the condition within 30 days. (*Id.* at 17, ¶ 4(d).) Thus, in Orion's view, the contract contemplates exactly the scenario that occurred here: it defined "Good Reason" to include a material diminution in Verfuerth's duties, giving Verfuerth an out that he could exercise if he wanted to end his employment and receive severance benefits. Because the contract specifically anticipated, and provided its own remedy for, the condition Verfuerth now complains about, Orion did not breach any provision of the agreement. If he wanted the benefits he now claims he is owed, he could have resigned for Good Reason by providing notice to the Board and giving the company an opportunity to cure.

At the outset, it is clear that the principal clause Verfuerth relies on cannot be dispositive of the issue. It is true that the contract provides that Verfuerth shall "have such duties and authority as is customarily associated with such [CEO] position," but that clause cannot be read in a vacuum. (ECF No. 20-1 at 15, ¶ 3(a)(i).) In Verfuerth's view, that clause is tantamount to a guarantee of employment as the company's CEO, no matter what. But that reading ignores the context of the employment agreement, which provides a framework for the parties' obligations and rights if circumstances change. Strangely, Verfuerth argues that the clause was "mandatory" and "is as binding on Verfuerth as it is on Orion." (ECF No. 92 at 3.) In his view, evidently, he was little more than an indentured servant to Orion, obliged to work as its CEO and nothing else, during the

24

term of the agreement, just as Orion was obligated to employ him as the CEO. This reading directly contradicts both common sense as well as the multiple paragraphs detailing what would happen, for example, if Verfuerth wanted to resign (¶ 4(d): "Executive may terminate his employment for or without Good Reason . . .") or if the company decided to terminate his employment (¶ 4(c): "Orion may terminate Executive's employment with or without Cause . . ."). His argument that "Orion had no right to remove him as CEO" (ECF No. 92 at 4) is patently undermined by the agreement itself. Echoing that argument, Verfurth further argues that "if Orion had desired the contractual right to remove Verfuerth as CEO, it could have included such language in the Agreement. It did not." (ECF No. 92 at 6.) In fact, an entire section of the contract is entitled "Termination of Employment." It provides that the executive's employment will terminate upon death, disability, or upon the decision of the Board to terminate his employment, with or without cause.

> (c) Orion may terminate Executive's employment with or without Cause (other than as a result of Disability which is governed by subsection (b)) by providing written notice to Executive that indicates in reasonable detail the facts and circumstances alleged to provide a basis for such termination. If the termination is without Cause, Executive's employment will terminate on the date specified in the written notice of termination.

(ECF No. 20-1 at 17, ¶ 4.)

If the Board could terminate his employment without cause, it follows that it could change his job duties as well without breaching the agreement. In that event, the agreement provides the executive with recourse. If the change in duties is "a material diminution in the Executive's authority, duties or responsibilities," (*Id.* at 14, ¶(k)), then that would constitute Good Reason for the executive to object and either (1) attempt to have the Board cure the problem or (2) resign and receive benefits. Or, the executive can simply accept the diminished duties and keep receiving his

25

salary.  The overarching point is that Verfuerth ignores the fact that the employment agreement was not some kind of ironclad guarantee that he would be employed as the CEO.  He studiously ignores entire swaths of the agreement that provide for his removal, and he also ignores the options the contract gave him if he didn't like the change in his duties.  Apart from overlooking important provisions in the employment agreement, Verfuerth also ignores the fact that the Board has a fiduciary duty to the company's shareholders.  No Board could ever guarantee that it would maintain a chief executive in that position *no matter what,* and no CEO with any public company experience could believe that his employment as CEO was guaranteed.

When read in its entirety, it is evident that the employment agreement contemplates that either party may end the employment relationship, with or without cause.  Whether or not there was cause to terminate, or "Good Reason" to resign, affects the benefits that are available following termination or resignation.  But in no event was the company obligated to keep Verfuerth as its CEO if it chose not to.  Any notion that he should be "reinstated" to the CEO position, or entitled to back pay or other damages, is completely unfounded.  (ECF No. 71 at 1 n.1.)

## C. Breach of Contract for Failure to Pay Severance Benefits

Verfuerth also alleges that Orion breached its agreement when it terminated him for cause, thereby denying him the right to receive his severance package.  On October 19, 2012, Verfuerth provided the company with notice that he was terminating his employment for Good Reason, which triggered a 30-day cure period for the company.  (ECF No. 20-1 at 15, ¶ 4(d).)  On November 8, however, prior to the expiration of that period, the Board terminated his employment for cause.  Verfuerth argues that the company was obligated to pay him severance benefits because he had Good Reason to resign and the company was unwilling to restore him to his CEO position.

Orion does not dispute that Verfuerth would have had "Good Reason" to resign because his job duties were essentially eliminated. It argues, however, that the employment agreement required more before Verfuerth would be entitled to severance benefits. Specifically, the agreement provides that if Verfuerth is otherwise eligible for benefits, "[a]s an additional prerequisite for receipt of the severance benefits . . . Executive must execute, deliver to Orion, and not revoke . . . a General Release." (ECF No. 20-1 at 15, § 5(b).) The agreement defines a General Release as:

> a release of all claims that Executive . . . has or may have against Orion, its board of directors, any of its subsidiaries or affiliates, or any of their employees, directors, officers, employees, agents, plan sponsors, administrators, successors (including the Successor), fiduciaries, or attorneys, including but not limited to claims arising out of Executive's employment with, and termination of employment from, the Company, but excluding claims for (i) severance payments and benefits due pursuant to this Agreement and (ii) any salary, bonus, equity, accrued vacation, expense reimbursement and other ordinary payments or benefits earned or otherwise due with respect to the period prior to the date of any Separation from Service. The General Release shall be in a form that is reasonably acceptable to the Company or the Board.

(*Id.* at 14, § 2(j)).

Following Verfuerth's reassignment, he and Jim Kackley, a board member, exchanged emails about Verfuerth's execution of a release. Verfuerth also met with and sent text messages about his release to Board member Williamson. Verfuerth proposed a release, however, that did not include a release for the company's directors, officers or attorneys. In addition, it lacked two-year confidentiality and non-disclosure clauses required by the employment agreement (Section 7(a)), and provided Verfuerth with five months of leave pay, which differed from the benefits provided in his employment agreement. Verfuerth says that the company's proposed agreement went well beyond what was required by requiring him to resign as a director and to forego any rights he had as a shareholder for two years.

27

Both sides have reasonable arguments justifying their negotiating positions. Verfuerth claims the company was being overly demanding, while the company notes that its desire for a strong, general release was especially acute given the manner in which Verfuerth left and the accusations he continues to make against the Board and even the company's outside attorneys. Verfuerth's argument seems to be that the respective merits of the parties' justifications needs to be hashed out in front of jury. But that ignores what the employment agreement actually provides, which is that if he wanted severance benefits, Verfuerth had to execute a General Release including a release of the "board of directors . . . directors, officers, employees . . .," etc. *Id.* Such a release was an "additional prerequisite for receipt of the severance benefits." (ECF No. 20-1 at 15, § 5(b)). Because that prerequisite was never met, he is not entitled to benefits.

One expects Verfuerth's response would be that the company was being unreasonable by requiring things above and beyond what was agreed to in the employment agreement. Even if that were true, however, the fact remains that Verfuerth is suing the company for benefits for which a key precondition was never met. If a contract requires someone to do A, B, and C in order to receive D, he cannot expect to win a lawsuit when he has admitted that he did not fulfill all the conditions the contract clearly required. The contract does not say anything about emails or text messages with Board members, and in fact it requires nothing from Orion itself. Instead, it simply requires Verfuerth to execute and deliver a General Release if he wants severance benefits. Thus, if Verfuerth wanted to receive benefits, he could have signed and delivered a General Release that included exactly what is provided in § 2(j), including a release for the directors and lawyers. If the company rejected it and demanded additional concessions, then Verfuerth could argue that the company breached its obligation to pay severance benefits. He could point to § 2(j) and claim that he did exactly what was required in order to get benefits. That would be a breach, because one side

28

performed every precondition required by the contract and the other side failed to live up to its end of the bargain. Here, however, Verfuerth never executed a release that would meet the requirements of § 2(j). Verfuerth's arguments about his negotiations with the company are irrelevant because he never executed the "prerequisite" General Release that the agreement required.

## D. Constructive Discharge

Verfuerth also brought a claim alleging that he was constructively discharged. This is an unusual claim because constructive discharge is not itself an independent cause of action. *Strozinsky v. Sch. Dist. of Brown Deer,* 2000 WI 97, ¶ 69, 237 Wis. 2d 19, 58, 614 N.W.2d 443, 461 (Wis. 2000) ("We agree with the decision of the circuit court that constructive discharge is not a generic, free-flowing cause of action.") Instead, it simply describes a scenario whereby an employee's working conditions are rendered so intolerable that a reasonable employee would resign. So long as the employer does not violate any labor statutes or regulations, there is nothing inherently unlawful about intolerable working conditions. Instead, constructive discharge only arises when some *other* independent right is implicated, such as the right not to be discriminated against unlawfully. *See, e.g., Green v. Brennan,* 136 S. Ct. 1769, 1777 (2016). Typically the employer alleges that the employee resigned voluntarily and thus is ineligible to claim discrimination, while the employee asserts that her resignation was coerced by the defendant's conduct. *Drake v. Minnesota Mining & Mfg. Co.,* 134 F.3d 878, 886 (7th Cir.1998) (noting that the working conditions "must be intolerable because of unlawful discrimination.")

Here, Verfuerth argues that his "chairman emeritus" position was rendered "intolerable given the meaningless position that it was." (ECF No. 80 at 21.) Putting to one side the questionable premise that a jury would find it "intolerable" to receive a CEO's salary while doing

29

no work, the point is that it does not matter.[9]  There is no independent right to have a job that is "tolerable."  Many people quit their jobs because they are intolerable, but they do not get to sue their employers unless the jobs were rendered intolerable by something proscribed by statute or contract.  Here, Verfuerth's contract gave him certain options, as discussed above.  But there is no right *apart* from the contract, and Verfuerth has not alleged age, race or sex discrimination nor suggested the violation of any other statutory provisions.  Accordingly, the "constructive discharge" claim will be dismissed.

**E. Termination "For Cause"**

Verfuerth also claims that the company violated the employment agreement because it did not have cause to terminate his employment.  Among the company's principal stated reasons was that it had given him over $90,000 to pay his divorce lawyer, but he had instead retained the funds for his personal use.  (The company evidently did not want Verfuerth to have to sell company stock to pay his lawyer because investors do not like to see CEOs selling stock.)  Eventually his divorce lawyer obtained a judgment against him, and that information was circulated to the Board of Directors.  During negotiations, the company informed Verfuerth he would have to repay the company if he had paid his divorce lawyer less than the company had given him.  Verfuerth alleges that Foley attorney Steve Barth and others then began a scheme to use the legal fees issue as leverage in negotiations and to cite it as "cause" for his termination.  In his view, a jury must decide whether the company had "cause" or whether instead its stated reasons were a pretext.

Even if Verfuerth were correct, it is unclear why "cause" would matter at this point.  As set forth above, under the employment agreement the company could have terminated his employment

---

[9] "Working conditions are not 'intolerable' unless they are extremely severe, usually accompanied by physical danger."  *Drake,* 134 F.3d at 886.

*without* cause.  The only apparent difference is that Verfuerth would have been entitled to severance benefits if Orion terminated him without cause.  But, as described above, Verfuerth never executed a General Release, which was also a condition of receiving severance benefits.  Thus, even if the company lacked appropriate cause, he would not be entitled to benefits under the agreement.  Accordingly, he has not identified any damages to which he would be entitled even if a jury sided with him.[10]

## F. Stock Options

Verfuerth also argues, in almost cursory fashion, that the company's termination for "cause" resulted in him losing out on some 500,000 stock options worth more than $350,000.  First, it is unclear what "cause" has to do with stock options, because Verfuerth cites no provision of the employment agreement that ties the exercise of stock options to termination with or without cause.  Second, the instrument granting the stock options in the first place indicates that the options terminate not later than three months following termination of employment "for any reason other than death or disability."  (ECF No. 94-2 § 8.2.)  Thus, the company had the right to terminate the any options upon Verfuerth's termination, without respect to whether the termination was with or without cause.  This is reflected in the company's 2013 proxy statement, which indicates that the option awards "were cancelled in connection with Mr. Verfuerth's termination for cause in November 2012."  (ECF No. 86-3 at 15, fn. 10.)  Accordingly, any claim for unexercised stock options must fail.

---

[10]For the same reason, the company did not "convert" his severance package.

**G. Conversion of Stock**

Additionally, Verfuerth argues that the company converted his stock when Steve Barth interfered with Verfuerth's right to possess his restricted stock. To recall, Verfuerth's stock contained restrictions that could not be removed unless the company's counsel provided an opinion letter stating that the restrictions can be removed. In order to provide such an opinion, Orion's counsel required Verfuerth to sign an affidavit indicating, among other things, that he was not aware of any material non-public information that the company had not disclosed. (ECF No. 61-5.) Verfuerth argues that this was not required by any securities laws or regulations. Instead, all that would have been required is that he wait more than six months from the time he received the stock, which he did. In his view, therefore, Orion was exercising unwarranted control over securities that were rightfully his.

There are a number of problems with this claim, not least of which is that Verfuerth has not attempted to show how he was damaged. He signed the affidavit Orion wanted and then the restrictions were removed. His stock was deposited with Energy Bank, as he wanted it to be, and he has not argued that there was some kind of injury resulting from any delay.[11] Second, his shares contained a restrictive legend indicating that "the holder hereof may be required to furnish the corporation with any opinion of counsel satisfactory to the corporation to the effect that the transfer complies with applicable securities laws." (ECF No. 61-2 at 2.) Given what Verfuerth was alleging about the Board, the company reasonably could have wanted a robust opinion of counsel, and that

---

[11]He does suggest that the company extorted some 20,000 shares from him, but the record shows that this was a voluntary settlement of the company's outstanding demand that he reimburse it for the unpaid legal expenses he had received. (ECF No. 61-8.) This appears to be part of a pattern of Verfuerth voluntarily signing an agreement and then later claiming it was the product of coercion or part of some larger, darker conspiracy.

32

opinion was to be "satisfactory" to the company. Verfuerth had alleged a litany of fraudulent non-disclosures, and now he wanted to be able to transfer his company stock. Was it any surprise that the company wanted to ensure that any transfer would not *itself* be an act of securities fraud? In short, it is hard to envision how a company could be "converting" a person's restricted shares merely by demanding an opinion of counsel to which it is entitled.

**H. Duty of Good Faith**

Finally, Verfuerth alleges that the company breached the general covenant of good faith and fair dealing when it required him to agree to a release containing conditions above and beyond what the employment meant by a "General Release." He then argues that the company deprived him of his "contractual right to be CEO" (an absurdity discussed above) and denying him severance benefits.

It appears that Verfuerth has conflated the duty of good faith with the contract itself. To the extent he argues he had a contractual right to be CEO and was entitled to severance benefits, those arguments are identical to his breach of contract claims. To the extent he argues that Orion's negotiations were not in good faith, that does not state a claim. Parties to a negotiation are not limited to requesting the bare minimum of what they are entitled to. In Verfuerth's view, the simple fact that Orion wanted him to agree to more than what the employment agreement stipulated is itself bad faith, but if that were true then almost any negotiation would lack good faith because at least one side is trying to get more than the bare minimum for itself.

But that is of little moment. The implied duty of good faith and fair dealing, like "constructive discharge," is not a cause of action. "[T]he covenant of good faith and fair dealing has never been an independent source of duties for the parties to a contract. A lack of good faith does not by itself create a cause of action like a failure to exert best efforts creates when a contract

33

contains an implied best efforts obligation." *Beraha v. Baxter Health Care Corp.,* 956 F.2d 1436, 1443 (7th Cir. 1992); *Hauer v. Union State Bank of Wautoma,* 192 Wis.2d 576, 532 N.W.2d 456, 463–64 (Wis. Ct. App.1995)( the implied covenant "does not support an independent cause of action for failure to act in good faith under a contract.") Accordingly, there is no recovery under a "good faith" theory based the bargaining position taken by one side in a commercial transaction.

## III. Conclusion

For the reasons given above, Orion's motion for summary judgment is **GRANTED** and Verfuerth's motion is **DENIED**. The case is **DISMISSED**. The motions to restrict documents [79, 91] are **GRANTED**. The motion to supplement [103] is **GRANTED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** this 25th day of August, 2016.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court

34